**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------x
                                 :

In re:                               :     **Chapter 11**

ONE AVIATION CORPORATION, *et al.*,[1]  :     **Case No. 18-12309 (____)**
                                 :

          Debtors.         :     **Joint Administration Requested**
                                 :
------------------------------------------------------------x

## DECLARATION OF MICHAEL WYSE IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Michael Wyse, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that:

1.      I am the Chairman of the Board of Directors of ONE Aviation Corporation ("ONE Aviation"). As part of my employment and service, I have become familiar with the history, day-to-day operations, business, and financial affairs of the above-captioned debtors and debtors in possession (collectively, the "Debtors")

2.      I have held the position of Chairman of the Board of Directors of One Aviation since January 2018. Since 2015, I have served as Managing Partner of Wyse Advisors, LLC, a boutique firm focused on distressed/special situations. I have more than 19 years professional and restructuring experience, across all industries and all sizes, providing expertise in business development, strategic advisory, turnaround management, capital raises and solution facilitation. I have been involved in numerous public and private situations, both domestic and internationally. I have served as chief restructuring officer and as a member of numerous Boards

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: ONE Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986). The Debtors' corporate headquarters is located at 3250 Spirit Drive SE, Albuquerque, NM 87106.

of financially distressed companies.  My prior clients include: Soupman, Inc., Ensequence, Inc.,

Enron, WorldCom, Lucent/Ontel, Wheeling Pittsburgh Steel Corporation, Flying J, Kerzner

International, Fashion Bug, Fresh & Easy, Wholesale Sports, Orchard Supply, TFM / TMM

railroad, and numerous other private engagements.

     3.      On October 9, 2018 (the "Petition Date"), the Debtors commenced voluntary cases

(the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The

Debtors intend to continue in the possession of their respective properties and to manage their

business as debtors in possession.

     4.      Concurrently herewith, the Debtors have filed a motion seeking joint

administration that requests that the Chapter 11 Cases be consolidated for procedural purposes

only and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

     5.      I submit this declaration (this "Declaration") in support of the Debtors' chapter 11

petitions and "first day" motions (each, a "First Day Motion").  Except as otherwise indicated

herein, all facts set forth in this Declaration are based upon my personal knowledge of the

Debtors' operations and finances, information learned from my review of relevant documents,

information supplied to me by other members of the Debtors' management and the Debtors'

advisors, or my opinion based on my experience, knowledge, and information concerning the

Debtors' operations and financial condition.  I am authorized to submit this Declaration on

behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

6.        The Debtors comprise a private company that combines Eclipse Aerospace, Inc. ("EAI") and Kestrel Aircraft Company, Inc. ("Kestrel") products and personnel to research and develop, produce, deliver, service, upgrade, and provide technical support to the Eclipse line of aircraft (a twin-turbofan very light jet or "VLJ"), including a prospective updated version of the Eclipse 550 known as the Eclipse 700 that has already garnered a significant backlog of orders, and the Kestrel line of aircraft (a high-performance composite single turboprop-engined aircraft). The Debtors generate revenue from the following business lines:  aircraft sales; aircraft parts sales; training programs; upgrades (including large upgrades and structural maintenance); service (including general service, inspections, and product improvements); and refurbishment.  The aircraft refurbishment line of business allows the Debtors to capture value and revenue from their current fleet of jets through updating certain features of older jets and through the resell of aircraft into the secondary market.

7.        As set forth more fully below and as manifested in the First Day Motions, the Debtors come to the Court on the Petition Date having filed a prepackaged plan of reorganization (the "Plan"), which implements that certain restructuring support agreement, dated as of October 9, 2018 (the "Restructuring Support Agreement") between the Debtors and their senior prepetition lender, Citiking International US LLC ("Citiking"), and a disclosure statement relating to the Plan (the "Disclosure Statement").  The Debtors are also filing, concurrently herewith, a motion seeking to schedule (i) a combined hearing for the Bankruptcy Court to consider approval of the Disclosure Statement and the prepetition solicitation procedures, as well

01:23721662.1

as confirmation of the Plan (the "Combined Hearing"), and (ii) related objection and other
deadlines (the "Solicitation Procedures Motion").

8.      The Plan is the culmination of more than a year and a half of negotiations among
the Debtors, Citiking (including its predecessors), and other parties in interest and follows two
separate robust yet unsuccessful marketing and sale processes.  The primary features of the Plan
are as follows:

- Citiking will receive 100 percent of the New Class A Common Stock and 100 percent of the New Preferred Stock of Reorganized ONE Aviation Corporation in full satisfaction of its claims against the Debtors arising under the First Lien Credit Agreement (defined below).

- If the class of Senior Secured Noteholder Claims (as defined in the Plan) votes to accept the Plan, holders of such Claims will receive a pro rata share of (a) shares of New Class B Common Stock representing, in the aggregate, 3 percent of the total equity interests in Reorganized ONE Aviation as of the Effective Date, and (b) warrants to purchase, upon certain events and in the manner as described in the Plan, New Class B Common Stock representing, in the aggregate, an additional 3 percent of the total equity interests in Reorganized ONE Aviation.  If the class of Senior Secured Noteholder Claims does not vote to accept the Plan, the holders of such Claims will not receive any distribution under the Plan on account of such claims.

- General Unsecured Claims (as that term is defined in the Plan) will be discharged and extinguished and the holders will not receive or retain any property under the Plan on account of such claims.

01:23721662.1

9.      In addition, Citiking has agreed to provide the Debtors with a $17 million postpetition credit facility (the "DIP Facility") to ensure the Debtors have sufficient working capital to implement the Plan.  Rather than demand payment in full in cash, Citiking has agreed, pursuant to the Restructuring Support Agreement and Plan, to convert the DIP Facility into an exit facility upon emergence, providing the Debtors with continued access to liquidity even after the Debtors exit chapter 11.

10.      Under the circumstances, I believe that the Plan and DIP Facility collectively represent a significant achievement and present a dynamic roadmap to allow an expeditious restructuring of the Debtors' prepetition obligations while maximizing the value of the Debtors' estates for the benefit of all stakeholders.

## I.      GENERAL BACKGROUND

### A.      Debtors' Business and Overview

11.      Headquartered in Albuquerque, New Mexico, the Debtors are an original equipment manufacturer of twin-engine light jet aircraft.  Primarily serving the owner/operator, corporate, and aircraft charter markets, the Debtors are on the forefront of private aviation technology.  The Debtors have a strong market share in the VLJ segment with 286 aircraft in service globally and have dedicated significant investment in tooling and intellectual property with the potential to license intellectual property and establish foreign manufacturing capabilities with international partners.

12.      The Debtors provide maintenance and upgrade services for their existing fleet of aircraft through two Company-owned Platinum Service Centers in Albuquerque, New Mexico and Aurora, Illinois, five licensed, global Gold Service Centers in locations including San Diego, California, Boca Raton, Florida, Friedrichshafen, Germany, Eelde, Netherlands, and Istanbul, Turkey, as well as a research and development center located in Superior, Wisconsin.

01:23721662.1

13.    Presently, the Debtors employ approximately 64 employees.  During the 2017 calendar year, the Debtors had revenues of approximately $35 million on a consolidated basis. As of June 30, 2018, the Debtors' unaudited quarterly consolidated financial statements reflected assets with a book value totaling approximately $222 million and liabilities totaling approximately $256 million.

14.    The Debtors' business focuses on aircraft service and upgrades, aircraft remanufacturing, and new aircraft manufacturing and sales.  Through their aircraft service and upgrades operations, the Debtors have multiple maintenance programs, providing visibility into future revenue streams due to the recurring nature of the Federal Aviation Administration ("FAA") mandated maintenance and inspections.  Furthermore, the Debtors provide a variety of upgrades for aircraft, including enhanced avionics, and, because of the Debtors' ownership of type certificates, the Debtors have exclusive rights to replace most parts, provide service, and support Eclipse aircraft.

