## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-----------------------------------------------------------x
:
In re:                                                      :       Chapter 11
:
ONE AVIATION CORPORATION, *et al.*,[1]                       :       Case No. 18-12309 (CSS)
:
Debtors.                                            :       Jointly Administered
:
:       **Requested Obj. Deadline: At the Hearing**
-----------------------------------------------------------x       **Requested Hearing Date: On or prior to October 30, 2020**[2]

## DEBTORS' MOTION FOR ENTRY
## OF ORDER (I) APPROVING PURCHASE
## AGREEMENT, (II) AUTHORIZING SALE FREE
## AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
## AND OTHER INTERESTS, AND (III) GRANTING RELATED RELIEF

ONE Aviation Corporation and its affiliated debtors as debtors in possession in the

above-captioned cases (collectively, the "Debtors") submit this motion (this "Motion") for entry

of an order to be filed with the Court in the Chapter 11 Cases (as defined below) and served on

the entities receiving this Motion to consummate the sale (the "Sale"), pursuant to that certain

Asset Purchase Agreement (the "Purchase Agreement," a copy of which is attached hereto as

**Exhibit A**),[3] to the Buyer of the Purchased Assets or as may be modified to consummate a

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  ONE Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986).  The debtors' corporate headquarters is located at 3520 Spirit Drive SE, Albuquerque, NM 87106.

[2]    Contemporaneously with the filing of this Motion, the Debtors have filed a motion for entry of an order shortening the time for notice of the hearing to consider this Motion (the "Motion to Shorten").  The proposed order granting the Motion to Shorten provides a proposed hearing date of October 26, 2020 at 10:00 a.m. (ET) based on the potential hearing date provided to the Debtors by the Court's chambers.  If the Motion to the Shorten is granted, the order entered by the Court and the Sale Notice (as defined herein) will set forth the actual objection deadline and the hearing date.

[3]    Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

transaction on account of a higher or otherwise better offer (the "Sale Order"):[4] (i) approving the Purchase Agreement; (ii) authorizing, at Closing, the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts to the Buyer free and clear of all liens, claims, encumbrances, and other interests (collectively, "Liens"), other than any Permitted Encumbrances as set forth in the Purchase Agreement; and (iii) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    Once more, the Debtors have been forced to adapt their restructuring strategy due to the failure of a transaction counterparty to perform its obligations.  Just two months ago, the Debtors were seeking the Court's approval with respect to a proposed sale and financing transaction (the "August 2020 Transaction") that was intended to revive the Debtors' restructuring efforts following the failure by the Debtors' prior plan proponent and lender, Citiking International US LLC ("Citiking"), to fulfill its obligations under the prior confirmed chapter 11 plan.  Unfortunately, the proposed purchaser in the August 2020 Transaction, SEF OA LLC (the "SE Falcon") failed to fulfill its funding and other obligations under its sale and financing agreements with the Debtors and, accordingly, the Debtors were forced to terminate those agreements and, yet again, the Debtors found themselves pursuing an alternative transaction for the benefit of the Debtors' estates.

2.    To avoid a value-destructive conversion to chapter 7 and liquidation of the Debtors' assets, the Debtors have continued to market their assets to potential purchasers, despite the significant challenges imposed by the prior failures of Citiking and SE Falcon.  As a result of these efforts, the Debtors are pleased to be able to present to the Court a sale transaction that the

---

[4]    The form of Sale Order will be filed as soon as practicable with the Court before the Sale Hearing.

Debtors believe will maximize the value of the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors request that the Court approve the sale transaction, as set forth in this Motion.