15.    The Debtors' remanufacturing business allows the Debtors to convert pre-owned aircraft to upgraded specifications to resell into the secondary market with full factory warranties.  Realizing the potential of this sector, the Debtors have invested significant near-term cash flow in supporting the Debtors' further upgrade potential that is in development.

16.    Finally, the Debtors have a history of excellence in new aircraft manufacturing and sales, including the Eclipse 500, Eclipse 550, and Eclipse SE models.  The Debtors believe this history will continue with the forthcoming next-generation Eclipse 700.  As of September 2018, the Debtors hold $1.5 million in escrow for 15 aircraft orders the Debtors received, and the Debtors are considering program plans that could result in 50 aircraft being delivered annually by 2024.  With state-of-the-art and fully integrated facilities of approximately 190,000 square

feet, the Debtors' believe their production tooling is capable of producing over 50 aircraft annually.

**B.     Early Corporate History**

17.     Eclipse Aviation Corporation ("EAC") was formed in 1999 by Vern Raburn, who served as the company's chief executive officer and president until July 2008.  EAC's signature product was the Eclipse 500 airplane, designed by Oliver Masefield.  Designed to be the industry's most cost-effective and fuel-efficient jet, the Eclipse 500 was the first aircraft to be certified under the then new VLJ class, and required that EAC design, construct, and establish a complete infrastructure to build the aircraft.

18.     Between 1998 and 2008, EAC received over $1.4 billion in investment, spurring the successful commercialization of the Eclipse 500 jet and later earning a FAA type certificate and production certificate.  Without these certificates, the manufacture, service, and development of airworthy aircraft in the U.S. and abroad is impossible.  EAC also received the prestigious Collier Trophy in 2005 for "technical innovation and the advancement of general aviation" in the VLJ class.  At one point, the Eclipse 500 had garnered over 700 orders and $70 million in deposit payments.

**C.     Acquisition by Eclipse Aerospace, Inc.**

19.     Despite the early success of the Eclipse 500, the business plan then in effect at EAC failed on two counts (1) EAC could not meet production goals and (2) could not meet costs requirements.  In other words, EAC could not deliver airplanes at the prices that were originally projected.  Inventory holdings increased based on unachieved production goals, and per-aircraft costs increased based in part on lower production volumes.  As a result, EAC continued to lose

larger-than-expected sums of money on each aircraft manufactured and could not reach a cash-flow-positive position in its operations, eventually forcing EAC to file for bankruptcy.

20.    EAC filed for chapter 11 bankruptcy in the Bankruptcy Court for the District of Delaware on November 25, 2008.  The chapter 11 case was ultimately converted to chapter 7 following an unsuccessful sale process.  EAI, an entity formed in 2009 with the specific purpose of acquiring EAC's assets, acquired the assets out of chapter 7 bankruptcy.

21.    Subsequently, the FAA reissued the US Eclipse 500 type certificate to EAI on September 30, 2009, and EAI opened for business.  Through 2012, EAI continued to produce the Eclipse 500.  In March 2013, EAI rolled out the Eclipse 550, which boasted an improved avionics package, including auto throttles, among other additional standard and optional improvements, making the Eclipse 550 one of the most advanced light jets available at the time.  EAI also holds the type and production certificates for the Eclipse 550.

**D.    New Focus**

22.    In 2015, EAI merged with Kestrel and formed ONE Aviation.  Kestrel, which formed in 2002, had been developing a high-performance single engine turboprop aircraft designated as "K-350."  By combining resources, the two companies intended to take advantage of one leadership and business-operation team, a single supply system, and one marketing and sales team.  With this combination, ONE Aviation believed it could actively provide maintenance and support on the existing Eclipse aircraft, and re-launched development and production of the Eclipse 550 jet.  In doing so, ONE Aviation simultaneously sought to modify the previous pricing model of the company through the commercialization of the new Eclipse 550 jet.

01:23721662.1

23.     The turn in business emphasis resulted in almost immediate results:  the Eclipse 550 jet was certified in March 2014 and 32 jets were subsequently manufactured and delivered. The company became profitable on a per unit basis, achieving over 50% gross margin per aircraft on deliveries utilizing pre-existing inventory and approximately 30% gross margin per aircraft on future aircraft.  Consequently, ONE Aviation received significant media attention and was featured in numerous international aviation magazines.

24.     Most recently, in 2016 and 2017, ONE Aviation invested considerable capital and effort in developing "Project Canada," a new model of VLJ and a marked improvement from the Eclipse 550 line, now known as the Eclipse 700.  The Debtors also continue to service the existing fleet of Eclipse aircraft profitably.  The Debtors' ultimate goal is to create a growing fleet of Eclipse aircraft, with the new Eclipse 700 jet providing more cabin room and industry leading performance, as well as to develop and manufacture add-on lines of aircraft to service other markets.

E.     **Business Plan**

25.     The Debtors are focusing on critical commercial markets, increasing their presence in the government sector, and expanding into new geographic markets.  The Debtors seek to maintain their focus on owner/operator and corporate customers both domestically and internationally by expanding into other previously untapped areas, including the air taxi, charter, and commercial flight training markets.  Finally, the Debtors seek to seize upon expanding into large international markets, where demand for private aviation from private businesses and state-owned companies has increased significantly.

26.     Although the Debtors have had to halt production due to the liquidity challenges that have necessitated the commencement of these Chapter 11 Cases, consummation of the

Debtors' Plan is expected to provide the Debtors with enhanced liquidity so that they can utilize their production capacity to meet new sources of demand.

### F.    The Debtors' FAA Certificates

27.    As mentioned above, the Debtors' hold the FAA type and production certificates for the Eclipse jet.  This is a point that deserves emphasis.  As holder of the certificates, the Debtors not only enjoy the exclusive rights to produce Eclipse aircraft, they also have the exclusive right to provide maintenance and support for the existing Eclipse fleet.  Moreover, the value of the Debtors' specialized assets connected to the production and maintenance of Eclipse aircraft is linked to the certificates—without the certificates, the related assets would lose significant value.

### G.    The Debtors' Corporate Structure

28.    The organizational structure of the Debtors is depicted on the chart attached hereto as **Exhibit A**.  As set forth on the organizational chart, privately held ONE Aviation is parent entity to each of the other Debtors through its 100% ownership of EAI, ACC Manufacturing, Inc., Aircraft Design Company, and OAC Management, Inc.  In addition, ONE Aviation is 90.6% owner, through Innovatus Holding Company, of Kestrel Aircraft Company, Inc. and its subsidiaries.

### H.    The Debtors' Prepetition Capital Structure

29.    As described in greater detail below, the Debtors owe approximately $198,801,602 in outstanding debt obligations (collectively, the "Prepetition Debt Obligations"), consisting of approximately: (i) $58,666,703 outstanding under the First Lien Credit Facility (defined below); (ii) $43,352,329 in Subordinated Secured Notes (defined below) outstanding; (iii) $20,580,426 in Subordinated Unsecured Notes (defined below); (iv) $2,905,586 in

additional unsecured notes outstanding; (v) approximately $53,274,753 representing amounts owed to various state and local governments in the form of development loans; (vi) approximately $10,821,805 in miscellaneous debt obligations; and (vii) approximately $9,200,000 in trade payables.  The Prepetition Debt Obligations are described in greater detail below.