## BACKGROUND

### I.    General

3.     Commencing on October 9, 2018 (the "Petition Date"), the Debtors filed voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     On October 22, 2018, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

5.     As discussed in the *Declaration of Michael Wyse in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "First Day Declaration"), the Debtors comprise a private company that combines Eclipse Aerospace, Inc. and Kestrel Aircraft Company, Inc. products and personnel to research and develop, produce, deliver, service, upgrade, and provide technical support to a number of twin-turbofan very light jets and single turboprop-engine aircrafts. The Debtors generate revenue from the following business lines: aircraft sales; aircraft parts sales; training programs; upgrades (including large upgrades and

structural maintenance); service (including general service, inspections, and product improvements); and refurbishment. The aircraft refurbishment line of business allows the Debtors to capture value and revenue from their current fleet of jets through updating certain features of older jets and through the resell of aircraft into the secondary market. Additional factual background information about the Debtors, including their business operations, their corporate and capital structure, and the events leading to the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## II.    The Debtors' Prior Marketing and Sales Efforts

6.     Prepetition, the Debtors engaged Duff & Phelps Securities, LLC ("Duff & Phelps") as their investment banker on December 27, 2017, to explore multiple restructuring alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt infusion, and a comprehensive restructuring of the Debtors' balance sheets. After the Debtors launched the sale process, communications between Duff & Phelps and potential acquirers began immediately and increased during the following weeks. As part of that marketing process (the "Prepetition Marketing Process"), Duff & Phelps contacted a total of 161 strategic and 315 potential investors, distributing a teaser regarding the sale to a total of 476 potential buyers. The extensive marketing process resulted in 41 parties executing non-disclosure agreements (each, an "NDA") to receive more information and then receiving a confidential information memorandum with detail on the Debtors' business. Throughout this process, Duff & Phelps and the Debtors worked closely to respond to potential investor inquiries and to encourage interest in acquiring or financing the Debtors. As detailed in the *Declaration of Vineet ("Vin") Batra, Managing Director of Duff & Phelps Securities, LLC in Support of the Proposed Debtor in Possession Financing Facility and the Joint Prepackaged Chapter 11 Plan of Reorganization of ONE Aviation Corporation and Its Debtor Affiliates* [Docket No. 16], despite an extensive

outreach process and efforts to engage with interested potential buyers, the Prepetition Marketing Process resulted in no viable bids for the Debtors' business or assets.

7.      Ultimately, the Debtors sought to pursue a chapter 11 bankruptcy with a prepackaged plan supported by the Debtors' prepetition first lien lender (and subsequently the DIP Lender).  However, the Debtors continued to conduct a post-petition marketing process (the "Post-Petition Marketing Process") in conjunction with the plan process.  Most importantly, Duff & Phelps continued to focus on identifying strategic and financial buyers and provided the Debtors and their boards of directors or managers, as applicable, with continuous updates.

8.      In addition to contacting all of the parties who had previously signed an NDA during the Prepetition Marketing Process, as part of the Debtors' Post-petition Marketing Process, the Debtors and their advisors corresponded with some 55 parties who the Debtors believed to have potential interest in a transaction given their experience and knowledge of the Debtors and their businesses.  All of these parties received an investment summary based on public information and were invited to enter into an NDA to receive additional information. Three of these parties subsequently executed an NDA with the Debtors, two of which received a confidential information package.  Of the three parties who executed an NDA, there were no firms that submitted preliminary indications of interest.  Unfortunately, no other offers came forward, and the debtors decided to pursue instead the debt-for-equity transaction contemplated in the Plan.

## III.    The Confirmed Plan and Citiking's Failure to Perform Its Obligations

9.      On the Petition Date, the Debtors filed their joint plan of reorganization, which the Court ultimately confirmed as amended and modified [Docket No. 707-1] (the "Plan") by entry of an order on September 18, 2019 [Docket No. 707] (the "Confirmation Order").  The delay in confirmation of the Plan was due to, among other reasons, negotiating a number of

settlements with parties in interests in the face of Citiking's recalcitrance in coming to the negotiating table.[5]  Unfortunately, Citiking's unwillingness to engage in meaningful discussions, finalize transaction documents, and meet its funding obligations has persisted even after confirmation of the Plan.

10.    For the effective date of the Plan to occur, the Plan and Confirmation Order required Citiking to fund various settlements and distributions to parties in interest.[6]  However, Citiking funded only a fraction of those amounts and then only when necessary to stave off objections or conversion of these Chapter 11 Cases.  In addition, the Plan obligated Citiking to provide the reorganized Debtors with exit financing and provided that the New ABL / Term Loan Facility Documents (as defined in the Plan) would be in form and substance acceptable to the Debtors, Citiking, and DWC Pine Investments I, LTD ("DW").[7]  Due to Citiking's lack of cooperation and refusal to engage with the Debtors and DW, none of the exit financing documents were finalized and, as a result, Citiking did not provide any of the required exit financing.