30.     The following table summarizes the Debtors' prepetition capital structure:

| Debt | Approximate Amount Outstanding |
|---|---|
| **First Lien Credit Facility** | **$58,666,703** |
| Term Loan Facility | $48,428,625 |
| Revolving Loan Facility | $10,238,078 |
| **Subordinated Secured Notes** | **$43,352,329** |
| Series A-1 Senior Subordinated Secured Notes | $17,421,552 |
| Series A-2 Senior Subordinated Secured Notes | $24,930,777 |
| Holland Family Trust Note | $1,000,000 |
| **Subordinated Unsecured Notes** | **$20,580,426** |
| Series A-5 Subordinated Unsecured Notes | $12,522,179 |
| Mann Subordinated Unsecured Note | $6,482,779 |
| PZL Subordinated Unsecured Note | $1,575,468 |
| **Additional Unsecured Notes** | **$2,905,586** |
| City of Superior Note | $1,721,935 |
| Douglas County Note | $479,421 |
| Eaton Note | $704,230 |
| **Government Development Loans** | **$53,274,753** |
| Kestrel State Community Development Loans | $49,398,245 |
| MRRA Notes | $474,133 |
| WEDC Notes | $3,402,375 |
| **Miscellaneous Debt Obligations** | **$10,821,805** |
| Albuquerque Project Participation Agreement | $254,137 |
| K-350 Notes | $6,270,000 |
| Non-EAI Shareholder Notes | $4,297,668 |

| Trade Payables | $9,200,000 |
|---|---|
| **Total Debt** | **$198,801,602** |

### i.     First Lien Credit Facility Obligations

31.     Pursuant to that certain amended credit and security agreement, dated as of July 20, 2012 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"), by and among EAI and Brigadoon Aircraft Maintenance, LLC ("Brigadoon"), as borrowers, and Wells Fargo Bank, National Association ("Wells Fargo") as administrative agent and collateral agent ("Agent"), Wells Fargo provided the Debtors with (i) a term loan (the "Term Loan Facility") and (ii) a revolving line of credit (the "Revolving Loan Facility" and, together with the Term Loan Facility, the "First Lien Credit Facility").  ONE Aviation is a guarantor under the First Lien Credit Facility.  In connection with the First Lien Credit Facility, the borrowers and guarantors entered into security documents providing for first-priority liens on substantially all of the borrowers' and One Aviation's assets.

32.     Pursuant to that certain 10th Amendment to the First Lien Credit Agreement, dated April 20, 2015, Wells Fargo assigned the entirety of its rights and obligations under the First Lien Credit Facility to DWC Pine Investments I, Ltd. ("DWC").  Pursuant to that certain Lender Resignation and Agent Appointment, also dated as of April 20, 2015, Wells Fargo resigned as Agent and Wilmington Trust, National Association ("Wilmington Trust") was appointed as successor Agent under the First Lien Credit Agreement.

33.     Pursuant to that certain 11th Amendment to the First Lien Credit Agreement, dated July 8, 2015, Wilmington Trust resigned as Agent and Crystal Financial SBIC LP

("Crystal") was appointed successor Agent.  I understand that also as of July 8, 2015, Crystal

acquired a 25% interest in the First Lien Credit Facility.

34.     Pursuant to that certain last out participation agreement (the "Last Out

Participation Agreement"), dated November 9, 2016, by and among Crystal and Alan Klapmeier

("Klapmeier"), current CEO of ONE Aviation, Klapmeier became a Participant (as that term is

defined in the Last Out Participation Agreement) in the First Lien Credit Facility by making a

$250,000 payment to the Agent.

35.     Pursuant to that certain assignment and assumption agreement, dated November

13, 2017, Crystal assigned the entirety of its rights and obligations under the First Lien Credit

Facility to DWC.  Pursuant to that agent resignation and appointment, also dated as of November

13, 2017, Crystal resigned as Agent and Cantor Fitzgerald Securities ("Cantor Fitzgerald") was

appointed successor Agent.

36.     I understand that DWC later assigned 50% of its rights and obligations in the First

Lien Credit Facility to Citiking.  More recently, in July 2018, I became aware that, DWC

assigned all of its remaining rights and obligations in the First Lien Credit Facility to Citiking,

such that Citiking holds 100% of the rights and obligations under the First Lien Credit facility as

of the Petition Date.

37.     As of the Petition Date, approximately $48,428,625 in principal, inclusive of

interest, is outstanding on the Term Loan Facility and $10,238,078 in principal, inclusive of

interest, is outstanding on the Revolving Loan Facility.

   **ii.       Subordinated Secured Notes**

38.     On April 20, 2015, EAI issued those certain notes due October 20, 2017 in the

principal amount of $37,253,942.36, consisting of: (a) $15,324,323.61 of Series A-1 notes with a

current interest rate of 4.5% and (b) $21,929,578.75 of Series A-2 notes with a current interest

rate of 4.5% (collectively, the "Senior Subordinated Secured Notes"). In connection with the

Senior Subordinated Secured Notes, EAI entered into security documents providing for liens on

certain assets of EAI. As of the September 30, 2018, approximately $17,421,552 in principal,

inclusive of interest, is outstanding under the Series A-1 Senior Subordinated Secured Notes and

approximately $24,930,777 in principal, inclusive of interest, is outstanding under the Series A-2

Senior Subordinated Secured Notes for a total of approximately $42,352,329.

      39.     The relative rights, positions, and priorities of Citiking and the noteholders of the

Senior Subordinated Secured Notes (the "Senior Subordinated Secured Noteholders") with

respect to the assets and properties of the Debtors and the liens held by (i) the Agent on behalf of

Citiking (collectively, the "First Lien Secured Parties"), and (ii) the Bank of New York Mellon

Trust Company, N.A. ("BNY Mellon") as collateral agent on behalf of the Senior Subordinated

Secured Noteholders are set forth in that certain amended and restated intercreditor and

subordination agreement, by and among Wilmington Trust, BNY Mellon, and the Subordinated

Noteholders, dated as of April 20, 2015 (as amended, restated, amended and restated,

supplemented, or otherwise modified from time to time, the "Intercreditor and Subordination

Agreement"). Pursuant to the Intercreditor and Subordination Agreement, the Subordinated

Noteholders' (i) loans and other financial accommodations and (ii) liens on certain assets of EAI

are: (a) subordinate to the payment of any and all indebtedness of the First Lien Secured Parties,

and (b) subordinate to the liens of the First Lien Secured Parties.

      40.     On September 16, 2015, ONE Aviation issued that certain 6% Senior Secured

Promissory Note in favor of Holland Family Trust in the principal amount of $1,000,000 (the

"Holland Family Trust Note" and together with the Senior Subordinated Secured Notes, the

"Subordinated Secured Notes").  In connection with the Holland Family Trust Note, the

borrowers entered into security documents providing for liens on substantially all of ONE

Aviation's assets.  As of the Petition Date, $1,000,000 in principal, exclusive of accrued interest,

remains outstanding under the Holland Family Trust Note.  The liens pursuant to the Holland

Family Trust Note are subordinated to the First Lien Secured Parties' liens pursuant to the

Intercreditor and Subordination Agreement, to which Holland Family Trust is a signatory.

### iii. Subordinated Unsecured Notes

41.     On April 20, 2015, EAI issued those certain 5% Series A-5 subordinated

unsecured notes due October 20, 2017 (the "Series A-5 Subordinated Unsecured Notes") in the

principal amount of $10,570,397.26.  As of September 30, 2018, approximately $12,522,179 in

principal, inclusive of interest, is outstanding under the Series A-5 Subordinated Unsecured

Notes.  Payment of the Series A-5 Subordinated Unsecured Notes is subordinate to the payment

of the First Lien Credit Facility pursuant to that certain Unsecured Subordination Agreement (as

defined in the First Lien Credit Agreement).

42.     Also on April 20, 2015, EAI issued that certain amended and restated senior

subordinated note due 2017 (the "Mann Subordinated Unsecured Note"), in favor of Alfred E.

Mann, in the principal amount of $5,742,972.22 and a current interest rate of 4.5%.  The Mann

Subordinated Unsecured Note matured on October 20, 2017.  As of the Petition Date,

approximately $6,482,779 in principal, inclusive of interest, is outstanding under the Mann

Subordinated Unsecured Note.  Payment of the Mann Subordinated Unsecured Note is

subordinate to the payment of the First Lien Credit Facility pursuant to that certain Mann

Subordination Agreement (as defined in the First Lien Credit Agreement).