## IV.    Subsequent Sale and Financing Process with SE Falcon

11.    Upon realizing that Citiking either would not or could not consummate the transactions required under the confirmed Plan and given the dire projected cash-flow shortage that would result, the Debtors pursued the August 2020 Transaction with SE Falcon in an attempt to preserve recoveries for stakeholders and provide the immediate liquidity the Debtors desperately needed.  On September 3, 2020, in connection with the August 2020 Transaction, the Court entered an interim order authorizing the Debtors to obtain certain debtor-in-possession

---

[5]    This included having to abandon temporarily the plan process and pivot to a sale process in June 2019.  *See* Docket Nos. 561, 633.

[6]    *See* Plan §§ 1.91, 9.1.6, 9.1.8, 9.1.10; Confirmation Order ¶ 131.

[7]    Plan § 9.1.2.

financing [Docket No. 911] (the "Interim DIP Order") and an order approving certain sale and noticing procedures for the August 2020 Transaction [Docket No. 908] (the "Sale Procedures Order").  Pursuant to the Interim DIP Order, DW funded approximately $200,000, including amounts for payroll and other similar expenses owing during the pendency of the August 2020 Transaction.  However, following the Court's entry of the Interim DIP Order and the Sales Procedures Order, the SE Falcon did not fulfill its funding and other obligations under the sale and financing agreements with the Debtors.  Accordingly, the Debtors terminated the purchase agreement with the SE Falcon and filed notice with the Court that the Debtors were withdrawing their prior sale motion with respect to SE Falcon and the August 2020 Transaction [Docket No. 951].

12.    However, during the course of the August 2020 Transaction, as permitted under the purchase agreement governing that proposed sale, the Debtors continued to entertain other possible offers for the Debtors' assets.  As part of that process, the Debtors received an indication of interest from the Buyer with respect to the purchase of the Purchased Assets and, following the termination of the prior purchase agreement with SE Falcon, the Debtors continued to pursue the potential transaction with the Buyer, ultimately culminating in the execution of the Purchase Agreement.

**V.    Current Sale**

13.    The Purchase Agreement is the result of a vigorous arm's-length negotiation between the Debtors and their advisors, on the one hand, and the Buyer and its own advisors, on the other hand.  The Sale provides the best available option for the Debtors under the very difficult circumstances where now multiple potential buyers have failed to perform or otherwise consummate transactions for the Debtors assets.  Nevertheless, should the Debtors receive a

competing offer prior to the entry of the Sale Order, they will consider such competing offer in accordance with their fiduciary duties.[8]

## VI.     Terms and Conditions of Purchase Agreement

14.     Through arm's-length negotiations, the Debtors and the Buyer have agreed to the terms of the Sale set forth in the Purchase Agreement, which is subject to higher and better offers and the Court's approval.   The following sets forth a summary of the material terms and conditions of the Purchase Agreement, pursuant to Local Rule 6004-1(c).[9]

| MATERIAL TERMS OF PURCHASE AGREEMENT | |
|---|---|
| **Sellers** | ONE Aviation Corporation; ACC Manufacturing, Inc.; Aircraft Design Company; Brigadoon Aircraft Maintenance, LLC; DR Management, LLC; Eclipse Aerospace, Inc.; Innovatus Holding Company; Kestrel Aircraft Company, Inc.; Kestrel Brunswick Corporation; Kestrel Manufacturing, LLC; Kestrel Tooling Company; and OAC Management, Inc. |
| **Buyer** | AML Global Eclipse LLC |
| **Sale to Insider** | The Buyer is not an insider of the Debtors within the meaning set forth in section 101(31) of the Bankruptcy Code. |
| **Credit Bid/Consideration (§ 3.1)** | The aggregate consideration for the sale and transfer of the Purchased Assets is $5,250,000 (the "Purchase Price"), subject to certain adjustments in accordance with the Purchase Agreement. |
| **Good Faith Deposit** | $500,000, payable on the first Business day following execution of the Purchase Agreement. |
| **Transfer of the Acquired Assets (§§ 2.1, 2.3)** | The Buyer agrees to purchase, acquire, and accept all of the Debtors' right, title, and interest in the Purchased Assets.   In addition, the Buyer will assume and pay, perform, and discharge the Assumed Liabilities. |
| **Excluded Assets and Liabilities (§§ 2.2, 2.4)** | The Sale shall not include the Excluded Assets or the Excluded Liabilities. |
| **Agreements with Management** | No agreements with management have been entered into in connection with the Sale. |

---

[8]    DW has informed the Debtors that it may submit a competing offer in the form of a credit bid up to and/or at the Sale Hearing.