43.     Also on April 20, 2015, EAI issued that certain 5% Unsecured and Subordinated Note due October 20, 2017 in favor of Polskie Zaklady Lotnicze Sp. zo.o (the "PZL Subordinated Unsecured Note" and, together with the Series A-5 Subordinated Unsecured Notes and the Mann Subordinated Unsecured Note, the "Subordinated Unsecured Notes") in the principal amount of $1,344,001.16.  As of September 30, 2018, approximately $1,575,468 is outstanding under the PZL Subordinated Unsecured Note.  Payment of the PZL Subordinated Unsecured Note is subordinate to the payment of the First Lien Credit Facility pursuant to that certain PZL Subordination Agreement (as defined in the First Lien Credit Agreement).

### iv.     Additional Unsecured Notes

44.     On February 22, 2012, Kestrel issued that certain 2.356% note due October 15, 2021, in favor of the Redevelopment Authority of the City of Superior, Wisconsin in the principal amount of $2,660,000 (the "City of Superior Note").  As of the Petition Date, approximately $1,721,935 in principal, exclusive of accrued interest, is outstanding under the City of Superior Note.

45.     Pursuant to that certain loan agreement and renewed 3% promissory note, also dated as of February 22, 2012, by and among Kestrel and Douglas Country Revolving Loan Fund, Inc. ("Douglas County") (as renewed, the "Douglas County Note"), Douglas County provided Kestrel with a $500,000 loan.  As of the Petition Date, approximately $479,421 in principal, exclusive of accrued interest, remains outstanding under the Douglas County Note.

46.     On June 10, 2015, EAI issued that certain amended 2.25% note due August 2017 (the "Eaton Note"), in favor of Eaton Industrial Corporation ("Eaton") in the principal amount of $1,380,000.  As of the Petition Date, approximately $704,229 in principal, exclusive of accrued interest, is outstanding under the Eaton Note.

### v.    Community Development Loans

47.    Pursuant to that certain loan agreement, dated April 20, 2011 (the "CCM Loan"), by and among Kestrel Brunswick Corporation ("KBC") and CCM Community Development XXIII LLC as lender ("CCM"), CCM provided KBC with a $19,706,449 loan with a current interest rate of 2.021%.  In connection with the CCM Loan, KBC entered into security documents providing for liens on substantially all of KBC's assets.  Kestrel is a guarantor of the CCM Loan.

48.    Pursuant to that certain loan agreement, dated August 2, 2012 (the "KM Loan" and together with the CCM Loan, the "Kestrel State Community Development Loans"), by and among Kestrel Manufacturing, LLC as borrower ("KM") and WCDLF SUB CDE XXXVI, LLC as lender ("WCDLF"), WCDLF provided KM with a $30,000,000 loan with a 2.215% interest rate.  In connection with the KM Loan, KBC entered into security documents providing for liens on substantially all of KM's assets.  Kestrel is a guarantor of the KM Loan.

49.    As of the Petition Date, approximately $49,398,245 in principal, exclusive of accrued interest, is outstanding under the Kestrel State Community Development Loans, net of debt issuance costs.  The Kestrel State Community Development Loans were made pursuant to the New Market Tax Credit Program (the "NMTC Program"), which is a federal program that incentivizes community development and economic growth through the use of tax credits that attract private investment to distressed communities.

50.    On December 31, 2013, Kestrel issued those certain 6% Promissory Notes in favor of Midcoast Regional Redevelopment Authority (the "MRRA Notes") in the principal amounts of $312,277.29 ("MRRA Note 1") and $50,000 ("MRRA Note 2" and together with MRRA Note 1, the "MRRA Notes").  In connection with MRRA Note 1, Kestrel entered into

security documents providing for liens on the property described therein.  In connection with

MRRA Note 2, Kestrel entered into security documents providing for liens on the property

described therein.  As of the Petition Date, approximately $474,133 in principal, exclusive of

accrued interest, is outstanding under the MRRA Notes.

51.     Pursuant to that certain loan agreement and 2% promissory note due May 1, 2020,

by and among Kestrel and the Wisconsin Economic Development Corporation ("WEDC") (as

amended, restated, amended and restated, supplemented or otherwise modified from time to

time, "WEDC Note 1"), WEDC provided Kestrel with a $2,000,000 loan.  Pursuant to that

certain loan agreement and 2% amended promissory note due October 1, 2020, by and among

Kestrel and WEDC (as amended, restated, amended and restated, supplemented or otherwise

modified from time to time, "WEDC Note 2" and together with WEDC Note 1, the "WEDC

Notes"), WEDC provided Kestrel with another $2,000,000 loan.  The WEDC Notes were issued

pursuant to the U.S. Treasury administered State Small Business Credit Initiative created under

the State Small Business Credit Initiative Act of 2010.

52.     In connection with the WEDC Notes, Kestrel entered into security documents

providing for liens on all assets now owned or hereinafter acquired by Kestrel, which shall be

acquired by Kestrel through Kestrel Aircraft Corporation ("KAC") in Wisconsin, to be shared on

a pro-rata basis with the providers of any other public loan assistance.  As of the Petition Date,

approximately $3,402,375 in principal, exclusive of accrued interest, is outstanding under the

WEDC Notes.

### vi.     Miscellaneous Debt Obligations

53.     On March 4, 2014, EAI and the City of Albuquerque, New Mexico ("City of

Albuquerque") entered into that certain project participation agreement (as amended from time to

time, the "Project Participation Agreement") pursuant to which the City of Albuquerque

provided EAI with $254,137.32 in combined City and State of New Mexico Local Economic

Development Act (LEDA) funding, which amount remains outstanding as of the Petition Date.

In connection with the Project Participation Agreement, EAI entered into security documents

providing for liens on certain aircraft and engines owned by EAI.

54.     I understand that in 2011 Kestrel issued certain 2.5% promissory notes (the "K-350 Notes") in the total principal amount of £4,800,000 in connection with its acquisition of the

K-350 plane program.  I further understand that the current holders of the K-350 Notes are

Kestrel's non-Debtor minority equity holders Anthony Galley, Maxine Galley, and Adrian

Norris, and that, as of the Petition Date, approximately £4,800,000 (or $6,270,000 at the current

exchange rate) in principal, exclusive of accrued interest, remains outstanding under the K-350

Notes.

55.     Upon information and belief, there are approximately $4,297,668 in non-EAI

shareholder notes outstanding as of the Petition Date.

### vii.          Trade Obligations

56.     As of the Petition Date, the Debtors owe their trade vendors approximately $9.2

million.  These trade vendors provide a variety of services and goods to the Debtors, including,

but not limited to, individual parts and components, varying from raw materials to major

assemblies, such as engines, avionics, and wings and include third-party shipping and

warehousing providers, mechanics, and information-technology and professional service

providers.

## II.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    Lack of Global Economic Confidence and the Impact on the Debtors in the Global Aviation Industry

57.    Prior to 2015, ONE Aviation's various ownership groups pursued a business strategy targeting a new "air taxi" industry in the hopes this would increase demand for VLJ aircraft.  This industry, however, did not come to fruition.  Following this period, the company pursued a strategy to undertake development of new airplane models (Eclipse 700 and K-350).  That strategy ultimately proved unsuccessful in the near term because, in addition to the negative macro-factors, including the condition of the U.S. and global economies, ONE Aviation was unable to raise the capital needed to complete the new airplane programs.  The VLJ market, a market dependent on luxury spending, simply had not recovered from its downturn in 2008.

58.    To be sure, however, there is undoubtedly still a market for this niche product.  New markets are opening up, particularly the potentially robust and valuable Chinese market.  To participate fully in this growing market, a large portion of the capital needed must be spent up front before a return can be realized.