[9]    If there are any inconsistencies between the summary set forth herein and the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern.

| MATERIAL TERMS OF PURCHASE AGREEMENT | |
|---|---|
| **Transition Services** | The Purchase Agreement does not contemplate that the Debtors will provide transition services to the Buyer. |
| **Representations and Warranties; Covenants (Articles V, VI, and IX)** | The representation and warranties and covenants include: (a) representations and warranties regarding (i) organization and qualifications of the Sellers and Buyer, (ii) authorization to enter into and the validity of the transaction contemplated by the Agreement, (iii) consents and approvals and notification of the transaction contemplated by the Agreement, (iv) brokers, finders or financial advisors, (v) Sellers' good title to the Purchase Assets, (vi) true and correct copies of all leases, (vii) leases of personal property, (viii) Intellectual Property and proprietary rights, (ix) litigation, (x), Permits, (xi) Inventory, (xii) Contracts, (xiii) taxes, (xiv) employees and employee benefits, (xv) labor matters, (xvi) bank accounts, (xvii) non-WARN Act occurrence, (xviii) environmental matters, (xix) absence of certain changes; and (b) covenants regarding (i) conduct of business by Sellers, (ii) access to information, (iii) conduct of business by Buyer, (iv) rejected contracts, (v) reasonable efforts to cooperate, (vi) further assurances, (vii) notification of certain matters, (viii) confidentiality, (ix) preservation of records, (x) publicity, (xi) Material Adverse Effect, (xii) casualty loss, (xiii) no successor liability, (xiv) change of name, (xv) receivables, (xvi) governmental approvals, and (xvii) certifications. |
| **Releases** | The Purchase Agreement does not provide for releases or the waiver of claims. |
| **Private Sale/No Competitive Bidding** | For the reasons set forth herein, the Debtors are seeking approval of a private sale without an auction process.  The Purchase Agreement does not limit shopping of the Purchased Assets. |
| **Closing and Other Deadlines (§ 4.4(d))** | The Purchase Agreement provides that the Purchase Agreement may be terminated if on or prior to October 30, 2020, subject to the Court's availability, (i) the Sale Hearing has not taken place or (ii) the Court has not entered the Sale Order. |
| **Use of Proceeds** | The cash proceeds from the Sale will be used to pay Administrative Expense Claims and other amounts related to the Debtors' estates and/or make distributions pursuant to order of the Court.  Pursuant to this Motion, the Debtors intend to transfer the Purchased Assets to the Buyer and wind down their operations. |

| MATERIAL TERMS OF PURCHASE AGREEMENT | |
|---|---|
| **<u>Tax Exemption</u>** | The Debtors are not seeking pursuant to the Purchase Agreement to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **<u>Record Retention</u>** | Prior to the Closing, the Debtors shall provide the Buyer with reasonable access to business records, and, after the Closing, the Buyer shall provide the Debtors with reasonable access to business records. |
| **<u>Sale of Avoidance Actions</u>** | The Buyer will not acquire avoidance actions under chapter 5 of the Bankruptcy Code. |
| **<u>Requested Findings as to Successor Liability</u>** | The Debtors' consummation of a sale of the Purchased Assets shall be sold free and clear of any successor liability. |
| **<u>Sale Free and Clear of Unexpired Leases</u>** | The sale of the Purchased Assets and the assignment of the Assigned Contracts shall be free and clear of any and all Liens (other than the Permitted Encumbrances that the Buyer has agreed to assume) pursuant to section 363(f) of the Bankruptcy Code. |
| **<u>Relief from Bankruptcy Rule 6004(h)</u>** | The Sale Order will provide for a waiver of the 14-day stay thereof, arising under Bankruptcy Rules 6004(h) and 6006(d), including the parties' ability to close the Sale and assign the Assigned Contracts in connection therewith. |

## VII.    Proposed Sale Timeline.

15.    Prior to the entry of the Sale Order, the sale of the Purchased Assets pursuant to the Purchase Agreement remains subject to higher or otherwise better offers in accordance with the terms of the Purchase Agreement.