59.    To stay competitive and develop cutting-edge technology, EAC and EAI combined have invested $1.4 billion over the past 19 years in products and technologies, including some investment in the development of the next-generation Eclipse 700 model.  The need to invest in newer engines with higher thrust and higher-capacity generators, higher-capacity batteries, strengthened landing gear, improved aerodynamics, increased fuel capacity, and new electronics systems governing the air data system, autopilot system, Avionics Control Systems, and data signaling unit systems entail substantial up-front expenditures that require financial investment over and above the current capabilities of the Debtors.  The long lead times inherently found in aircraft development and manufacturing thus drive performance trends in the

business and general aviation industry, which have historically lagged behind trends in general economic conditions and corporate profits.

60.     As a result, the Debtors' financial performance—including liquidity—declined significantly as they sought to stay operational and they were not able to raise the necessary additional capital to pursue market expansion and development of the EA700.  Although the Debtors were successful in arranging for a commitment of capital in 2015, the contributions were not made according to the expected time-frame, around which the Company's business plan was, in part, premised.  Accordingly, without sufficient capital coming at the expected time, the Company was forced to divert resources away from research and development to fund operations.  This delayed the Company's ability to certify its next generation of aircraft.  Considering the deterioration in the Debtors' performance, the Debtors realized that they would need to implement certain initiatives to stabilize their operations and return to long-term profitability.

### B.     The Debtors' Prepetition Restructuring Efforts

61.     Beginning with the onset of a shortage of capital, the Debtors began to evaluate all aspects of their business with an eye toward aligning their operations and cost-structure to with declining demand in the global aviation industry.  This evaluation resulted in the implementation of a number of significant financial, operational, and personnel changes.

62.     First, in late 2016 the Debtors hired Paul Hastings LLP to serve as legal counsel in connection with the Debtors' assessment of their restructuring alternatives.  The Debtors also engaged with the lenders under the First Lien Credit Agreement (the "Prepetition First Lien Lenders") to address an impending maturity date and attempt to alleviate immediate liquidity concerns.  As a result, since 2016 the Debtors and Prepetition First Lien Lenders entered into a series of amendments to the First Lien Credit Facility that extended the maturity dates on an

01:23721662.1

iterative basis and provided access to additional liquidity by establishing a revolving loan facility.  These amendments also required the Debtors to explore additional restructuring alternatives, including seeking financing, engaging in significant cost-reduction measures, and conducting a marketing and sale process to find buyers interested in purchasing the Debtors' assets through either an in-court or out-of-court process.

63.     Second, to assist the Debtors with their potential marketing and sale process, the Debtors, with the consent of the Prepetition First Lien Lenders, engaged Guggenheim Securities ("Guggenheim") to act as investment banker on February 17, 2017.  Guggenheim launched a marketing and sale process in the second quarter of 2017.  Upon information and belief, Guggenheim contacted 95 financial investors and 14 strategic investors.  Guggenheim sent out 72 teasers and 19 non-disclosure agreements were executed.  Two interested parties submitted indications.  The Board (as defined below) reviewed each proposal and made a determination that both proposals lacked certainty to close, either because the indication was subject to the raising of significant additional capital or did not result in a value-maximizing solution based on its terms and conditionality.  In sum, the Debtors and Guggenheim did not receive any viable bids from this process, and the Debtors and Prepetition First Lien Lenders returned to the negotiating table to explore additional restructuring alternatives.

64.     In connection with Guggenheim's engagement, on March 29, 2017, the Debtors also retained Guotai Junan Securities USA, Inc. as their exclusive financial advisor in mainland China to assist the Debtors with their recapitalization efforts.  Upon information and belief, no credible or viable investor or potential buyer came forward.

65.     After spending several months operating at a net negative cash flow basis but without any solution to the Debtors' liquidity issues, the Debtors, after carefully evaluating the

situation with their professionals, and the Prepetition First Lien Lenders decided that the Prepetition First Lien Lenders would serve as the stalking horse bidder for the Debtors' assets. Given this revised restructuring scenario, the Debtors, with the consent of the Prepetition First Lien Lenders, decided to hire Duff & Phelps as investment banker to re-engage the marketing and sale process in a final out-of-court attempt to find a third-party buyer for the Debtors' assets. Duff & Phelps commenced its new marketing and sale process at the beginning of 2018.

66.    The sale process contemplated a broad outreach to a large list of potential buyers, including strategic buyers, financial buyers with investments in aerospace, and buyers of distressed assets.  The sale process included buyers worldwide, including North and South America, Europe, the Middle East, and Asia.  The sale process also provided buyers with three potential alternatives for operation of the Debtors' business post-transaction: (a) a continuation of the Debtors' business servicing existing aircraft only; (b) refurbishment and resale of existing aircraft with improved avionics; and (c) investment in, and development of, next-generation aircraft.

67.    On January 22, 2018, the Debtors re-launched their sale process. Communications between Duff & Phelps and potential acquirers began immediately after the launch and increased during the following weeks.  Duff & Phelps contacted a total of 161 strategic and 315 potential financial investors, distributing a teaser regarding the sale to a total of 476 potential buyers, but this time with a view towards effectuating any potential transaction through a chapter 11 process.  More than 100 potential buyers engaged with Duff & Phelps following the initial launch, and 41 executed non-disclosure agreements to receive more information and were provided a confidential information memorandum with detail on the Debtors' business.  Throughout this process, Duff & Phelps and the Debtors worked closely to

respond to bidder inquiries, strategize ways to encourage participation and bids, and advance

bidders through the process, all with an eye toward maximizing competition and value.

68.     The deadline for submission of bids was February 16, 2018.  Despite the

extensive outreach process, and subsequent efforts to re-engage with interested potential buyers,

the sale process resulted in no viable bids for the Debtors' business or assets.  One potential

buyer did come forward and the Debtors extended their process to allow further discussions and

diligence to take place.  Ultimately, this potential buyer did not move forward, and in fact, never

moved beyond receiving the NDA.  The Board and Duff & Phelps continue to speak with

prospective investors, but have not received any form of indication of interest from them to date.

69.     While the marketing process unfolded, the Debtors also attempted to restructure

and manage their cash flow by stretching trade terms with various vendors, suppliers, partners,

former employees, and other creditors.  Certain of these parties, unhappy with their outstanding

balances, sought to enforce their rights, first by letter writing, and next, through formal collection

actions.  For example, Henry Orlosky, Edward M. Lundeen, former Senior Vice President at

EAI, Ken Ross, former executive of EAI, and Living Benefits Asset Management, LLC

("LBAM") have, respectively, either commenced litigation against one or more of the Debtors or

have taken acts to obtain possession of the Debtors' aircraft and other property as a result of

enforcing their default judgments.

70.     With the Debtors in current default under the First Lien Credit Facility and facing

a string of collection actions, and with their production operations having come to a halt due to

lack of liquidity, the Debtors determined that it was in the best interests of the company and their

stakeholders to effectuate a consensual restructuring through a prepackaged plan of

reorganization pursuant to which prepetition first lien debt, now held entirely by Citiking, would be converted to equity in the reorganized Debtors.

71.     Third, during pendency of the Debtors' exploration of viable restructuring alternatives, the Debtors determined that it was desirable and in the best interest of North American Jet Charter Group, LLC ("NAJ") to approve a sale of the Debtors' membership interest in NAJ to Orion Aviation Holdings, LLC ("Orion") in exchange for Orion assuming certain liabilities of NAJ and the Debtors assuming certain liabilities of NAJ.

72.     Fourth, the Debtors continued to pare down their operations to more manageable units.  In October 2017, ONE Aviation engaged in a reduction in force ("RIF") that streamlined the 200 employees to approximately 74 and reduced the Albuquerque facility lease costs, through exiting of unnecessary space.  The RIF was an important aspect of the Debtors' restructuring efforts and significantly reduced payroll expenses contemplated thereby on a go-forward basis.  In turn, the Debtors hope that more efficient operations will contribute to a decrease in overall costs.