16.    The Debtors' proposed timeline with respect to the Sale Hearing is as follows:

| **Key Events and Deadlines** | **Date** |
|---|---|
| **Debtors' Service of Sale Notice and Assumption and Assignment Notice** (providing deadline for any (i) objections to the Sale to the Buyer and entry of the Sale Order and (ii) Contract Objections) | October 20, 2020 or such date as the Motion to Shorten is granted |
| **Sale Objection Deadline** | At the Sale Hearing |
| **Sale Hearing** | On or prior to October 30, 2020 |

## VIII.  Notice of the Sale

17.    The Debtors intend to provide notice of the Sale to parties in interest by serving a notice of sale, substantially in the form attached hereto as **Exhibit B** (the "Sale Notice"),[10] upon the following entities or their counsel, if known (collectively, the "Notice Parties"):

(a)    the U.S. Trustee;

(b)    the DIP Lender;

(c)    the Debtors' prepetition lenders;

(d)    the Committee;

(e)    the Internal Revenue Service;

(f)    the United States Attorney for the District of Delaware;

(g)    all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the relief requested herein;

(h)    any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Debtors' assets;

(i)    any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Debtors' assets;

(j)    the non-Debtor counterparties to the Assigned Contracts (defined below); and

(k)    any parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.

18.    In light of the prior notices that were provided in connection with the August 2020 Transaction, the Debtors believe that such notice is appropriate under the circumstances.

---

[10]    In accordance with Bankruptcy Rule 2002(c)(l), the Sale Notice will include, among other things:  (a) the date, time, and place of the Sale Hearing; (b) a summary of certain of the terms and conditions of the Sale; (c) the time fixed for filing objections to the Sale; and (d) a description that the Sale of the Purchased Assets is free of any liens or encumbrances as set forth in the Purchase Agreement.  The Sale Notice also will direct parties to access the website of the Debtors' claims and noticing agent, http://dm.epiq11.com/Oneaviation, or call the Debtors' restructuring information line at (855) 255-4838.  The Sale Notice will provide that any party that wishes to obtain a copy of this Motion (and any related documents) may make such a request by calling the Debtors' claims and notice agent, Epiq Bankruptcy Solutions, LLC at (855) 255-4838 or by visiting http://dm.epiq11.com/Oneaviation.

### IX.     Notice to Contract Counterparties.

19.     The Debtors intend to provide notice to non-Debtor counterparties (collectively, the "Contract Counterparties") to executory contracts and unexpired leases (each, as applicable, a "Contract" or "Lease" and, collectively, the "Contracts and Leases") that will be assumed by the Debtors and assigned to the Buyer in connection with the Sale pursuant to the terms of the Purchase Agreement (collectively, the "Assigned Contracts") by serving such Contract Counterparties of Assigned Contracts with a notice of assumption and assignment, substantially in the form attached hereto as **Exhibit C** (the "Assumption and Assignment Notice").  Due to the small number of Contracts and Leases that will be assumed and assigned in connection with the Sale (currently less than a dozen), the Debtors do not intend to send the Assumption and Assignment Notice to all Contract Counterparties but only to the Contract Counterparties to Assigned Contracts.  This will avoid a substantial, unnecessary cost to the Debtors' estates and, because the Debtors recently served all Contract Counterparties with a similar notice in connection with the August 2020 Transaction, the Debtors believe that such limited service is appropriate under the circumstances.

### JURISDICTION AND VENUE

20.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

21.     The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 3007, 6004, 6006, 9007, 9014, and Local Rule 6004-1.

## RELIEF REQUESTED

22.     By this Motion, the Debtors seek entry of the Sale Order (a) approving the Purchase Agreement by and between the Debtors and the Buyer, (b) authorizing the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts to the Buyer free and clear of all Liens, other than any Permitted Encumbrances as set forth in the Purchase Agreement, and (c) granting related relief.