73.     Fifth, the Debtors made internal leadership changes.  More specifically, One Aviation reconstituted its board of directors (the "Board") and appointed Kevin Gould, Alan Klapmeier, Jonathan Dwight, R.J. Siegel, and myself to the Board.  In addition, I was appointed to the position of Chairman of the Board.

### C.     Negotiations With the Prepetition First Lien Lenders

74.     After going through two separate sale and marketing processes for the Debtors' business, and given the Debtors' inability to completely rationalize their operational performance and financial position, the Debtors and the Prepetition First Lien Lenders entered into negotiations to effectuate a transaction through the chapter 11 process that would result in the Prepetition First Lien Lenders converting their debt to equity.  The Debtors engaged in parallel

01:23721662.1

negotiations with the Prepetition First Lien Lenders and third parties to secure DIP financing on the best terms possible.  The Debtors negotiated at arm's-length and in good faith, ultimately securing a DIP from Citiking in the amount of $17 million

75.     The Debtors commenced these Chapter 11 Cases to effectuate the best relief available to the Debtor.  By securing in advance the substantial support for DIP financing, the Debtors now have a clear path for a successful chapter 11 restructuring that will enhance liquidity, reduce leverage and annual interest expense, and improve long-term growth prospects and operating performance.

### III.     RELIEF SOUGHT IN THE DEBTORS' FIRST DAY PLEADINGS

76.     To allow the Debtors to operate effectively postpetition and to ensure a smooth transition into chapter 11, with minimal disruption to the Debtors' business, the Debtors have filed various First Day Motions.  The First Day Motions request various types of relief that debtors traditionally seek in the beginning stages of chapter 11 cases in order to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

### Summary of First Day Motions[2]

77.     To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file in the near term, the motions and applications described below.

78.     In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth

---

[2]     Capitalized terms used but not defined in this section shall have the meanings given them in the relevant First Day Motion.

more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and will assist in their reorganization efforts.

### A.   Administrative and Procedural Motions

**i.   *Debtors' Motion for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* (the "<u>Joint Administration Motion</u>")**

79.    The Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, ONE Aviation Corporation.

80.    Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, notices and hearings, and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable Debtors to continue to operate their businesses in chapter 11 with the least disruption.

### B.   Operational Motions

81.    The Debtors have filed the following First Day Motions seeking immediate relief necessary for the continued operation of the Debtors' business.

    i.       ***Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Secured Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing*** (the "<u>DIP Financing Motion</u>")

82.    The Debtors request that the Court approve the Debtors' entry into a postpetition revolving credit facility in the aggregate principal amount of $17 million (the "<u>DIP Facility</u>"), provided by Citiking (the "<u>DIP Lender</u>").  Rather than demand payment in full in cash, the DIP Lender has agreed, pursuant to the Restructuring Support Agreement and Plan, to convert the DIP Facility into an exit facility upon emergence, providing the Debtors with continued access to liquidity even after the pendency of the Chapter 11 Cases.  In connection with the DIP Facility, the DIP Lender has agreed to support the terms of a specific restructuring pursuant to the Plan Restructuring Support Agreement and Plan.

83.    The Debtors were able to obtain the terms of the DIP Facility based on many months of hard fought, arm's-length negotiations with their key stakeholders.  Moreover, the Debtors are unable to obtain such financing as unsecured credit pursuant to section 364(a) or (b) of the Bankruptcy Code, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.

84.    Absent the Debtors' ability to use Cash Collateral and to implement the adequate protection arrangements proposed therein, the Debtors would lack sufficient available sources of capital and would be unable to pay their restructuring expenses, to the severe detriment of the estate and creditors.  However, I also believe the use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.  I believe the DIP Facility provides liquidity that is essential to fund the administrative cost of these Chapter 11 Cases and, critically, to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors that are the lifeblood of the

Debtors' businesses.  Without access to the DIP Facility, I believe the Debtors likely would need to liquidate in the near term, to the serious detriment of their stakeholders.

85.     I believe that the DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases as the Debtors seek to implement the restructuring contemplated by the Plan.  Finally, I believe that the DIP  Facility is on the most favorable terms available, presents the best—and likely only—option for the Debtors to reorganize their businesses as a going concern, was negotiated in good faith and at arm's length, and will allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

86.     In light of the foregoing, and based upon the additional reasons as set forth in the *Declaration of Vineet Batra, Managing Director of Duff & Phelps Securities LLC in Support of the Proposed Debtor in Possession Financing Facility and the Joint Prepackaged Chapter 11 Plan of Reorganization of One Aviation Corporation and Its Debtor Affiliates* filed concurrently herewith, I do not believe that alternative sources of financing with terms as favorable as those of the DIP Facility are available to the Debtors.  I believe the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors were denied the liquidity that would be provided by the DIP Facility pursuant to the interim order and the final order.  Accordingly, I submit that the DIP Motion should be approved.

**ii.     *Debtors' Motion for Entry of Interim and Final Orders  (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Continue Intercompany  Transactions, and (C) Maintain and Use Existing Bank Accounts and Check Stock and (II) Waiving the Requirements of Section 345(b)of the Bankruptcy Code on an Interim Basis* (the "<u>Cash Management Motion</u>")**

87.     Prior to the Petition Date and in the ordinary course of their business, the Debtors maintained a centralized cash management system to manage the collection, transfer, and

disbursement of funds generated by their business operations, and to supervise, control, and accurately record such transactions (the "Cash Management System").  The Cash Management System is consistent with those employed by other business organizations of similar size and scope.

88.    I understand that the guidelines promulgated by the U.S. Trustee require each debtor in a chapter 11 case to, among other things, close all existing bank accounts and open new accounts that must be designated as debtor-in-possession bank accounts.  Contemporaneously herewith, the Debtors have filed the Cash Management Motion requesting a waiver of these requirements, requesting authorization to continue to manage their cash receipts and disbursements in the manner in which they were managed prior to the Petition Date, and requesting related relief.

89.    I believe that the Debtors' existing Cash Management System and related intercompany accounting procedures are vital to the orderly operation of the Debtors' business. Strict compliance with the U.S. Trustee requirements would cause confusion, disrupt payroll, place unnecessary stress on the Debtors' relationships with vendors and other critical third parties, and introduce inefficiencies and added expenses and administrative burdens at precisely the worst time.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

iii.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Payments*** (the "Wages Motion")

90.    The Debtors have filed a motion seeking entry of orders (i) authorizing, but not directing, the Debtors to (a) pay certain employee compensation and benefits and (b) maintain

and continue such benefits and other employee-related programs, and (ii) authorizing the

Debtors' banks and financial institutions to honor and process checks and transfers related to

such payments.

91.     In the ordinary course of their business, the Debtors incur payroll and employee

benefits obligations to their employees for the performance of their services to the Debtors.  As

of the Petition Date, the Debtors employ approximately 64 individuals (the "Employees"):

EAI employs approximately 48 individuals; ONE Aviation employs approximately 9 individuals;

Kestrel Manufacturing, LLC, Inc. employs approximately 5 individuals; and DR Management,

LLC employs approximately 2 individuals.

92.     Of the Debtors' Employees, 24 Employees are paid on an hourly basis and 40

Employees are paid on a salaried basis.  In addition, the Debtors employ approximately one

independent contractor, though that number fluctuates, who performs various services on behalf

of the Debtors on a contractual basis.

93.     The Debtors have incurred obligations with respect to the Employees relating to

the period prior to the Petition Date.  Certain of these costs and obligations are outstanding, due,

and payable, while others will become due and payable in the ordinary course of the Debtors'

business after the Petition Date.  The Debtors' ability to operate their business depends on the

continued loyalty and morale of their workforce.  As a service-oriented business, any delay in the

processing of regular payments to Employees would cause the Debtors and their business

irreparable harm.