## BASIS FOR RELIEF

**I.      Approval of the Proposed Sale Transaction Is Appropriate and in the Best Interest of the Debtors' Estates.**

23.     In accordance with Bankruptcy Rule 6004(f)(l), sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors, in their business judgment, determined that a private sale of the Purchased Assets to the Buyer will enable the Debtors to obtain the highest or otherwise best offer in a sale of their assets at this time and is in the best interests of the Debtors, their estates, and their creditors.

**A.      Sale of Purchased Assets is a Sound Exercise of the Debtors' Business Judgment.**

24.     Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides, in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

25.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of

the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.[11]

26.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:    (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.[12]    In *In re Del. & Hudson Ry.*, the court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the [proposed] Buyer is proceeding in good faith.[13]

27.    The business judgment rule shields a debtor's management from judicial second-guessing.[14]    Once a debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interests of the company."[15]    Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(l) of the Bankruptcy Code.

---

[11]    *See, e.g., In re Trans World Airlines, Inc.*, Case No. 01-00056, 2001 WL 1820326, at *10–11 (Bankr. D. Del. Apr. 2, 2001); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991).

[12]    *See In re Del. & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.*, Case No. 97-1159, 1997 WL 176574, at *4-5, *4 n.2 (D.N.J. Mar. 26, 1997).

[13]    124 B.R. at 176.

[14]    *See In re Tower Air*, 416 F.3d 229, 238 (3d Cir. 2005).

[15]    *Id.*

28.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders.[16]  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.[17]

29.     The sale of the Purchased Assets will be consummated only after thorough consideration of all viable alternatives and after concluding that such transactions are supported by sound business justifications.  Based on available information, the Debtors believe that the consideration to be received for the Purchased Assets under the Purchase Agreement is fair and reasonable under the circumstances.

30.     As further assurance of value, the Purchase Agreement will be subject to higher or otherwise better offers, consistent with the requirements of the Bankruptcy Code and the Bankruptcy Rules.

**B.      Sale of Purchased Assets and Assigned Contracts Free and Clear of Liens Is Authorized By Section 363(f) of the Bankruptcy Code.**

31.     The Debtors further submit that it is appropriate to sell the Purchased Assets and to assign the Assigned Contracts free and clear of any Liens as set forth in the Purchase Agreement pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Purchased Assets, as and to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

---

[16]     *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).

[17]     *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (noting that in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

     (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

     (2)     such entity consents;

     (3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

     (4)     such interest is in *bona fide* dispute; or

     (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

32.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of Liens.[18]

33.    The Debtors believe that one or more of the tests of section 363(f) of the Bankruptcy Code are satisfied with respect to the transfer of the Purchased Assets and the assignment of the Assigned Contracts pursuant to the Purchase Agreement.  In particular, the Debtors expect that at least section 363(f)(2) of the Bankruptcy Code will be met in connection with the transactions proposed under the Purchase Agreement because each of the parties holding Liens on the Purchased Assets, if any, will consent, or, absent any objection to this Motion, will be deemed to have consented to, the Sale.

34.    Any holder of a Lien also will be adequately protected by having its Liens, if any, attach to the sale proceeds received by the Debtors for the Sale of the Purchased Assets to the Buyer, in the same order of priority, with the same validity, force, and effect that such creditor had prior to such Sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  Accordingly, section 363(f) of the Bankruptcy Code authorizes the

---

[18]   *In re Decora Indus., Inc.*, Case No. 00-4459 (JJF), 2002 WL 32332749, at *7 (D. Del. May 20, 2002) ("Because §363(f) is drafted in the disjunctive, the satisfaction of any of the requirements outlined is sufficient to warrant Debtors' sale of the Acquired Assets free and clear of all Interests as provided in the Purchase Agreement, except with respect to such Interests as are assumed liabilities pursuant to the Purchase Agreement."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (same).

sale of the Purchased Assets and the assignment of the Assigned Contracts free and clear of any such Liens.

### C. If the Debtors Consummate Sale of Assets, Purchased Assets Should Be Sold or Assumed Free and Clear of Successor Liability.