94.     For the reasons stated above, and explained more fully in the Wages and

Employees Motion, I believe that the relief sought therein is necessary for a successful

reorganization and is in the best interests of the Debtors, their estates, their creditors, and all

other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Employees Motion should be approved.

       iv.      ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Domestic and Foreign Vendors and Administrative Claimholders and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Payments* (the "Critical Vendors Motion")**

95.      The Debtors seek entry of orders (i) authorizing, but not directing, the Debtors to pay, in their sole discretion and in the ordinary course of business, the prepetition claims of certain critical vendors and service providers, subject to the conditions described in the Critical Vendors Motion (the "Critical Vendor Payments"), and (ii) authorizing the Debtors' banks and financial institutions to honor and process checks and transfers related to such payments.

96.      In the ordinary course of business, the Debtors make payments to certain vendors and suppliers (the "Critical Vendors") who supply raw materials, custom components, and shipping, warehousing, and other services that are vital to the Debtors' continued operations and ability to generate revenue.  As discussed in greater detail in the Critical Vendors Motion, the Debtors have spent considerable time analyzing which of their vendors are absolutely necessary to their successful reorganization efforts and fashioning limited relief.  Absent the cooperation of these Critical Vendors, the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions.

97.      For the reasons stated above, and explained more fully in the Critical Vendor Motion, I believe that the relief sought therein is necessary for a successful reorganization and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be approved.

01:23721662.1

> **v.** **_Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Honor Prepetition Obligations to Customers and Continue Certain Customer Programs and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations_** (the "**Customer Programs Motion**")

98.    In the ordinary course of their businesses, the Debtors' agreements with their Customers include certain sales and pricing practices including, without limitation: (i) warranty programs; (ii) maintenance programs; (iii) training programs; (iv) discount programs; (v) deposits; and (vi) credits (collectively, the "Customer Programs"). The Customer Programs are, for the most part, performance obligations aimed at preserving customer loyalty and the Debtors' reputation for safety and service. As such, continuation of the Customer Programs does not require significant cash expenditures in most instances, but is critical to maintaining certain aspects of the Debtors' revenue. Through the Customer Programs Motion, the Debtors request authority to continue to honor obligations related to these programs in the ordinary course of business.

99.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

> **vi.** **_Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Adequate Assurance of Payment for Postpetition Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services, and (III) Approving Debtors' Proposed Procedures for Resolving Additional Assurance Requests_** (the "Utilities Motion")

100.    The Debtors have filed a motion seeking entry of orders: (i) approving the Debtors' proposed adequate assurance of payment for postpetition utility services;

01:23721662.1

(ii) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of any outstanding amount for services rendered prepetition; and (iii) approving the Debtors' proposed procedures for resolving adequate assurance requests.

101.    In connection with the operation of their businesses and management of their estates, the Debtors obtain electricity, internet, telephone, natural gas, water, sewer, and other similar services (collectively, the "Utility Services") from a number of utility companies or their brokers (each a "Utility Company," and collectively, the "Utility Companies").

102.    Historically, the Debtors spent, on average, approximately $58,800 each month for Utility Services.

103.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of the Chapter 11 Cases.  ONE Aviation requires electricity and phone services to maintain customer relationships and professional appearance to its client base.  Further, utilities at the Albuquerque site keep services, manufacturing, and repairs running.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed.  Accordingly, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

104.    For the reasons stated above, and explained more fully in the Utilities Motion, I believe that the relief sought therein is necessary for a successful reorganization and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

01:23721662.1

**vii.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Taxes and Fees and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* (the "Taxes Motion")**

105.    The Debtors seek entry of orders (i) authorizing them to pay various prepetition sales, franchise, and other similar taxes, as well as fees for licenses, permits, and other similar charges and assessments, including any penalties and interest thereon, (collectively, the "Taxes and Fees") to various governmental and other licensing authorities in the United States (the "Taxing Authorities") and (ii) authorizing the Debtors' banks and financial institutions to honor and process checks and transfers related to such payments.

106.    In the ordinary course of business, the Debtors collect and/or incur Taxes and Fees.  The Debtors pay the Taxes and Fees on a monthly, quarterly, or annual basis to the Taxing Authorities in accordance with applicable laws and regulations.  The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing Authorities will not exceed approximately $585,000.  The Taxes and Fees are described in the Taxes and Fees Motion.

107.    The relief requested within the Taxes and Fees Motion is appropriate because, as described therein, the sales taxes the Debtors collect on behalf of the Taxing Authorities are likely not property of the Debtors' estates.  Moreover, non-payment of the prepetition Taxes and Fees will cause avoidable, immediate and irreparable harm to the Debtors because it (a) would cause the Debtors to incur substantial, irreversible tax penalties from governmental authorities that are likely to be paid in full and in cash as priority claims under section 507(a)(8) of the Bankruptcy Code, (b) could prevent the Debtors from operating their business, and (c) could expose certain directors and officers of the Debtors to personal liability for certain unpaid Taxes and Fees.

108.    The Debtors seek authority to remit and pay any Taxes and Fees in the ordinary course of business, whether those amounts accrued before or after the Petition Date.  I believe that the authority to pay Taxes and Fees in the ordinary course of business is in the best interest of the Debtors and their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

> **viii.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing but Not Directing Debtors to (A) Maintain Their Insurance Program, (B) Pay All Prepetition Obligations in Respect Thereof, and (C) Continue Insurance Premium Financing Program and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Payments*** (the "<u>**Insurance Motion**</u>")

109.    The Debtors seek entry of orders (i) authorizing, but not directing, the Debtors to continue their workers' compensation and insurance programs and (ii) authorizing the Debtors' banks and financial institutions to honor and process checks and transfers related to such payments.

110.    In the ordinary course of their business the Debtors maintain insurance coverage including, without limitation, the Workers' Compensation Program, the Professional Liability Policies, commercial general liability, automobile liability, umbrella, directors' and officers' liability, crime, cyber liability, workers' compensation, and various other property and casualty liabilities, including certain excess policies and reinsurance and policy stop loss programs (collectively, the "<u>Insurance Program</u>") and incur obligations in connection with the Insurance Program (collectively, the "<u>Insurance Program Obligations</u>").  The Debtors pay approximately $840,000 in aggregate annual premiums for the Insurance Policies.

111.    It is not always economically advantageous for the Debtors to pay the premiums on some of the insurance policies on a lump-sum basis.  Accordingly, the Debtors pay certain amounts of their insurance premiums on an installment basis in monthly installments to the

Insurance Carriers pursuant to two insurance premium finance agreements (the "Premium Finance Agreements") with Aon Premium Finance, LLC (the "PFA Lender").

112.    Pursuant to the Premium Finance Agreements, the PFA Lender has agreed to pay the insurance premiums related to (i) the Workers' Compensation Program and various property and certain other Insurance Policies (the "WC Financed Policies") in exchange for an initial payment of $28,713.42 and 11 monthly payments of $28,713.42,  and (ii) the  aviation liability and similar Insurance Policies (the "Aviation Financed Policies" and together with the WC Financed Policies, the "Financed Polices") in exchange for an initial payment of $95,791.00 and 9 monthly payments of $44,100.00.  The Debtors have made both initial payments for the Financed Policies and the first six monthly payments for the WC Financed Policies, as well as, the first five monthly payments for the Aviation Financed Policies.  As of the Petition Date, the Debtors are (i) current on monthly payments for the WC Financed Policies and the next monthly payment is due mid-October 2018 and (ii) one month in arrears in the amount of $44,100.00 with respect to the Aviation Financed Policies and the next monthly payment is due mid-October 2018.  Consequently, the Debtors believe that they do not have outstanding liability on account of their WC Financed Policies and have an outstanding liability of approximately $44,100 on account of their Aviation Financed Policies.