35. The Buyer of the Purchased Assets is unlikely to be liable for any of the Debtors' liabilities as a successor to the Debtors' business or otherwise, unless the Buyer expressly assumes such liabilities. Extensive case law exists providing that claims against the purchaser are directed to the proceeds of a free-and-clear sale of property and may not subsequently be asserted against a buyer.

36. Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined in the Bankruptcy Code.[19] In *Trans World Airlines, Inc.*, the Third Circuit specifically addressed the scope of the term "any interest."[20] The Third Circuit observed that while some courts have "narrowly interpreted interests in property to mean *in rem* interests in property," the trend in modern cases is toward "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"[21] As determined by the Fourth Circuit in *Leckie Smokeless Coal Co.*, a case cited extensively and approvingly by the Third Circuit in *Folger*, the scope of section 363(f) of the Bankruptcy Code is not limited to *in rem* interests.[22] Thus, the Third Circuit in *Folger* quoted *Leckie* as holding that the debtors "could sell their assets under

---

[19]    *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000).

[20]    322 F.3d 283, 288–89 (3d Cir. 2003).

[21]    *Id.* at 289 (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]).

[22]    99 F.3d 573, 581–82 (4th Cir. 1996).

§ 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."[23]

37.     Courts have held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims.[24]

38.     Here, the Debtors filed the Chapter 11 Cases in good faith. The Debtors expect that they will be able to satisfy the Court that (a) the Buyer engaged in arm's-length negotiations with the Debtors and did not exert control or undue influence over the Debtors, (b) the Buyer is a completely and wholly unrelated entity to the Debtors, (c) the Buyer does not, and will not, share any common incorporators, officers, directors, or stockholders with the Debtors, and (d) the Buyer is not an insider of the Debtors.

39.     For obvious reasons, the very purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a buyer arising from a seller's pre-sale conduct. Furthermore, the Debtors will provide notice of the proposed sale to all known parties in interest that may assert claims or interests relating to the Purchased Assets against the Debtors, including trade creditors, contract counterparties, lenders, and other parties known to the Debtors to be asserting claims relating to the Purchased Assets.

---

[23]   *Folger*, 209 F.3d at 258 (internal quotation marks omitted).

[24]   *See The Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (holding channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (holding transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (holding that transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes was permissible).

40.     Under section 363(f) of the Bankruptcy Code, a buyer of assets is entitled to know that the purchased assets are not infected with latent claims that will be asserted against the Buyer after the proposed transaction is completed.  Accordingly, consistent with the above-cited case law, the order approving the Sale of the Purchased Assets may provide that the Buyer of the Purchased Assets is not liable as a successor under any theory of successor liability for claims that encumber or relate to the Purchased Assets.

**D.      Buyer Is Good-Faith Buyer and Is Entitled to Full Protection of Section 363(m) of the Bankruptcy Code, and Transfer and Sale of Purchased Assets Does Not Violate Section 363(n) of the Bankruptcy Code.**

41.     The Debtors believes that the Purchase Agreement has been negotiated at arm's length and in good faith.  Thus, the Buyer is entitled to the full protections of section 363(m) of the Bankruptcy Code, which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

While the Bankruptcy Code does not define "good faith," the Third Circuit in held that:

> [t]he requirement that a Buyer act in . . . good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the [proposed] Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.[25]

---

[25]     *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted).

42.     Accordingly, absent a showing of fraud or collusion between a buyer and a debtor, or an attempt by the buyer to take grossly unfair advantage the sale process, courts will uphold the transaction under section 363(m) of the Bankruptcy Code.[26]

43.     The Debtors and the Buyer engaged in thorough arm's-length negotiations over the terms of the Purchase Agreement and there has been no fraud, improper insider dealing, or collusion in those negotiations.  In addition, the Buyer is not an "insider," as that term is defined in section 101(31) of the Bankruptcy Code, of any of the Debtors.  If the Debtors proceed to consummate the Purchase Agreement, it will be because the Debtors believe that the consideration to be received by the Debtors pursuant to the Purchase Agreement is substantial, fair, reasonable, and the best and highest offer under the circumstances.