113.    In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing their insurance premiums, the Debtors believe it is in the best interest of the Debtors and their estates to honor the Premium Finance Agreements.  Accordingly, the Debtors seek authorization pursuant to section 363(c) of the Bankruptcy Code to honor their Insurance Program Obligations the ordinary course of business and pay any such obligations, in their discretion, as they come due.

114.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

ix.    ***Debtors' Motion for Entry of an Order (I) Scheduling Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing the Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Form and Manner of Notice, (V) Directing That a Meeting of Creditors Not Be Convened, and (VI) Conditionally Waiving Requirement of Filing Schedules and Statements*** (the "Solicitation Procedures Motion")**

115.    The Debtors are pursuing an expedited plan confirmation process to implement the consensual prepackaged Plan, which has support from the Debtors' primary stakeholders.  To that end, the Debtors are filing the Solicitation Procedures Motion, requesting that the Bankruptcy Court approve and/or schedule certain confirmation-related dates and deadlines on the following timeline:

| Event | Date[3] |
|---|---|
| Voting Record Date | October 9, 2018 |
| Commencement of Solicitation | October 9, 2018 |
| Petition Date | October 9, 2018 |
| Mailing of Notice | October 12, 2018 |
| Voting Deadline | October 31, 2018 |
| Plan Supplement Deadline | November 6, 2018 |
| Objection Deadline | November 9, 2018 |
| Reply Deadline | November 13, 2018 |
| Confirmation Order Deadline | November 13, 2018 |
| Confirmation Brief Deadline | November 13, 2018 |

---

[3]    Certain of the proposed dates are subject to the Court's availability.

01:23721662.1

Combined Hearing                          November 19, 2018

116.    The Debtors commenced the solicitation of votes on the Plan before the Petition

Date in accordance with the following Solicitation Procedures and applicable provisions of the

Bankruptcy Code and Bankruptcy Rules.  Specifically, on October 9, 2018, the Debtors caused

its solicitation agent, Epiq Corporate Restructuring, LLC (the "Solicitation Agent")[4] to distribute

a solicitation package containing the Disclosure Statement, the Plan, and the Ballot

(the "Solicitation Package") to Citiking International US LLC, agent nominee for voting

purposes (in such capacity, the "Agent") for the holders of Class 3 First Lien Credit Agreement

Claims and to holders of Class 4 Senior Subordinated Secured Note Claims, which are the only

Classes entitled to vote to accept or reject the Plan (the "Voting Classes").[5]  The Ballots stated in

clear and conspicuous language that the Agent or that holders of Senior Subordinated Secured

Note Claims, as applicable, must properly complete, execute, and deliver a Ballot to the

Solicitation Agent by electronic mail so that the Ballot would be actually received by the

Solicitation Agent no later than October 31, 2018 at 8:59 p.m. (prevailing Eastern Time) (the

"Voting Deadline").

117.    After the expiration of the Voting Deadline the Solicitation Agent will tabulate

the Ballots submitted by the Voting Classes and file a declaration in support of the voting and

tabulation of the Ballots cast (the "Voting Declaration"), which certifies the results and

methodologies for tabulating the Ballot submitted by the Voting Classes.  Thus far, the Debtors

---

[4]    Concurrently herewith, the Debtors filed an application with the Court for authority to retain Epiq Corporate Restructuring, LLC as their claims and noticing agent pursuant to the *Debtors' Application for Entry of an Order Authorizing and Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent, Effective as of the Petition Date*.

[5]    The Solicitation Agent did not distribute a Solicitation Package to any other Class of Claims or Interests because such Classes are:  (a) unimpaired under, and conclusively presumed to accept, the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (b) impaired, not entitled to receive any distribution on account of their Claims or Interests under the Plan, and therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

have received support for the Plan from 100 percent of the outstanding amount voted and 100

percent in number of First Lien Credit Agreement Claims.

118.    In addition to proposing the foregoing timeline of events, the Debtors request

entry of an order: (a) Scheduling the Combined Hearing; (b) the Solicitation Procedures: and (c)

the form and manner of notice of the commencement of the Chapter 11 Cases and the Combined

Hearing.  By the Solicitation Procedures Motion, the Debtors also request that the Court

conditionally (i) direct the U.S. Trustee not to convene a meeting of creditors pursuant to section

341(a), and (ii) waive the requirement that the Debtors file schedules of assets and liabilities and

statements of financial affairs and the periodic reports of financial information with respect to

entities in which the Debtors' estate holds a controlling or substantial interest pursuant to

Bankruptcy Rule 2015.3(a), provided that the Plan is confirmed within 75 days of the Petition

Date.

119.    I believe that the proposed schedule of confirmation-related dates is fair to all

parties in interest and is consistent with the Debtors' need to comply with the Restructuring

Support Agreement in seeking confirmation of the Plan within forty (40) days of the Petition

Date.  Such compliance is critical to the restructuring.  The proposed schedule also provides

parties with sufficient time to evaluate their rights in respect of the Plan before the Combined

Hearing.  Similarly, I believe that the requested conditional waivers and the request for

conditional approval, on a first-day basis, of the Solicitation Procedures and the Combined

Notice will permit the Debtors to proceed expeditiously toward confirmation without

unnecessary delays or distractions.  Additionally, as noted above, the only Voting Classes under

the Plan are comprised of Citiking and the holders of Senior Subordinated Secured Note Claims.

Consequently, I believe the time period between the distribution of the Solicitation Package and

the Voting Deadline (the same day) was reasonable under the circumstances.  For these reasons,

I believe that the time for voting was reasonable and sufficient for Holders of Claims in the

Voting Classes to make an informed decision to accept or reject the Plan.

### C.    Applications and Motions Related to the Retention of Professionals

#### i.    *Application to Employ and Retain Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent*

120.    As part of the First Day Motions, the Debtors have filed an application to retain

Epiq Corporate Restructuring, LLC ("Epiq") as this Court's notice and claims agent for the

Chapter 11 Cases.  The terms of Epiq's engagement are set forth in the Engagement Agreement

attached to the retention application.  I believe that the retention of Epiq is required because of

the large number of creditors identified in these cases.

121.    I understand that Epiq is a data processing firm with extensive experience in

noticing, claims processing, and other administrative tasks in large chapter 11 cases.  The

Debtors solicited bids from five prominent bankruptcy claims and noticing agents prior to

selecting Epiq and believe Epiq's rates are reasonable given the quality of Epiq's services and

prior bankruptcy experience.  Given the need for the services described above and Epiq's

expertise in providing such services, I believe that the selection and retention of Epiq is

consistent with the Court's Protocol for Employment of Claims and Noticing Agents Under 28

U.S.C. § 156(c) and will expedite service of notices, streamline the claims administration

process, and permit the Debtors to focus on their reorganization efforts.

122.    The Debtors also intend to file a separate application to retain Epiq as Solicitation

Agent.

###### ii.   *Other Retention Applications*

123.    The Debtors intend to file applications for authorization to retain professionals who will assist the Debtors in the administration of the Chapter 11 Cases, including, without limitation, Paul Hastings LLP and Young Conway Stargatt & Taylor, LLP as bankruptcy counsel, Ernst & Young LLP, as financial advisor, and Duff & Phelps Securities LLC as investment banker.

## <u>CONCLUSION</u>

124.    This Declaration illustrates the factors that have led to the commencement of the Chapter 11 Cases and the need for the relief requested in the First Day Motions.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 10th day of October, 2018

/s/ Michael Wyse
Michael Wyse
Chairman of the Board of Directors
ONE Aviation Corporation

## Exhibit A

## Organizational Structure



ONE Aviation Corporation Organizational Chart

**Legend**
1. Each entity is owned 100% by its parent, unless indicated otherwise

01:23222610.1