44.     The Purchase Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and the Buyer or other prevailing bidder should receive the protections afforded good faith Buyers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Purchase Agreement reached with the Buyer was at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

---

[26]   *See, e.g.*, *In re Trans World Airlines, Inc.*, Case No. Civ.A. 01-226 (SLR), 2002 WL 500569, * 1 (D. Del. Mar. 26, 2002) (upholding bankruptcy court's ruling premised on finding that there was "'no evidence of unlawful insider influence or improper conduct,' nor was there "any evidence of fraud or collusion between [the Successful Bidder] and [debtors], or [the Successful Bidder] and other bidders," that sale was in good faith); *In re Tempo Tech. Corp.*, 202 B.R. at 367 ("A Buyer's good faith status at a bankruptcy sale would be destroyed by misconduct involving 'fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Abbots Dairies of Pa., Inc.*, 788 F.2d at 147); *see also Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

### E.    Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code.

45.    Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365(b)(l) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

46.    The standard applied by the Third Circuit to determine whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.[27]

47.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.[28]

---

[27]    *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989).

[28]    *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that section 365 is traditionally subject to the "business judgment" standard)*; In re Decora Indus., Inc.,* No. 00-4459 JJF, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm, for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a

48.     In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Buyer will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code.  As discussed above, the transactions contemplated by the Purchase Agreement will provide significant benefits to the Debtors' estates.  Because the Debtors cannot obtain the benefits of the Purchase Agreement without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

49.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.[29]  Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.[30]

50.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."[31]

---

decision to reject an executory contract is governed by the business judgment standard."), *vacated on other grounds*, 607 F.3d 957 (3d Cir. 2010); *see also Phar-Mor, Inc. v. Strauss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).  Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." *Network Access Solutions*, 330 B.R. at 74 (citations omitted).  While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts . . . [t]o the extent they are outside the ordinary course of business, court approval is necessary." *Id.*  Regardless, "[t]here is . . . no discernable difference in the notice requirements or standard for approval under section 363 and 365." *Id.*

[29]  *See* 11 U.S.C. § 365(f)(2).

[30]  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance to be present where prospective assignee of a lease from debtor had financial resources and expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

[31]  *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Hornes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

51.     To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

52.     Section 365(f)(l) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

53.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.[32]

54.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.[33]  Similarly, in *Mr. Grocer, Inc.*, the court noted that:

> [the] case law interpreting§ 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves *ipso*

---

[32]     *See Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F.3d 904, 910–11 (9th Cir. 1997) ("[N]o principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365.").  Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  *See, e.g.*, *In re Jamesway Corp.*, 201 B.R. 73, 77–78 (Bankr. S.D.N.Y. 1996) (providing that section 365(f)(3) of the Bankruptcy Code prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

[33]     *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").

> *facto* anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.[34]

Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

55.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

56.     Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any invoice or claim related to the relief requested herein in accordance with applicable law.

## CONSENT TO JURISDICTION

57.     Pursuant to Local Rule 9013-1(f), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[34]    *In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr. D.N.H. 1987).

## **NOTICE**

58.     Notice of this Motion will be provided to the following, or their counsel, if known: (i) the U.S. Trustee; (ii) the DIP Lender; (iii) the Debtors' prepetition lenders; (iv) the Committee; (v) the Internal Revenue Service; (vi) any parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.  In addition, the Debtors shall serve the Sale Notice on the Notice Parties, as set forth above.  The Debtors submit that in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request entry of the Sale Order, substantially in the form to be submitted prior to the Sale Hearing, granting the relief requested in this Motion and such other and further relief as is just and proper.

Dated:  October 20, 2020
　　　　Wilmington, Delaware

*/s/ Jaime Luton Chapman*
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Jaime Luton Chapman (No. 4936)
Jared W. Kochenash (No. 6557)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

Chris L. Dickerson (admitted *pro hac vice*)
Brendan M. Gage (admitted *pro hac vice*)
Nathan S. Gimpel (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile:  (312) 499-6100

- and -

Todd M. Schwartz (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
1117 South California Avenue
Palo Alto, California 94304
Telephone:  (650) 320-1800
Facsimile:  (650) 320-1900

*Counsel for the Debtors and Debtors in Possession*