**<u>EXHIBIT A</u>**

**PURCHASE AGREEMENT (WITHOUT EXHIBITS)**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**By and Among**

**AML GLOBAL ECLIPSE LLC, as Purchaser,**

**ONE AVIATION CORPORATION,**

**and**

**CERTAIN SUBSIDIARIES OF ONE AVIATION CORPORATION NAMED HEREIN**

**as the Sellers.**

**Dated as of October 20, 2020**

# TABLE OF CONTENTS

**Page**

**Article I. DEFINITIONS**...................................................................................................**1**
    1.1    Definitions........................................................................................ 1
    1.2    Interpretations ................................................................................ 11

**Article II. PURCHASE AND SALE OF THE PURCHASED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES**.............................................................................**12**
    2.1    Purchase and Sale of the Purchased Assets ....................................... 12
    2.2    Excluded Assets ............................................................................ 14
    2.3    Assumption of Liabilities................................................................ 15
    2.4    Excluded Liabilities ...................................................................... 16
    2.5    Post-Closing Liabilities.................................................................. 17
    2.6    Assumption/Rejection of Certain Contracts ...................................... 17

**Article III. CONSIDERATION**.....................................................................................**20**
    3.1    Consideration ................................................................................ 20
    3.2    Deposit ......................................................................................... 20
    3.3    Holdback Escrow Account .............................................................. 20
    3.4    Escrow Agent Fees and Expenses .................................................... 21

**Article IV. CLOSING AND TERMINATION**................................................................**21**
    4.1    Closing ......................................................................................... 21
    4.2    Closing Deliveries by the Sellers..................................................... 21
    4.3    Closing Deliveries by Purchaser ..................................................... 23
    4.4    Termination of Agreement............................................................... 23
    4.5    Procedures Upon Termination .......................................................... 25
    4.6    Effect of Termination ..................................................................... 25

**Article V. REPRESENTATIONS AND WARRANTIES OF THE SELLERS** .....................**25**
    5.1    Organization and Qualification........................................................ 26
    5.2    Authorization of Agreement ............................................................ 26
    5.3    Conflicts; Consents; Compliance with Law ...................................... 26
    5.4    Brokers and Finders ....................................................................... 27
    5.5    Title to Purchased Assets ................................................................ 27
    5.6    Intellectual Property....................................................................... 27
    5.7    Litigation...................................................................................... 27
    5.8    Permits ......................................................................................... 27
    5.9    Tax Returns: Taxes ........................................................................ 28
    5.10    Eclipse Aircraft Matters ................................................................. 29
    5.11    Aircraft Certificates ....................................................................... 29
    5.12    Environmental Matters.................................................................... 29
    5.13    No Other Representations or Warranties ........................................... 30

**Article VI. REPRESENTATIONS AND WARRANTIES OF PURCHASER** .....................**31**
    6.1    Organization and Qualification........................................................ 31
    6.2    Authority ...................................................................................... 31
    6.3    No Inconsistent Obligations............................................................. 31

6.4     Conflicts: Consents ................................................................................................ 31
6.5     Brokers .................................................................................................................... 32
6.6     Adequate Assurances Regarding Assigned Contracts ............................................ 32
6.7     No Litigation ........................................................................................................... 32
6.8     Sufficient Funds ...................................................................................................... 32

**Article VII. BANKRUPTCY COURT MATTERS** ...................................................**32**
7.1     Sale Order ................................................................................................................ 32
7.2     Bankruptcy Filings .................................................................................................. 33
7.3     Sale Free and Clear .................................................................................................. 33

**Article VIII. COVENANTS AND AGREEMENTS** ...................................................**33**
8.1     Conduct of the Sellers ............................................................................................. 33
8.2     Access to Information .............................................................................................. 34
8.3     Reasonable Efforts; Cooperation ............................................................................ 34
8.4     Further Assurances .................................................................................................. 34
8.5     Confidentiality ......................................................................................................... 35
8.6     Publicity ................................................................................................................... 35
8.7     Casualty Loss ........................................................................................................... 35
8.8     No Successor Liability ............................................................................................. 35
8.9     Change of Name ...................................................................................................... 35
8.10    Certifications ........................................................................................................... 36

**Article IX. CONDITIONS TO CLOSING** .................................................................**36**
9.1     Conditions Precedent to the Obligations of Purchaser and Sellers ........................ 36
9.2     Conditions Precedent to the Obligations of the Sellers .......................................... 36
9.3     Conditions Precedent to the Obligations of Purchaser ........................................... 37

**Article X. TAXES** .........................................................................................................**37**
10.1    Certain Taxes ........................................................................................................... 37
10.2    Allocation of Purchase Price ................................................................................... 38
10.3    Cooperation on Tax Matters .................................................................................... 38
10.4    Tax Refunds ............................................................................................................. 38

**Article XI. MISCELLANEOUS** .................................................................................**38**
11.1    Payment of Expenses ............................................................................................... 38
11.2    Survival of Representations and Warranties; Survival of Confidentiality ............. 38
11.3    Entire Agreement; Amendments; Waivers .............................................................. 39
11.4    Execution of Agreement; Counterparts; Electronic Signatures .............................. 39
11.5    Governing Law ......................................................................................................... 39
11.6    Jurisdiction, Waiver of Jury Trial ........................................................................... 39
11.7    Notices ..................................................................................................................... 40
11.8    Binding Effect; Assignment .................................................................................... 41
11.9    Severability .............................................................................................................. 41
11.10   Bulk Sales Laws ...................................................................................................... 41
11.11   Access and Right to Use .......................................................................................... 41
11.12   Enforcement of Agreement ...................................................................................... 42
11.13   Interpretation; Drafting ........................................................................................... 42
11.14   Waiver of Setoff ...................................................................................................... 42

## INDEX OF SCHEDULES

Schedule 2.1(r)          Other Purchased Assets

Schedule 2.2(h)          Excluded Actions

Schedule 2.3(b)(i)       Cure Amounts for Assigned Contracts

Schedule 2.3(b)(ii)      Cure Amounts for Pending Assigned Contracts

Schedule 2.6(b)          Closing Date Assumed Contracts

Schedule 5.2             Notices, Filings and Consents

Schedule 5.3(a)          Conflicts with Organizational Documents

Schedule 5.3(b)          Consents

Schedule 5.3(c)          Compliance Exceptions

Schedule 5.3(d)          Aircraft Certificates

Schedule 5.4             Brokers and Finders

Schedule 5.6             Purchased Intellectual Property

Schedule 5.7             Litigation

Schedule 5.9(a)          Tax Return Filings; Extensions of Time

Schedule 5.9(b)          Payment of Taxes

Schedule 5.9(e)          Material Tax Proceedings

Schedule 5.9(g)          Tax Sharing Agreements and Liabilities

Schedule 5.9(h)          Sales, Use, and Similar Taxes

Schedule 5.10(a)         Exception to Authority to Sell Eclipse Aircraft

Schedule 5.10(b)         Exception to Good Title to Eclipse Aircraft

Schedule 6.4(b)          Consents Related to Purchaser

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of October 20, 2020 (the "***Agreement Date***"), has been entered into by and among AML Global Eclipse LLC, a Delaware limited liability company ("***Purchaser***"), ONE Aviation Corporation, a Delaware corporation, and certain direct and indirect wholly owned subsidiaries set forth on Annex I hereto (individually a "***Seller***," and collectively, the "***Company***" or the "***Sellers***"). Purchaser and the Sellers are individually referred to herein as a "***Party***," and collectively as the "***Parties***." For the purposes of this Agreement, capitalized terms used herein shall have the meanings set forth herein or in Article I.

## R E C I T A L S:

WHEREAS, on October 9, 2018, each Seller filed a voluntary petition (the "***Chapter 11 Petitions***") for relief under chapter 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), commencing jointly administered chapter 11 cases under lead case no. 18-12309 (the "***Bankruptcy Case***");

WHEREAS, in accordance with Sections 1107 and 1108 of the Bankruptcy Code, each Seller continues to manage its properties and operate its business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase the Purchased Assets and assume the Assumed Liabilities from the Sellers, with such sale to be free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), and the Sellers desire to sell, convey, assign and transfer to Purchaser the Purchased Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth herein, and subject further to all requisite Bankruptcy Court and other applicable approvals as set forth herein; and

WHEREAS, each Seller's board of directors (or similar governing body) has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and the Sellers hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

1.1    Definitions. As used herein:

(a)       "***Action***" means any action, dispute, claim, complaint, grievance, summons, suit, litigation, arbitration, mediation, proceeding (including any civil, criminal,

administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation by or before any Governmental Body.

(b)    "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means (i) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise, or (ii) an officer, director, or any Person that has the power, directly or indirectly, to vote five (5%) or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person.

(c)    "*Agreement*" shall have the meaning set forth in the preamble.

(d)    "*Agreement Date*" shall have the meaning set forth in the preamble.

(e)    "*Aircraft Certificates*" shall have the meaning set forth in Section 5.3(d).

(f)    "*Allocation*" shall have the meaning set forth in Section 10.2(a).

(g)    "*Alternative Transaction*" means (i) the approval by the Bankruptcy Court of one or more sales, assignments or other transfers of a material portion of the Purchased Assets to a Person other than Purchaser or its designee or its Affiliates, or (ii) the confirmation of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Purchaser in accordance with the terms hereof.

(h)    "*Ancillary Documents*" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated this Agreement.

(i)    "*Assigned Contracts*" shall have the meaning set forth in Section 2.1(f).

(j)    "*Assignment and Assumption Agreement*" shall have the meaning set forth in Section 4.2(b).

(k)    "*Assumed Liabilities*" shall have the meaning set forth in Section 2.3.

(l)    "*Assumption Approval*" shall have the meaning set forth in Section 2.6(h).

(m)    "*Avoidance Actions*" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of each Seller under chapter 5 of the Bankruptcy Code.

(n)    "*Bankruptcy Case*" shall have the meaning set forth in the Recitals.

(o)    "*Bankruptcy Code*" shall have the meaning set forth in the Recitals.

(p)    "*Bankruptcy Court*" shall have the meaning set forth in the Recitals.

(q)        "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Bankruptcy Case, and the general, local and chambers rules of the Bankruptcy Court.

(r)        "***Benefit Plan***" means (i) all "*employee benefit plans*" (including, without limitation, as defined in Section 3(3) of ERISA), including all employee benefit plans which are "*pension plans*" (including, without limitation, as defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including severance pay, vacation pay, Seller awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, fringe benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, equity-based, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies), and (ii) all other employment, termination, bonus, severance, change in control, collective bargaining or other similar plans, programs, contracts, or arrangements (whether written or unwritten), in each case, maintained, contributed to, or required to be contributed to by Seller or any ERISA Affiliate for the benefit of any current or former employee, director, officer or independent contractor of Seller or under which Seller or any ERISA Affiliate has any liability.

(s)        "***Bill of Sale***" shall have the meaning set forth in Section 4.2(a).

(t)        "***Business Day***" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(u)        "***Chapter 11 Petitions***" shall have the meaning set forth in the Recitals.

(v)        "***Claim***" shall have the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, inter alia, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment right, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

(w)        "***Closing***" shall have the meaning set forth in Section 4.1.

(x)        "***Closing Assumed Contract List***" shall have the meaning set forth in Section 2.6(b).

(y)        "***Closing Assumed Leased Real Property***" means those certain leases of real property related to the Sellers' Eclipse locations that are subject to the Closing Assumed Contract List and that are identified in Schedule 2.6(b).

(z)        "***Closing Contracts***" means those certain Contracts subject to the Closing Assumed Contract List and that are identified in Schedule 2.6(b).

(aa)        "***Closing Date***" means the date on which the Closing occurs.

(bb)        "***Code***" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time.

(cc)    "*Contract*" means any legally binding contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument or other agreement, arrangement or commitment that is binding upon a Person.

(dd)    "*Cure Amounts*" shall have the meaning set forth in <u>Section 2.3(b)</u>.

(ee)    "*Deposit*" shall have the meaning set forth in <u>Section 3.2</u>.

(ff)    "*Designation Deadline*" means the end of the day on the fifteenth (15th) day following the Closing Date; *provided,* that such date may be extended with respect to any Contract for up to an additional fifteen (15) days with the consent of Purchaser and the applicable counterparty.

(gg)    "*Documents*" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental plans and reports, data, Permits and Permit applications, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(hh)    "*EASA*" means the European Union Aviation Safety Agency.

(ii)    "*Eclipse*" means Eclipse Aerospace, Inc., a Delaware corporation.

(jj)    "*Eclipse Aircraft*" means Eclipse aircraft, including the Eclipse 550, Eclipse 500, 400, SE, Total Eclipse and other Eclipse brands, (whether in production, complete, certified and registered, new or used with the FAA or otherwise), and shall include all Eclipse aircraft objects, airframes, engines, rotors and propellers, parts and other goods, accessions and property attached to, incorporated in, affixed to or used in connection with such aircraft and any other log books, CAMP records and maintenance, repair and other records and related information (in English) for each such Eclipse aircraft and Eclipse aircraft engine, as applicable.

(kk)    "*Eclipse EASA Certificate*" means the revised type certificate for model EA500, identified as NBR: EASA.IM.A.171 issued to Eclipse Aerospace, Inc., on November 13, 2009 with major change approval on November 18, 2015.

(ll)    "*Eclipse Production Certificate*" means production certificate number 550SW for model EA500 as amended and forwarded to Eclipse Aerospace, Inc., on December 11, 2017 by the U.S. Department of Transportation Federal Aviation Administration.

(mm)    "*Eclipse Project*" means the project of owning, designing, engineering, manufacturing, repairing, maintaining, supporting and upgrading of existing or future Eclipse Aircraft and Eclipse simulators. The Eclipse Project shall include, without limitation, the Sellers' Project Canada, Sellers' Project Eclipse Garmin SE, and other aircrafts and simulators owned by Sellers.

(nn)        "*Eclipse Type Certificate*" means type certificate number A00002AC for model EA500 issued to Eclipse Aviation Corporation on July 27, 2006, reissued on September 30, 2006 (change from provisional to standard type certificate) and transferred to Eclipse Aerospace, Inc., on September 30, 2009 by the U.S. Department of Transportation Federal Aviation Administration.

(oo)        "*Encumbrance*" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

(pp)        "*Environmental Law*" means any foreign, federal, state or local statute, regulation, ordinance rule of common law or agency guidance or policies relating to the protection of human health, safety, the environment, natural resources or consumer products.

(qq)        "*Environmental Liabilities and Obligations*" means all Liabilities arising from any actual or threatened impairment, impact or damage to the environment, health or safety, or any actual or threatened failure to comply with Environmental Law in connection with the prior or ongoing ownership or operation of the any assets, liabilities of business of any of the Debtors, the Purchased Assets, or any real property where any such business, assets or liabilities is currently or have been located, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials; (ii) the Release of Hazardous Materials; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Law including all applicable Permits; (v) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports; and (vi) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)-(v) of this definition.

(rr)        "*Escrow Account*" shall have the meaning set forth in Section 3.2.

(ss)        "*Escrow Agent*" shall have the meaning set forth in Section 3.3.

(tt)        "*Escrow Agreement*" shall have the meaning set forth in Section 3.3.

(uu)        "*Excluded Assets*" shall have the meaning set forth in Section 2.2.

(vv)        "*Excluded Contract*" shall have the meaning set forth in Section 2.6(c).

(ww)        "*Excluded Liabilities*" shall have the meaning set forth in Section 2.4.

(xx)        "*Excess Cure Amount*" shall have the meaning set forth in Section 2.3(b).

(yy)        "*FAA*" means the United States Federal Aviation Administration.

(zz)    "*Final Order*" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Sellers' Bankruptcy Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(aaa)    "*GAAP*" means United States generally accepted accounting principles as in effect from time to time.

(bbb)    "*Governmental Body*" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(ccc)    "*Hazardous Material*" means any substance, material or waste which is regulated by any Governmental Body, including petroleum and its by-products, asbestos, and any material or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or the subject of any provision of Environmental Law.

(ddd)    "*Holdback Escrow Account*" shall have the meaning set forth in Section 3.3.

(eee)    "*Holdback Escrow Amount*" means $500,000.

(fff)    "*Indebtedness*" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person with respect to any Contracts relating to the deferred and unpaid purchase price of property or services, including any interest accrued thereon and prepayment or similar penalties and expenses; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or

otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(ggg)    "*Intellectual Property*" means all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans, logos, designs, symbols, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, any fictitious names, d/b/a's or similar filings related thereto, or any variant of any of them, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iii) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, intangibles, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, industrial property rights, and methodologies; (iv) computer software, computer programs, and databases (whether in source code, object code or other form); and all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

(hhh)    "*Inventory*" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) related to the Eclipse Project and the Purchased Assets maintained or held by, stored by or on behalf of, or in transit to, any Seller.

(iii)    "*IP Assignment and Assumption Agreement*" shall have the meaning set forth in <u>Section 4.2(d)</u>.

(jjj)    "*Knowledge*" or ("*Knowledge of the Sellers*" or the "*Sellers' Knowledge*") means the actual knowledge of Alan Klapmeier, Steve Serfling and Jon Hansen, after commercially reasonable due inquiry.

(kkk)    "*Law*" means any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, airworthiness directive, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, including but not limited to Environmental Laws.

(lll)    "*Liability*" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(mmm)    "*Material Adverse Effect*" means any event, change, occurrence or state of facts that has had, individually or in the aggregate, a material adverse effect on the Purchased Assets and Assumed Liabilities, taken as a whole; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (a) changes in the U.S. or global economy or capital markets in general but that do not have a disproportionate effect on the Purchased Assets and Assumed Liabilities relative to similar assets and liabilities, (b) changes that affect generally the industry in which the Sellers operate but that do not have a disproportionate effect on the Purchased Assets and Assumed Liabilities relative to similar assets and liabilities, (c) changes (other than due to the COVID-19 virus) after the Agreement Date in any applicable Law or GAAP or the interpretation or enforcement thereof, (d) the commencement of the Bankruptcy Case and the Sellers' inability to pay certain obligations as a result of the filing of the Bankruptcy Case, (e) any actions taken or proposed to be taken by Purchaser or any of its Affiliates or actions taken or proposed to be taken by any of the Sellers at the request or direction of the Purchaser or any of its Affiliates, (f) any effect resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement, (g) actions or omissions of the Sellers resulting from restrictive covenants contained in this Agreement which Purchaser does not waive following an explanation and request from the Sellers, or (h) any change arising in connection with acts of God, natural disasters, earthquakes, epidemics, plagues, pandemics, disease outbreaks, illnesses or public health events (other than the COVID-19 virus and any non-human epidemic, plague, pandemic or other similar disease outbreak or illness), the declaration of a national emergency, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such epidemics, plagues, pandemics, disease outbreaks, illnesses or public health events or hostilities, acts of war, sabotage or terrorism or military actions.

(nnn)    "*New Certificates*" shall have the meaning set forth in Section 8.10.

(ooo)    "*New EASA Certificate*" shall have the meaning set forth in Section 8.10.

(ppp)    "*New FAA Production Certificate*" shall have the meaning set forth in Section 8.10.

(qqq)    "*New FAA Repair Station Certificate(s)*" shall have the meaning set forth in Section 8.10.

(rrr)    "*New FAA Type Certificate*" shall have the meaning set forth in Section 8.10.

(sss)    "*New FAA Parts Certificate*" shall have the meaning set forth in Section 8.10.

(ttt)    "*Order*" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Body.

(uuu)    "*Organizational Documents*" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general

partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments or supplements to any of the foregoing.

(vvv)    "**_Outside Date_**" shall have the meaning set forth in <u>Section 4.4(a)</u>.

(www)    "**_Party_**" shall have the meaning set forth in the preamble.

(xxx)    "**_Pending Assigned Contracts_**" shall have the meaning set forth in <u>Section 2.3(b)</u>.

(yyy)    "**_Permits_**" means to the fullest extent permitted under applicable law, all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any of the Sellers.

(zzz)    "**_Permitted Encumbrances_**" means (i) Encumbrances for utilities; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect any of the Purchased Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens that are included in the Assumed Liabilities, (v) licenses granted on a non-exclusive basis, and (vii) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole and exclusive discretion.

(aaaa)    "**_Person_**" means an individual, corporation, partnership, limited liability Seller, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(bbbb)    "**_Post-Closing Tax Period_**" means any taxable period (or portion thereof) beginning after the Closing Date.

(cccc)    "**_Pre-Closing Period_**" means the period commencing on the Agreement Date and ending on the earlier of the date upon which this Agreement is terminated pursuant to <u>Section 4.4</u> or the Closing Date.

(dddd)    "**_Pre-Closing Tax Period_**" means any taxable period (or portion thereof) ending on or before the Closing Date.

(eeee)    "**_Purchase Price_**" shall have the meaning set forth in <u>Section 3.1</u>.

(ffff)    "**_Purchased Assets_**" shall have the meaning set forth in <u>Section 2.1</u>.

(gggg)    "**_Purchased Intellectual Property_**" shall have the meaning set forth in <u>Section 2.1(g)</u>.

(hhhh)    "***Purchaser***" shall have the meaning set forth in the preamble.

(iiii)    "***Rejection Effective Date***" shall have the meaning set forth in <u>Section 2.6(c)</u>.

(jjjj)    "***Release***" means any actual or threatened release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property.

(kkkk)    "***Remedial Action***" means all actions to (i) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

(llll)    "***Representative***" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

(mmmm)   "***Sale Hearing***" means the hearing to approve this Agreement and seeking entry of the Sale Order.

(nnnn)    "***Sale Motion***" means the motion or motions of the Sellers, in form and substance reasonably acceptable to the Sellers and Purchaser, seeking approval and entry of the Sale Order.

(oooo)    "***Sale Order***" means the order entered by the Bankruptcy Court, in form and substance satisfactory to Purchaser in its sole and exclusive discretion and in accordance with the provisions of <u>Section 7.1</u>, approving the sale of the Purchased Assets to the Purchaser and the transaction contemplated in this Agreement.

(pppp)    "***Seller***" or the "***Sellers***" shall have the meaning set forth in the preamble.

(qqqq)    "***Subsidiary***" or "***Subsidiaries***" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

(rrrr)    "***Systems***" means all software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and other information technology equipment that are used to process, store, maintain and operate business data, information, and functions.

(ssss)    "***Tax***" and "***Taxes***" mean (i) any and all taxes, including any federal, state, provincial, local, foreign or other income, gross receipts, sales, value added, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental,

stamp, occupation, premium, property (real or personal), real property gains, windfall profits, capital, production, recapture, net worth, surplus, customs, duties, levies, surtaxes or other taxes, fees, assessments, reassessments or charges of any kind whatsoever, together with any interest, additions, installments or penalties with respect thereto and any interest in respect of such additions or penalties, (ii) any Liability for the payment of any items described in clause (i) above as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary or aggregate group (or being included (or being required to be included)) in any Tax Return related to such group (including any Liability pursuant to Section 1.1502-6 of the Treasury Regulations, or any similar provision of state, local or non-U.S. Law), and (iii) any Liability for the payment of any amounts as a result of any express or implied obligation to indemnify any other Person, or any successor or transferee liability, by contract or otherwise in respect of any items described in clause (i) or (ii) above.

(tttt)    "*Tax Proceeding*" means any action, suit, investigation, audit, Claim, investigation, or other action or proceeding with respect to Taxes.

(uuuu)    "*Tax Refunds*" means all Tax assets net of any Liability (including all state and federal Tax refunds (or the right to such state and federal refunds of Taxes, whether claimed or unclaimed) for all taxable periods (or portions thereof)), whether ending on, prior to, or after the Closing Date.

(vvvv)    "*Tax Return*" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(wwww)    "*Treasury Regulations*" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

1.2    <u>Interpretations</u>. Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Schedule, clause or subclause, such reference shall be to an Article, Section, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)     All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)     References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References herein to a Person are also to its successors and permitted assigns. Any reference herein to a Governmental Body shall be deemed to include reference to any successor thereto. References from or through any date means, unless otherwise specified, from and including or through and including such date, respectively.

(i)     Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)     References to "days" shall refer to calendar days unless Business Days are specified. If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

(k)     Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if."

## ARTICLE II.

## PURCHASE AND SALE OF THE PURCHASED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

2.1     <u>Purchase and Sale of the Purchased Assets</u>. Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and the Bankruptcy Rules, and on the terms and subject to the conditions set forth herein and the Sale Order, at the Closing, the Sellers shall sell, transfer, assign, convey and deliver to Purchaser (or any entity or person designated by Purchaser), and Purchaser shall purchase, acquire and accept from the Sellers all of the Sellers' right, title and interest in, to and with the following assets (the "***Purchased Assets***"):

(a)     the Aircraft Certificates as set forth on <u>Schedule 5.3(d)</u>;

(b)     all other type, supplemental type, parts or similar certificates, held by, and all applications heretofore submitted by, any of the Sellers with respect to any existing and future Eclipse Aircraft;

(c)     all tangible assets of the Sellers relating to the Eclipse Project, including, without limitation, the tangible assets of the Sellers located at any Closing Assumed Leased Real Property or at the locations listed on Schedule 2.6(b);

(d)     to the extent transferrable hereunder and at the time when Sellers are able, all production and other similar aircraft certificates, held by, and all applications heretofore submitted by, any of the Sellers with respect to any existing and future Eclipse Aircraft;

(e)     to the extent transferrable hereunder and at the time when Sellers are able, all other Permits relating to the Eclipse Project or the Purchased Assets, and all pending applications therefor;

(f)     subject to Section 2.6, all rights under Contracts that are not Excluded Contracts, including all rights under the Closing Assumed Contract List (the "*Assigned Contracts*");

(g)     all Intellectual Property and proprietary rights of any kind related to, or arising under, the Eclipse Project, including, the following: (i) trademarks, service marks, trade names, slogans, logos, designs, symbols, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, any fictitious names, d/b/a's or similar filings related thereto, or any variant of any of them, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iii) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, intangibles, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, industrial property rights, and methodologies; (iv) computer software, computer programs, and databases (whether in source code, object code or other form); and (v) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith (the "*Purchased Intellectual Property*"), including all claims (including all rights to bring claims for past, present or future infringement of the Purchased Intellectual Property owned by the Seller) and causes of action of the Sellers as of the Closing against any Persons (regardless of whether or not such claims and causes of action have been asserted by the Sellers) related thereto;

(h)     all rights under non-disclosure or confidentiality agreements related to the Purchased Intellectual Property;

(i)     all vehicles, tools, parts and supplies, machinery, equipment, appliances, and related documentation, stored data, in each case, with any freely transferable warranty and service rights of the applicable Sellers related to, or arising under, the Eclipse Project or the Purchased Assets;

(j)     all Inventory, including raw materials, work in process, parts, subassemblies and finished goods, wherever located and whether or not obsolete or carried on the Sellers' books of account, in each case with any transferable warranty and service rights of the applicable Seller with respect to the Eclipse Project or the Purchased Assets;

(k)    all Eclipse Aircraft and simulators, in any state, owned or leased by any of the Sellers;

(l)    to the extent permitted by Law, all Documents arising under or relating to the Purchased Assets, Assumed Liabilities or the Eclipse Project, including, without limitation, financial accounting and other books and records, correspondence, and all customer lists. customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, manuals related to the part 145 repair station certificates, and all other business and other records, in each case arising under or relating to the Purchased Assets, the Assumed Liabilities or the Eclipse Project;

(m)    except for the Excluded Actions, all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assigned Contracts) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities, guaranties and claims and causes of action under applicable Law that are possessed by the Sellers (excluding Avoidance Actions);

(n)    to the extent transferable, all rights and obligations under or arising out of all insurance policies relating to the Purchased Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to the Sellers, with respect to cancelled policies);

(o)    any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment relating to or in respect of any Purchased Asset;

(p)    to the extent transferable, all Systems related to the Eclipse Project or the Purchased Assets that are owned by the Sellers;

(q)    except for the Excluded Actions, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), relating to the Purchased Assets; and

(r)    all other assets related to the Eclipse Project as set forth on <u>Schedule 2.1(r)</u>.

2.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall the Sellers be deemed to sell, transfer, assign or convey, and the Sellers shall retain all right, title and interest to, in and under the following assets, properties, interests and rights of the Sellers (collectively, the "***Excluded Assets***"):

(a)    copies of any and all information not relating to the Eclipse Project or the Purchased Assets that is stored on the Sellers' computer systems, data networks or servers;

(b)     all agreements and contracts of the Sellers other than the Assigned Contracts;

(c)     all Documents and all personnel records of the Sellers' employees that the Sellers are required by Law to retain and are prohibited by Law from providing a copy thereof to Purchaser;

(d)     the Sellers' Organizational Documents, corporate charter, minute and stock record books, Tax Returns, corporate seal, checkbooks and canceled checks;

(e)     all shares of capital stock or other equity interests issued by the Sellers or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(f)     the Sellers' rights under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Purchaser to the Sellers in connection with the transactions contemplated hereby, or any side agreement between the Sellers and Purchaser entered into on or after the Agreement Date;

(g)     all causes of action to the extent arising out of or related to any Excluded Asset;

(h)     all causes of action, indemnities, rights, claims, and counterclaims set forth on Schedule 2.2(h) (the "*Excluded Actions*");

(i)     all current, as of the date of Closing, and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(j)     all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto);

(k)     all trade and non-trade accounts receivable, notes receivable and negotiable instruments of the Sellers;

(l)     all of the Sellers' cash and cash equivalents (except to the extent of the Purchase Price);

(m)     all rights and obligations under key employee retention plans and similar arrangements with (or for the benefit of) employees and agents of the Sellers; and

(n)     all assets expressly excepted from the subsections of Section 2.1, including those set forth on applicable schedules, regardless of whether such assets are listed in this Section 2.2.

2.3     Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume from the Sellers (and pay, perform, discharge or otherwise satisfy in accordance with their respective terms or as required by Law), and the Sellers shall irrevocably convey, transfer and assign to Purchaser,

the following Liabilities (and only the following Liabilities) (collectively, the "***Assumed Liabilities***"):

(a)    all Liabilities of the Sellers arising from the ownership of the Purchased Assets, relating to periods occurring on or after the Closing; and

(b)    all Liabilities and obligations of the Seller under the Assigned Contracts, including any costs of cure with respect to the Assigned Contracts (the "***Cure Amounts***," or with respect to an individual Assigned Contract, the "***Cure Amount***") in each case to the extent arising and relating to the period through the Closing Date. In accordance with Section 2.6(g), the Parties understand and agree that to the extent that the aggregate Cure Amounts for the Assigned Contracts (as determined by the Bankruptcy Court or otherwise agreed to by the Parties and the counterparties to the Assigned Contracts) exceeds the aggregate amount of the Cure Amounts for such Assigned Contracts set forth on Schedule 2.3(b)(i), Purchaser shall be solely liable for such excess; provided, however, that with respect to any Assigned Contract set forth on Schedule 2.3(b)(ii) (each, a "***Pending Assigned Contract***"), to the extent that the Purchaser and the applicable lessor or contract counterparty to a Pending Assigned Contract stipulate and agree to an aggregate Cure Amount for such Pending Assigned Contract that exceeds the amount of the Cure Amount for such Pending Assigned Contract as set forth on Schedule 2.3(b)(ii), the aggregate amount of such excess (the "***Excess Cure Amount***") shall be borne fifty percent (50%) by the Sellers by means of a reduction to the Purchase Price and fifty percent (50%) by Purchaser, subject to and in accordance with the holdback requirements set forth in Section 3.3; provided that, to the extent the Excess Cure Amount is determined after the Closing, Sellers' aggregate liability for such Excess Cure Amount shall be limited to the amount set forth in the Holdback Escrow Account.

Notwithstanding the foregoing or any other provisions of this Agreement, Purchaser shall not assume hereunder, and "Assumed Liabilities" shall not include, Liabilities under any Contract to the extent such Liabilities arise as a result of a breach or failure of such Contract occurring prior to, as of, or as a result of, the Closing.

The assumption by Purchaser of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4    Excluded Liabilities. Notwithstanding any provision in this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any other Liabilities of the Sellers of whatever nature (whether arising prior to, at the time of, or subsequent to Closing), whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and the Sellers shall be solely and exclusively liable for any and all such Liabilities, including without limitation, those Liabilities set forth below (collectively, the "***Excluded Liabilities***"):

(a)    all Liabilities of the Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)    any and all Liabilities for Indebtedness with respect to borrowed money;

(c)    subject to Section 2.3, all Liabilities of the Sellers resulting from the conduct of the Sellers or ownership or lease of any properties or assets or any properties or assets

previously used by the Sellers at any time, or other actions, omissions or events and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to all Actions against the Sellers or their predecessors or Affiliates whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(d)    any and all Liabilities of the Sellers in respect of Contracts that are not Assigned Contracts;

(e)    all Liabilities related to or with respect to any employees, including with respect to wages, commissions, vacation, sick leave, personal time;

(f)    all Liabilities arising out of or relating to any business or property formerly owned or operated by the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by the Sellers;

(g)    all Environmental Liabilities and Obligations arising or relating to any period prior to the Closing;

(h)    any and all Liabilities of the Sellers for any (i) Taxes (including any Taxes owed by the Sellers and arising in connection with the consummation of the transactions contemplated by this Agreement), and (ii) Taxes attributable to the Purchased Assets or the operation of the Eclipse Project for any Pre-Closing Tax Period; and

(i)    any and all Liabilities of the Sellers arising under this Agreement and/or any Ancillary Document executed and delivered by the Sellers to Purchaser in connection with the transactions contemplated hereby, or any side agreement between the Sellers and Purchaser entered into on or after the Agreement Date.

2.5    <u>Post-Closing Liabilities</u>. Purchaser acknowledges that Purchaser shall be responsible for all Liabilities and obligations relating to Purchaser's ownership or use of, or right to use, the Purchased Assets and the Assumed Liabilities after the Closing Date, including, without limitation, all Taxes arising out of or related to the Purchased Assets or the operation of conduct of the Purchased Assets acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

2.6    <u>Assumption/Rejection of Certain Contracts</u>.

(a)    The Sale Order shall provide for the assumption by the Sellers (to the extent not already assumed by the Sellers), and the assignment to the extent legally capable of being assigned by the Sellers to Purchaser or its designee, of the Assigned Contracts on the terms and conditions set forth in the remainder of this <u>Section 2.6</u>, and shall provide for the Designation Deadline. At Purchaser's reasonable request, the Sellers shall reasonably cooperate from the date hereof forward with Purchaser: (i) to allow Purchaser or its designee to enter into an amendment of any Contract upon assumption of such Contract by Purchaser or its designee (and the Sellers shall reasonably cooperate with Purchaser or its designee to the extent reasonably requested with Purchaser or its designee in negotiations with the lessors and contract counterparties thereof), or (ii) to otherwise amend any Contract to the extent such amendments would not adversely affect the Sellers; <u>provided</u>, that the Sellers shall not be required to enter into any such amendment if

17

such amendment would result in an assumption by the Sellers of such Contract, unless such Contract will be assigned to Purchaser or its designee at the time of such assumption and the Sellers will have no Liability in connection therewith following such assignment and assumption. The Sellers shall have no obligation to Purchaser to provide adequate assurances of future performance under any Assigned Contract in connection with the assignment and assumption thereof by the Seller.

(b)        Purchaser has identified the Contracts that Purchaser has decided will be Assigned Contracts to be assumed and assigned to Purchaser or its designee on the Closing Date by providing a list thereof to the Sellers consisting of the Closing Contracts and the Closing Assumed Leased Real Property (as updated in accordance with this Agreement, the "***Closing Assumed Contract List***"), as set forth on <u>Schedule 2.6(b)</u>. Until two (2) Business Days prior to the Closing Date, Purchaser may, in its sole discretion, add or remove any Contract as an Assigned Contract to be assumed and assigned to Purchaser or its designee on the Closing Date by amending the Closing Assumed Contract List, and, in connection with the Closing, the Sellers shall move in the Bankruptcy Court to assign any such Contract on the Closing Assumed Contract List to Purchaser or its designee, and at the Closing shall assign to, and Purchaser or its designee shall accept the assignment of and assume such Contract. Until two (2) Business Days prior to the Closing Date, Purchaser may, in its sole discretion, designate a Contract for exclusion and rejection by delivering written notice to the Sellers and, in connection with the Closing, such Contract will be deemed rejected as of the Closing (which date shall constitute the Rejection Effective Date with respect thereto).

(c)        From and after the Agreement Date until the Designation Deadline, with respect to any Contract that was neither included on the Closing Assumed Contract List nor excluded and rejected as of the Closing Date, Purchaser may, in its sole discretion, designate such Contract as an Assigned Contract by providing written notice to the Sellers, specifying the Contract to be assumed by the Sellers and assigned to Purchaser or its designee. All Contracts not designated as an Assigned Contract by the expiration of the Designation Deadline shall be deemed rejected as of the Closing (the "***Rejection Effective Date***") and no Seller shall have any obligation to assign any such Contract to Purchaser (such contract, an "***Excluded Contract***"). Upon delivery of a notification by Purchaser with respect to any Contract to be designated for assumption and assignment, the applicable Seller shall move in the Bankruptcy Court within two (2) days of receipt of such notice to assign such Contract to Purchaser or its designee and shall assume and assign to, and Purchaser or its designee shall accept the assignment of and assume such Contract. Unless and until Purchaser or its designee accepts the designation of such Contract, Purchaser or its designee shall not be obligated to perform or cause to be performed Sellers' obligations under such Contract, and shall not retain any liabilities thereunder.

(d)        After the Closing and prior to the Designation Deadline, the Sellers shall not terminate, amend, supplement, modify, waive any rights under, or create any lien with respect to any Contract, or take any affirmative action not required by the terms thereof, without the prior written consent of Purchaser (not to be unreasonably withheld or delayed), unless Purchaser has provided notice to the Sellers in writing designating such Contract for rejection pursuant to <u>Section 2.6(c)</u>.

(e)        Within two (2) Business Days of Purchaser's delivery of any notice of designation of any Contract as an Assigned Contract pursuant to <u>Section 2.6(c)</u>, or such lesser time

as is approved by the Bankruptcy Court, the Sellers shall give notice of the designation of such Contract as an Assigned Contract to the other parties thereto.

(f)    As part of the Sale Motion (or as necessary in one or more separate motions), the Sellers shall request that, by virtue of the Sellers' providing notice of its intent to assume and assign any Contract, the Bankruptcy Court deem any non-debtor party to such Contract to have given any required consent to the assumption of the affected Contract by the relevant Seller and assignment to Purchaser or its designee.

(g)    Subject to Section 2.3(b) and Section 3.3, in connection with the assumption and assignment to Purchaser or its designee of any Assigned Contract that is executory pursuant to this Section 2.6, the Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assigned Contracts, including any amounts payable to any landlord under any lease that is an Assigned Contract that relates to the period prior to the Assumption Approval, shall be paid by Purchaser, on or before the Closing.

(h)    The Sellers shall use their commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assigned Contracts to Purchaser or its designee (the "*Assumption Approval*") on the terms set forth in this Section 2.6. In the event the Sellers are unable to assign any such Assigned Contract to Purchaser or its designee pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts until the Designation Deadline to obtain, and to cooperate in obtaining, all consents from Governmental Bodies and third parties necessary to assume and assign such Assigned Contracts to Purchaser or its designee.

(i)    To the extent that any consent that is required to assign to Purchaser or its designee any Assigned Contract is not obtained by the Designation Deadline, the Sellers shall, with respect to each such Assigned Contract, from and after the Closing and until the earliest to occur of (x) the date on which such applicable consent is obtained (which consents the Parties shall use their reasonable best efforts, and cooperate with each other, to obtain promptly; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Purchaser), (y) the date on which such Contract is rejected following the written request of Purchaser, and (z) thirty (30) days after the Closing Date, use commercially reasonable efforts during the term of such Assigned Contract to (i) provide to Purchaser or its designee the benefits under such Assigned Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Purchaser or its designee pending receipt of the required consent) designed to provide such benefits to Purchaser or its designee and (iii) use its commercially reasonable efforts to enforce for the account of Purchaser or its designee any rights of the Sellers under such Assigned Contract (including the right to elect to terminate such Assigned Contract in accordance with the terms thereof upon the written direction of Purchaser). Purchaser shall reasonably cooperate with the Sellers in order to enable Seller to provide to Purchaser the benefits contemplated by this Section 2.6(i).

(j)    Notwithstanding the foregoing, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser or its designee to the extent that such Contract (i) is rejected by the Sellers or terminated by the Sellers in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the

19

Designation Deadline and is not continued or otherwise extended upon assumption, or (ii) requires a consent of any Governmental Body or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser or its designee of the Sellers' rights under such Contract, and no such consent has been obtained prior to the Designation Deadline. In addition, a Permit shall not be assigned to, or assumed by, Purchaser or its designee to the extent that such Permit requires a Consent of any Governmental Body or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser or its designee of the Sellers' rights under such Permit, and no such consent has been obtained prior to the Closing.

## ARTICLE III.

## CONSIDERATION

3.1 <u>Consideration</u>. The aggregate consideration for the Purchased Assets shall be equal to the sum of a cash payment to the Sellers of $5,250,000 (the "**_Purchase Price_**"), subject to adjustment in accordance with <u>Section 2.3(b)</u>, <u>Section 3.2</u>, <u>Section 3.3</u> and <u>Section 3.4</u>.  On the Closing Date, any payment required to be made pursuant to any provision hereof in cash shall be made by the Purchaser by wire transfer of immediately available funds to such bank account as shall be designated in writing by the Sellers not later than two (2) Business Days prior to the Closing Date.

3.2 <u>Deposit</u>. On the first Business day following the execution of this Agreement, Purchaser shall deposit a deposit in the amount of $500,000 (the "**_Deposit_**"), by wire transfer of immediately available funds into an account mutually acceptable to the Sellers and Purchaser (the "**_Escrow Account_**"). If the Closing occurs, the Sellers and Purchaser shall deliver a joint written instruction to an authorized representative of the Escrow Account authorizing such Person to release from the Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by the Sellers, and the Deposit shall be credited against the amount required to be paid by Purchaser to the Sellers at Closing. If this Agreement is validly terminated by the Sellers in accordance with the terms of this Agreement prior to Closing pursuant to <u>Section 4.4(h)</u>, then the Sellers and Purchaser shall deliver a joint written instruction to an authorized representative of the Escrow Account authorizing such Person to release from the Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by Sellers, with such Deposit to be retained by the Sellers as the Sellers' sole and exclusive remedy as liquidated damages for any and all losses or damages of any nature against Purchaser in respect of this Agreement or the transactions contemplated hereby. In all other circumstances, if this Agreement is validly terminated in accordance with the terms of this Agreement prior to Closing, then within two (2) Business Days of such termination, the Sellers and Purchaser shall deliver a joint written instruction to an authorized representative of the Escrow Account authorizing such Person to release all funds held in the Escrow Account, including any interest or earnings thereon, by wire transfer of immediately available funds to an account designated by Purchaser.

3.3 <u>Holdback Escrow Account</u>. If the Purchaser and the applicable lessor or contract counterparty to any Pending Assigned Contract set forth on <u>Schedule 2.3(b)(ii)</u> fail to stipulate and agree to an aggregate Cure Amount in respect of such Pending Assigned Contract on or prior to the Closing Date, then on the Closing Date, the portion of the Purchase Price payable by Purchaser to Sellers at Closing shall be reduced by the Holdback Escrow Amount and Purchaser shall deposit with an escrow agent mutually acceptable to the Sellers and Purchaser (the "**_Escrow Agent_**"), the

Holdback Escrow Amount, by wire transfer of immediately available funds for deposit into a separate escrow account (the "***Holdback Escrow Account***"), established pursuant to a mutually acceptable escrow agreement, to be executed by and among the Sellers, Purchaser and the Escrow Agent (the "***Escrow Agreement***"). From the Closing Date through until the Designation Deadline, the Parties shall use good faith efforts to finalize the Cure Amounts with respect to the Pending Assigned Contracts set forth on Schedule 2.3(b)(ii). Within two (2) Business Days following the earlier of (a) the Designation Deadline, or (b) the date upon which the Purchaser and the applicable lessor or contract counterparty stipulate and agree to the aggregate Cure Amount in respect of such Pending Assigned Contract, the Sellers and Purchaser shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release from the Holdback Escrow Account the amount therein as follows: (i) fifty percent (50%) of the Excess Cure Amount to Purchaser, and (ii) the remainder to the Sellers.

3.4     Escrow Agent Fees and Expenses.  Fifty percent (50%) of the fees and expenses of the Escrow Agent shall be borne by the Purchaser and fifty percent (50%) of such fees and expenses shall be borne by the Sellers.

## ARTICLE IV.

## CLOSING AND TERMINATION

4.1     Closing. Subject to the satisfaction or waiver by the appropriate Party of the conditions set forth in Article IX, the closing of the purchase and sale of the Purchased Assets, the payment of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "***Closing***") shall occur as soon as practicable following the satisfaction or waiver of all conditions set forth in this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The Closing shall take place at such place as the Parties may agree. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of each of the Sellers in the Purchased Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser and the assumption of all of the Assumed Liabilities shall be deemed to have occurred as of 12:01 a.m., Eastern Time on the Closing Date.

4.2     Closing Deliveries by the Sellers. At or prior to the Closing, the Sellers shall deliver to Purchaser:

(a)     a Bill of Sale in form and substance satisfactory to Purchaser in its sole and exclusive discretion (the "***Bill of Sale***") duly executed by each Seller;

(b)     FAA bills of sale (the "***FAA Bills of Sale***") or warranty bills of sale for all Eclipse Aircraft included in the Purchased Assets executed by each applicable Seller and, in each case, filed with the FAA and the International Registry, as applicable;

(c)     one or more assignment and assumption agreements in form and substance satisfactory to Purchaser in its sole and exclusive discretion (the "***Assignment and Assumption Agreement***") duly executed by the Sellers;

(d)    one or more assignment and assumption of lease in form and substance satisfactory to Purchaser in its sole and exclusive discretion (a "***Lease Assignment Agreement***"), duly executed by the Sellers;

(e)    an Intellectual Property Assignment and Assumption Agreement in form and substance satisfactory to Purchaser in its sole and exclusive discretion (the "***IP Assignment and Assumption Agreement***"), duly executed by the Sellers;

(f)    a file-stamped copy of the Sale Order;

(g)    copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Purchased Assets from all Encumbrances, including any applicable UCC termination statements, releases of mortgages, and FAA or International Registry releases or terminations, all in a form reasonably satisfactory to Purchaser;

(h)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each of the Sellers certifying that the conditions set forth in Section 9.3 have been satisfied;

(i)    a copy of the resolutions adopted by the Board of Directors or similar governing body of each Seller evidencing the authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of each Seller;

(j)    an IRS Form W-9 executed by each Seller;

(k)    copies of all certificates of airworthiness for the Eclipse Aircraft included in the Purchased Assets, as applicable;

(l)    copies of any statements of account from each subscription, program, and service provider on the Eclipse Aircraft included in the Purchased Assets, including the corresponding engines, propellers or APU, as applicable, of such Eclipse Aircraft owned or leased by any Seller, confirming in each case that the relevant statement of account has been paid in full, with no account deficit, failing which any deficit amounts shall be paid out of the purchase price proceeds owing to the applicable Seller at Closing;

(m)    access to all of Sellers' Transacting User Entity accounts on the International Registry, including any necessary passwords to the extent such access is required and related to the Eclipse Project;

(n)    an irrevocable power of attorney (and any necessary authorizing documents), duly executed by each applicable Seller, in form(s) and substance satisfactory to Purchaser, granting Purchaser the power to take any and all appropriate action and to make, execute, endorse, deliver, file and/or record registrations at the FAA or International Registry in connection with the Eclipse Aircraft included in the Purchased Assets and any prior owned Eclipse Aircraft, including any corresponding engines, propellers or APU, by Sellers for which such actions are required to be taken and Sellers are unable to take such actions;

(o)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser,

22

as Purchaser may reasonably request to vest in Purchaser all of the Sellers' right, title and interest of the Sellers in, to or under any or all the Purchased Assets; and

(p)     such other documents as Purchaser may reasonably request that are not inconsistent with the terms of this Agreement and customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.3     <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) the Sellers:

(a)     the Assignment and Assumption Agreement duly executed by Purchaser;

(b)     the Lease Assignment Agreement duly executed by Purchaser;

(c)     the Intellectual Property Assignment and Assumption Agreement duly executed by Purchaser;

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized manager of Purchaser certifying that the conditions set forth in <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u> have been satisfied;

(e)     other agreements required by the terms of the Agreement;

(f)     all other certificates, agreements and other documents required by this Agreement to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement;

(g)     such other documents as the Sellers may reasonably request that are not inconsistent with the terms of this Agreement and customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement; and

(h)     for the avoidance of doubt, such funds as necessary to pay the remainder of the Purchase Price due upon Closing (taking into account <u>Section 2.3(b)</u>, <u>Section 3.2</u>, <u>Section 3.3</u> and <u>Section 3.4</u>).

4.4     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 4.4</u>. This Agreement may be terminated at any time prior to the Closing, as follows:

(a)     by the mutual written consent of the Sellers and Purchaser;

(b)     by written notice of either the Sellers or Purchaser to such other Party, if the Closing shall not have been consummated prior to November 27, 2020 (the "***Outside Date***"); <u>provided</u>, <u>however</u>, that the Outside Date may be extended by the mutual written consent of the Sellers and Purchaser, for a period up to fifteen (15) days to the extent that all conditions to Closing set forth in this Agreement are capable of being satisfied as of such time; <u>provided</u>, <u>further</u>, <u>however</u>, that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 4.4(a)</u> if such Party is in material breach of this Agreement; <u>provided</u>, <u>further</u>, <u>however</u>, that if the Closing has not occurred by the Outside Date, but on such date all of the conditions set forth in <u>Article 10</u> have been satisfied or waived (to the extent such conditions may be waived) other than

23

the condition set forth in Section 9.1(b), then the Outside Date shall automatically be extended until the earlier to occur of the following: (i) the date all of the conditions set forth in Article 10 have been satisfied or waived (to the extent such conditions may be waived), or (ii) December 11, 2020 (and such extended date shall be deemed to be the "Outside Date" for all purposes hereunder) unless two (2) Business Days prior to the end of the earlier to occur of (i) or (ii) hereof, Purchaser provides written notice to the Sellers that it is no longer extending the Outside Date pursuant to this Section 4.4(a);

(c)     by written notice from Purchaser to the Sellers, if (i) the Sellers seek to have the Bankruptcy Court enter an Order dismissing, or converting the Bankruptcy Case into a case(s) under chapter 7 of the Bankruptcy Code, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Eclipse Project (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (ii) an order of dismissal, conversion or trustee appointment is entered for any reason and is not reversed or vacated within twenty-one (21) days after entry thereof;

(d)     by written notice from Purchaser to the Sellers, if (i) the Sale Hearing has not taken place on or prior to October 30, 2020, (ii) the Bankruptcy Court has not entered the Sale Order on or prior to October 30, 2020, or (iii) the Sale Order shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Date), vacated, modified or supplemented without Purchaser's prior written consent;

(e)     by written notice from Purchaser to the Sellers, if following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Date), reversed, modified or amended in any material respect without the prior written consent of Purchaser;

(f)     by written notice from Purchaser to the Sellers, if the Sellers publicly announce their intention to pursue an Alternative Transaction;

(g)     automatically upon the consummation of an Alternative Transaction;

(h)     by written notice from the Sellers to Purchaser, if Purchaser breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Article X, (ii) cannot be or has not been cured within ten (10) days following delivery of notice to Purchaser of such breach or failure to perform and (iii) has not been waived by the Sellers;

(i)     by written notice from Purchaser to the Sellers, if the Sellers breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Article X, (ii) cannot be or has not been cured within ten (10) days following delivery of notice to the Sellers of such breach or failure to perform and (iii) has not been waived by Purchaser; or

(j)     by Sellers, if the Deposit is not timely paid by Purchaser in accordance with Section 3.2.

Each condition set forth in this <u>Section 4.4</u> pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this <u>Section 4.4</u> is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this <u>Section 4.4</u> shall become effective until two (2) Business Days after the delivery of such notice to the other Parties (unless such Outside Date is less than two (2) Business Days after the delivery of such notice, in which case such notice shall become effective upon the Outside Date), and only if such notice shall not have been withdrawn during such two (2) Business Day (or shorter) period.

4.5    <u>Procedures Upon Termination</u>. In the event of termination and abandonment by Purchaser or the Sellers, or both such Parties, pursuant to <u>Section 4.4</u> hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall be abandoned, without further action by Purchaser or the Sellers. If this Agreement is terminated as provided herein, each Party shall return all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same. If this Agreement is terminated pursuant to <u>Section 4.4(f)</u>, the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement, as described in <u>Section 4.6</u>.

4.6    <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 4.4</u>, this Agreement shall forthwith become null and void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; <u>provided</u>, <u>however</u>, that this <u>Section 4.6</u>, <u>Section 3.2</u> (Deposit) and <u>Article XI</u> (Miscellaneous), shall survive any such termination. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law. Each Party acknowledges that the agreements contained in this <u>Section 4.6</u> and in <u>Section 4.5</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this <u>Section 4.6</u> and <u>Section 4.5</u> do not constitute a penalty.

**ARTICLE V.**

**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Subject to the exceptions noted in the schedules delivered by the Sellers concurrently herewith (any matters listed or referenced on one schedule will be deemed to be listed or referenced on any other schedule, regardless of the absence of a cross reference, if the applicability of such matter is reasonably apparent), and with the Sellers having the right (but not the obligation) to supplement or amend the schedules hereto, prior to the Closing Date, with respect to any change, event, occurrence, state of facts, development or effect so long that, individually or in the aggregate, such supplements or amendments are not likely to result in a Material Adverse Effect on the assets, Liabilities, business, properties, or financial condition of the Sellers, taken as a whole, the Sellers represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

25

5.1     <u>Organization and Qualification</u>. Each Seller is duly incorporated or organized under the Laws of the jurisdiction of its formation. Each Seller has previously delivered to Purchaser complete and correct copies of its Organizational Documents, as amended and in effect on the Agreement Date.

5.2     <u>Authorization of Agreement</u>. Subject to the entry of the Sale Order, the Sellers have or will have at Closing all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform their obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Ancillary Documents to which they are a party, the performance by the Sellers of their obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been or will be at the Closing duly and validly authorized by all necessary action on the part of the Sellers. This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which they are a party will be, duly and validly executed and delivered by the Sellers and (assuming the due authorization, execution and delivery by the other Parties, and the entry of the Sale Order) this Agreement constitutes, and each Ancillary Document to which they are a party when so executed and delivered (assuming the due authorization, execution and delivery by the other parties thereto) will constitute, legal, valid and binding obligations of the Sellers, enforceable against the Sellers in accordance with its terms. Subject to entry of the Sale Order, except (a) for entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case and (c) for the notices, filings and consents set forth on <u>Schedule 5.2</u>, no Seller is required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement and each of the Ancillary Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, other than such notices, registrations, declarations, filings, consents, waivers, or approvals, the failure of which to make or obtain would not have a Material Adverse Effect.

5.3     <u>Conflicts; Consents; Compliance with Law</u>.

(a)     Except as set forth on <u>Schedule 5.3(a)</u>, the execution, delivery and performance by the Sellers of this Agreement or any Ancillary Document to which they are a party, the compliance by the Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by the Sellers of any other action contemplated hereby or thereby, do not and will not at the Closing contravene, violate or conflict with any term or provision of its respective Organizational Documents.

(b)     Except (i) for the entry of the Sale Order, and (ii) as set forth on <u>Schedule 5.3(b)</u>, no filing with, notice to or consent from any Person is required in connection with the execution, delivery and performance by the Sellers of this Agreement or the Ancillary Documents to which they are a party, the compliance by the Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the taking by the Sellers of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not have a Material Adverse Effect.

(c)     Each Seller is in compliance in all material respects with all applicable Laws. Except as set forth on <u>Schedule 5.3(c)</u>, neither any Seller nor any Subsidiary has received any outstanding written notice from any Governmental Body regarding any actual or possible

material violation of, or failure to comply in any material respect with, any Law. The Sellers are not in default in any material respect of any order, writ, injunction, judgment or decree applicable to the Purchased Assets.

(d)      Each Seller is in compliance in all material respects with all applicable laws and regulations of applicable Governmental Bodies, including the Department of Transportation and the FAA and each other civil aviation authority and respective jurisdiction that has oversight with respect to any of the Purchased Assets, including, without limitation, all valid and enforceable (i) Type Certificate(s), (ii) Production Certificate(s), (iii) Production Under Type Certificate(s), (iv) Parts Certificate(s), (v) Part 145 repair station certificates, and (vi) Supplemental Type Certificate(s) relating to the Eclipse Aircraft (collectively the "***Aircraft Certificates***"), as set forth on Schedule 5.3(d).

5.4      Brokers and Finders. Except as set forth on Schedule 5.4, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Sellers in connection with the transactions contemplated by this Agreement and Purchaser is not or will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of the Sellers.

5.5      Title to Purchased Assets. Except for Permitted Encumbrances, the Sellers have good title to the Purchased Assets and, at the Closing, Purchaser, pursuant to this Agreement and the Sale Order, shall acquire good and marketable title in, and under all of such Purchased Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances) and other claims and interests to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. For the sake of clarity, the right to use any assets included in the Purchased Assets in which the Sellers have leasehold or non-ownership rights to use shall be assigned to Purchaser only through the assumption and assignment of the Assigned Contracts in accordance with and subject to this Agreement.

5.6      Intellectual Property. Schedule 5.6 sets forth an accurate and complete list of all material Purchased Intellectual Property The Sellers own all right, title and interest to the Purchased Intellectual Property, such rights, title and interest are valid and enforceable, and the Sellers can convey the Purchased Intellectual Property free and clear of liens and other claims and interests pursuant to the Sale Order. To the Knowledge of the Sellers, (i) no Person is engaging in any activity that infringes any Purchased Intellectual Property and (ii) no claim has been asserted to the Sellers that the use of any Purchased Intellectual Property or the operation of the Eclipse Project infringes or violates the Intellectual Property of any third party. The representations set forth in this Section 5.6 are the only representations given by the Sellers with respect to matters related to Intellectual Property and no other representations given by the Sellers relate to Intellectual Property.

5.7      Litigation. Except as set forth on Schedule 5.7 and other than in connection with the Bankruptcy Case, there is no Action, in progress or pending against or relating to the Sellers or any Order which, in any case, would adversely affect the ability of the Sellers to enter into this Agreement or to consummate the transactions contemplated hereby.

5.8      Permits. To the Sellers' Knowledge, each Seller is in compliance with the material terms of all material Permits used by the Sellers with respect to the Purchased Assets, all such

Permits are valid and in full force and effect, and no proceeding is pending or threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

     5.9    <u>Tax Returns: Taxes</u>.

     (a)    Except as set forth on <u>Schedule 5.9(a)</u>, all Tax Returns required to have been filed by the Sellers have been duly and timely filed and are true, correct and complete in all material respects, and no material fact has been omitted therefrom. Except as set forth on <u>Schedule 5.9(a)</u>, no Seller is currently the beneficiary of any extension of time within which to file any Tax Return. True, correct and complete copies of such Tax Returns have been delivered to Purchaser (or its representatives) prior to the Agreement Date.

     (b)    Except as set forth on <u>Schedule 5.9(b)</u> or except as precluded by the Bankruptcy Code, all Taxes due and payable by the Sellers have been paid in full. All Taxes of the Sellers attributable to Tax periods (or portions thereof) commencing after the date hereof have arisen in the ordinary course of business.

     (c)    The Sellers have not waived any statute of limitations affecting any Liability for Taxes or agreed to any extension of time during which a Tax assessment or deficiency assessment may be made or extending the time within which to file any Tax Return.

     (d)    No amount of income (or deduction) will be required to be included in (or excluded from) taxable income by any Person for any Post-Closing Tax Period with respect to the Purchased Assets or the Eclipse Project as a result of any prepaid amount received during a Pre-Closing Tax Period, or for any other reason.

     (e)    No material Tax Proceeding is being asserted in writing with respect to the Sellers, nor to the Knowledge of the Sellers has any claim with respect to Taxes been threatened or asserted. Except as set forth on <u>Schedule 5.9(e)</u>, all deficiencies for Taxes asserted or assessed against the Sellers have been fully and timely paid or settled.

     (f)    No Seller is a party to any Tax sharing, indemnity or similar agreement (written or otherwise), and the Sellers have no Liability for the Taxes of any other Person as a transferee or successor, or by Contract or otherwise. To the Sellers' Knowledge, no Seller has received any Tax Refund to which it is not entitled, either pursuant to applicable Law or any Contract.

     (g)    Except as set forth on <u>Schedule 5.9(g)</u>, there are no Encumbrances or other liens with respect to Taxes on the Purchased Assets.

     (h)    Except as set forth on <u>Schedule 5.9(h)</u>, each Seller has properly and timely imposed, collected and paid all sales, use and similar Taxes as required by Law with respect to the sale, rental or lease of any product or service in connection with the Purchased Assets and the Eclipse Project.

     (i)    No transaction contemplated by this Agreement is subject to withholding under any Law (including Section 1445 of the Code), and the Purchaser's acquisition of the Purchased Assets will not otherwise result in any Tax liability to the Purchaser (or any direct or indirect owner thereof).

(j)     No Seller has ever been subject to Tax in a jurisdiction in which it does not currently file Tax Returns or pay Taxes, and no claim has been made by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns that it is or may be subject to Tax by that jurisdiction. The Sellers have no permanent establishment in any country other than the United States.

For purposes of this Section 5.9, any reference to a Seller shall be deemed to include any Person that merged, or was merged, with or was liquidated into such Seller. The representations set forth in this Section 5.9 are the only representations given by the Sellers with respect to matters related to Taxes and no other representations given by the Sellers relate to Taxes.

5.10    Eclipse Aircraft Matters.

(a)     Except as set forth on Schedule 5.10(a), Sellers have the full power, right and authority to sell and convey the Eclipse Aircraft to Purchaser.

(b)     Except as set forth on Schedule 5.10(b), at the time of the Closing, Sellers shall convey to Purchaser good and marketable title to the Eclipse Aircraft, free and clear of all Encumbrances except Permitted Encumbrances.

(c)     Neither Sellers nor any of their employees (or any assignee) are listed by the United States Department of Treasury on the Specifically Designated Nationals and Blocked Persons List or by the United States Department of Commerce on the Denied Persons List. There exists no prohibition on the transactions contemplated by this Agreement related to the identity, citizenship, location or business of Sellers or to the purpose for which the Eclipse Aircraft were previously used.

5.11    Aircraft Certificates.

(a)     Schedule 5.3(d) lists, as of the Closing Date, all Aircraft Certificates and their applicable expiration dates.

(b)     As of the Closing Date, Sellers are in compliance with the terms of, and there exists no default under or breach of, the Aircraft Certificates it holds. No Seller, to any Seller's knowledge, has been issued any citations, written notices, or orders of non-compliance under any Aircraft Certificate that are still pending or otherwise unresolved, and no Governmental Body or holder of Intellectual Property related to such Aircraft Certificate has given written notice to any Seller of, or otherwise indicated in writing, any violation of, or failure to comply with, any Aircraft Certificate. To the extent applicable to the Aircraft Certificates, no Seller has received any written notice that an Aircraft Certificate will not be renewed in the ordinary course and no Governmental Body has taken, or, to any Seller's knowledge, threatened to take, any action to terminate, cancel, fail to renew or reform any Aircraft Certificate.

5.12    Environmental Matters. Except for facts, circumstances or conditions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) with respect to the Purchased Assets, there is no Order by any Governmental Body nor has Seller received any verbal or written notice, complaint or inquiry from a Governmental Body respecting Environmental Laws, (b) there is no investigation, action or proceeding pending, or, to the Knowledge of the Sellers, threatened that could reasonably be expected to result in any Seller(s)

or Purchaser incurring any Environmental Liabilities or Obligations, (c) the Sellers are not aware of and have not caused or allowed the Release of Hazardous Materials at, on or under the Closing Assumed Leased Real Property, and (d) to the Sellers' Knowledge, the Sellers have obtained and have complied with all Permits, and all Permits remain effective which are required under or pursuant to Environmental Laws for the operation of the Purchased Assets. The Sellers have delivered or made available to Purchaser copies of all Permits, Permit applications, reports, assessments or tests with respect to compliance of the Purchased Assets with any Environmental Laws or the presence of Hazardous Material which are in the Sellers' possession, custody or control, including the following records: (i) reports concerning the removal of underground storage tanks from the Closing Assumed Leased Real Property and Remedial Actions; (ii) correspondence from Governmental Bodies informing the Sellers that no further action is required to address Releases which have been the subject of Remedial Action conducted by or on behalf of the Sellers; (iii) the most recent final Phase I Environmental Site Assessment reports for any Closing Assumed Leased Real Property; (iv) Permits, Permit applications, and Permit disapprovals; and (v) inventories of asbestos and asbestos-containing materials, if any, for the Purchased Assets. The representations set forth in this Section 5.12 are the only representations given by the Sellers with respect to matters related to Environmental Laws and Environmental Liabilities or Obligations and no other representations given by the Sellers relate to Environmental Laws and Environmental Liabilities or Obligations.

5.13   No Other Representations or Warranties. The representations and warranties set forth in this Agreement constitute the sole and exclusive representations and warranties of the Sellers to Purchaser in connection with the transactions contemplated by this Agreement and by the Ancillary Documents. Except as expressly set forth in this Agreement, no Seller or its Representatives, nor any other Person, make any representation or warranty, expressed or implied, under contract, at Law, or in equity, with respect to any of the Purchased Assets or the Assumed Liabilities, including representations or warranties with respect to merchantability or fitness for any particular purpose, suitability, usage, workmanship, quality, physical condition, or value, and any and all such other representations and warranties are hereby expressly disclaimed. Without limiting the generality of the foregoing, no Seller or its Representatives, nor any other Persons make any representations or warranties with respect to (a) any projections, estimates, or budgets delivered to or made available to Purchaser of future financial reserves, future revenues, future results of operations (or any component thereof), future cash flows, future financial condition (or any component thereof) of the Sellers, or the future business and operations of the Sellers or (b) any other information or documents made available to Purchaser or its counsel, accountants, or advisors with respect to the Sellers or the Eclipse Project, including in any data room. Except for the representations and warranties of the Sellers specifically set forth in this Agreement, all of the Purchased Assets and the Assumed Liabilities are being acquired or assumed "as is, where is" on the Closing Date and in their present condition, with all faults, and Purchaser shall rely on its own examination and investigation thereof in making its acquisition investment decision. Except as otherwise set forth herein, there shall be no Purchase Price adjustments of any type or manner, including any quality assessment of the Purchased Assets or Assumed Liabilities being conveyed.

## ARTICLE VI.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Subject to the exceptions noted in the schedules delivered by Purchaser concurrently herewith, Purchaser represents and warrants to the Sellers as follows as of the date hereof and as of the Closing Date:

6.1    <u>Organization and Qualification</u>. Purchaser is duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation. Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Purchaser's ability to consummate the transactions contemplated hereby.

6.2    <u>Authority</u>. Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities. The execution and delivery of this Agreement by Purchaser and each of the Ancillary Documents to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly and validly authorized by all necessary actions on the part of Purchaser. This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Purchaser. Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by the Sellers and subject to the effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.

6.3    <u>No Inconsistent Obligations</u>. Neither the execution and delivery of this Agreement or any other documents contemplated hereby, nor the consummation of the transactions contemplated herein or therein in accordance with the Sale Order, will, to Purchaser's knowledge, result in a violation or breach of, or constitute a default under, (a) the certificate of incorporation, as amended, the bylaws, or other organizational instruments of Purchaser, (b) any applicable ruling or order of any Governmental Body, (c) any term or provision of any contract or agreement, (d) any writ, order, judgment, decree, Law, rule, regulation or ordinance, and (e) any other commitment or restriction to which Purchaser is a party, nor will such actions result in the creation of a lien.

6.4    <u>Conflicts: Consents</u>.

(a)    The execution, delivery and performance by Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Purchaser of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

31

(b)      Except as set forth on <u>Schedule 6.4(b)</u>, no consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Person or Governmental Body is required in connection with the execution, delivery and performance by Purchaser of this Agreement or the Ancillary Documents to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assumption and performance of the Assumed Liabilities or the taking by Purchaser of any other action contemplated hereby or thereby, other than such filings, notices or consents, the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby.

6.5      <u>Brokers</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and the Sellers are not or will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Purchaser.

6.6      <u>Adequate Assurances Regarding Assigned Contracts</u>. As of the Closing, Purchaser will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

6.7      <u>No Litigation</u>. To Purchaser's knowledge, there are no material actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to the knowledge of Purchaser, threatened) instituted against Purchaser challenging the legality of the transactions contemplated in this Agreement (other than with respect to any objection which may be filed in connection with the Bankruptcy Case).

6.8      <u>Sufficient Funds</u>. The Purchaser will have sufficient funds, including its committed financing, available to pay the Purchase Price, its obligations hereunder, and any expenses incurred by the Purchaser in connection with the transactions contemplated by this Agreement.

## ARTICLE VII.
## BANKRUPTCY COURT MATTERS

7.1      <u>Sale Order</u>. The Sale Order shall be entered by the Bankruptcy Court. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Sellers of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Claims, Liabilities and Encumbrances (other than Liabilities and Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by Sellers of their obligations under this Agreement; and (ii) find that Purchaser is a "good faith" Purchaser within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code. Purchaser agrees that it will promptly take such actions requested by the Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) establishing

adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

7.2 <u>Bankruptcy Filings</u>. From and after the Agreement Date and until the Closing Date, the Sellers shall use their reasonable efforts to deliver to Purchaser drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment, and such filings shall be reasonably acceptable to Purchaser to the extent they relate to the Purchased Assets, any Assumed Liabilities or any of Purchaser's obligations hereunder. The Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

7.3 <u>Sale Free and Clear</u>. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) of, against or created by the Sellers or their bankruptcy estates shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities.

**ARTICLE VIII.**
**COVENANTS AND AGREEMENTS**

8.1 <u>Conduct of the Sellers</u>. During the Pre-Closing Period, the Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court or this Agreement, to (A) maintain the Purchased Assets (normal wear and tear excepted), and (B) continue to operate the Purchased Assets in all material respects in compliance with all Laws applicable to the Sellers, it being understood by the Purchaser that the Sellers' employees currently are furloughed. Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in, permitted by or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, the Sellers may not, without the prior written consent of Purchaser, which consent may be withheld, denied, delayed or conditioned in Purchaser's sole and exclusive discretion, take any of the following actions with respect to the Eclipse Project or the Purchased Assets:

(a) sell, lease or otherwise dispose of mortgage, hypothecate or otherwise encumber any Purchased Asset;

(b) amend, terminate or renew any Assigned Contract;

(c) remove or permit to be removed from any building, facility, or real property any asset or any Inventory;

(d) fail to use commercially reasonable efforts to maintain the validity of the Sellers' rights in, to or under any Purchased Intellectual Property;

33

(e)     fail to use commercially reasonable efforts to maintain all material Permits of the Sellers used in the operation of the Eclipse Project or the Purchased Assets; and

(f)     agree, whether in writing or otherwise, to do any of the foregoing.

8.2    <u>Access to Information</u>. The Sellers agree that, between the Agreement Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with <u>Section 4.4</u>, Purchaser shall be entitled, through its Representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, employees, accountants, auditors, counsel and operations of the Sellers as Purchaser's Representatives may reasonably request. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances. The Sellers shall use commercially reasonable efforts to cause their Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with the Sellers and their Representatives, and shall use its commercially reasonable efforts to minimize any disruption to the Eclipse Project.

8.3    <u>Reasonable Efforts; Cooperation</u>.

(a)     Subject to the other provisions hereof, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.

(b)     In the event that any of the Parties to this Agreement discovers a Contract related to the Eclipse Project, the Purchased Assets or the Assumed Liabilities during the period from and after the Agreement Date, and such Contract (i) was unknown as of the Agreement Date, (ii) is a Contract that Purchaser wishes to assume the rights and obligations of and (iii) such Contract would not be deemed an excluded Contract by Seller, Purchaser and the Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Purchaser to assume the rights and obligations under such Contract.

(c)     The obligations of the Sellers pursuant to this <u>Section 8.3</u> shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and the Sellers' obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Sale Order) and the Sellers' duty to seek and obtain the highest or otherwise best price for the Eclipse Project as required by the Bankruptcy Code.

8.4    <u>Further Assurances</u>. Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement. After the Closing, the Sellers shall promptly transfer or deliver to Purchaser cash, checks (which shall be properly endorsed) or

other property that the Sellers may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.

8.5     Confidentiality.    Purchaser acknowledges that the confidential information provided to it in connection with this Agreement, including under Section 8.2, and the consummation of the transactions contemplated hereby, is subject to the Purchaser's covenant and agreement to maintain the confidentiality thereof.

8.6     Publicity. Neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or the Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.

8.7     Casualty Loss. Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any material portion of the Purchased Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify Purchaser promptly in writing of such fact, (i) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, the Sellers shall assign the insurance proceeds therefrom to Purchaser at Closing. Notwithstanding the foregoing, the provisions of this Section 8.7 shall not in any way modify Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.8     No Successor Liability. The Parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Purchaser shall not be deemed to: (i) be the successor of the Sellers, (ii) have, de facto, or otherwise, merged with or into the Sellers, (iii) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers, or (iv) be liable for any acts or omissions of the Sellers in the conduct of the Eclipse Project or arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against the Sellers or any of the Sellers' predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Eclipse Project, the Purchased Assets or any Liabilities of Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 8.8 shall be reflected in the Sale Order.

8.9     Change of Name. Promptly following the Closing, the Sellers shall, and shall cause their direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by the Sellers or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Eclipse," "Eclipse Aviation," or any derivation thereof, without the prior written consent of Purchaser, and the Sellers shall cause the names of the Sellers in the caption of the Bankruptcy Case to be changed to the new name of the Sellers.

8.10    Certifications. Prior to the Closing Date, to extent applicable or reasonably necessary, the Sellers shall cooperate with and provide reasonable assistance to the Purchaser in connection with the Purchaser's negotiation with (i) all EASA authorities, employees, officials and personnel to obtain the issuance to Purchaser of a new EASA certificate, of the same quality and type, and as applicable to each Seller, as the Sellers' Eclipse EASA Certificate (the "*New EASA Certificate*") and (ii) all FAA authorities, employees, officials and personnel to obtain the issuance to Purchaser of a new (w) FAA Repair Station Certificate(s) (the "*New FAA Repair Station Certificate(s)*"), (x) FAA Production Certificate (the "*New FAA Production Certificate*"), (y) FAA Type Certificate (the "*New FAA Type Certificate*"), and (z) FAA Parts Certificate (the "*New FAA Parts Certificate*" and collectively with the New EASA Certificate, New FAA Repair Station Certificate(s), New FAA Production Certificate, and New FAA Type Certificate, the "*New Certificates*"), in each case of the same quality and type, and as applicable to each Seller, as the Eclipse Production Certificate, Eclipse Type Certificate and Eclipse Parts Certificate. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, it is expressly understood and agreed by the Sellers and Purchaser that Purchaser shall bear all risk that the New Certificates are not obtained by Purchaser.

## ARTICLE IX.

## CONDITIONS TO CLOSING

9.1    Conditions Precedent to the Obligations of Purchaser and Sellers. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of the Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents; and

(b)    the Bankruptcy Court shall have entered the Sale Order (as provided in Article VII) in form and substance reasonably satisfactory to the Sellers and Purchaser, which orders shall not have been reversed, modified, amended or stayed.

9.2    Conditions Precedent to the Obligations of the Sellers. The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by the Sellers in their sole discretion:

(a)    the representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has

not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated hereby;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 4.3</u>.

9.3    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchaser in its sole discretion:

(a)    The Sellers shall have delivered to Purchaser (i) a file-stamped copy of the Sale Order (which shall contain the terms described in <u>Section 7.1</u>) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Seller;

(b)    the representations and warranties made by each Seller in this Agreement shall be true and correct in all material respects (<u>provided</u>, that any such representation or warranty that is subject to any materiality, Material Adverse Effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations and warranties to be true and correct as of the applicable date would not have a Material Adverse Effect;

(c)    The Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date; and

(d)    The Sellers shall have delivered, or caused to be delivered, to Purchaser, all of the items set forth in <u>Section 4.2</u>.

## ARTICLE X.

## TAXES

10.1    <u>Certain Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne and timely paid by the Sellers. The Sellers shall, at their own expense, timely file any Tax Return or other document required to be filed with respect to such Taxes, and Purchaser shall join in the execution of any such Tax Return if required by Law.

    10.2    <u>Allocation of Purchase Price</u>.

        (a)    As soon as reasonably practicable after the Closing Date, the Purchaser shall determine the allocation of (i) the Purchase Price, plus (ii) the Assumed Liabilities, plus (iii) all other items required to be treated as consideration for federal income Tax purposes, among the Purchased Assets and the agreements provided for herein, for all purposes (including financial, accounting and Tax) (the "*Allocation*"). The Purchaser and the Sellers shall each report the federal, state and local income and other Tax consequences of the transactions contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Code (or any successor form or successor provision of any future Tax Law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable Law. The Sellers shall provide the Purchaser and the Purchaser shall provide the Sellers with a copy of any information required to be furnished to the Secretary of the Treasury under Code Section 1060.

        (b)    Notwithstanding the allocation of the Purchase Price in <u>Section 11.2(a)</u>, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets in any chapter 11 plan of reorganization or liquidation that may be proposed. The Sellers reserve the right on their own behalf and on behalf of the Sellers' estates, to the extent not prohibited by applicable law and accounting rules, for purposes of any chapter 11 plan of reorganization or liquidation, to ascribe values to the Purchased Assets and to allocate the value of the Purchased Assets to the Sellers in the event of, or in order to resolve, creditor disputes in the Bankruptcy Case.

    10.3    <u>Cooperation on Tax Matters</u>. The Purchaser and the Sellers agree to provide each other with such information and assistance as is reasonably necessary, including access to records, Tax Returns and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with a Tax Proceeding or otherwise.

    10.4    <u>Tax Refunds</u>. The Sellers agree to cooperate with the Purchaser in all respects, and take or cause to be taken any steps necessary, in order to apply for and obtain any Tax Refunds with respect to the Sellers for any taxable year, <u>provided</u>, that the Purchaser pays all reasonable expenses incurred in connection therewith.

## ARTICLE XI.

## MISCELLANEOUS

    11.1    <u>Payment of Expenses</u>. The Purchaser shall bear its own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, regardless of whether or not such contemplated transactions are consummated.

    11.2    <u>Survival of Representations and Warranties; Survival of Confidentiality</u>. The Parties agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

11.3    <u>Entire Agreement; Amendments; Waivers</u>. This Agreement, together with the Ancillary Documents, represents the entire understanding and agreement between the Parties with respect to the subject matter hereof. This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by each Party; <u>provided</u>, that the Schedules hereto may be amended in accordance with <u>Section 2.6</u>. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

11.4    <u>Execution of Agreement; Counterparts; Electronic Signatures</u>.

(a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

(b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" ("*.pdf*") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

11.5    <u>Governing Law</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

11.6    <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEW YORK COUNTY, NEW YORK WILL HAVE SOLE

JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.7    <u>Notices</u>. Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

If to Seller, to:

ONE Aviation Corporation
3520 Spirit Drive SE
Albuquerque, New Mexico 87106
Attn:    Alan Klapmeier
          Jim Carroll
Email:   alan.klapmeier@oneaviation.aero
          jim.carroll@carrollservicesllc.com

With a copy (which shall not constitute effective notice) to:

Paul Hastings, LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Attn:    Chris Dickerson
          Brendan Gage
          Nathan Gimpel
Email:   chrisdickerson@paulhastings.com
          brendangage@paulhastings.com
          nathangimpel@paulhastings.com

-and-

Paul Hastings, LLP
1117 South California Avenue
Palo Alto, California 94304
Attn:    Todd Schwartz
Email:   toddschwartz@paulhastings.com

If to Purchaser, to:

> AML Global Eclipse LLC
> c/o iLaw
> Temple Chambers, 3-7 Temple Avenue
> London, EC4Y 0HP
> Attn:    Allan Murray
> Email:    Allan.murray@ilaw.co.uk

> With a copy (which shall not constitute effective notice) to:

> Fried, Frank, Harris, Shriver & Jacobson LLP
> One New York Plaza
> New York, NY  10004
> Attention:    Philip Richter and Gary Kaplan
> Email:         philip.richter@friedfrank.com,
> Gary.Kaplan@friedfrank.com

11.8    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to entry of the Sale Order, the Sellers, and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties other than by Purchaser to any of its Affiliates; provided that no such assignment shall relieve Purchaser of its obligations hereunder. Any attempted assignment without such required consents shall be void.

11.9    Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

11.10    Bulk Sales Laws. Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any Ancillary Document.

11.11    Access and Right to Use.  Purchaser shall, at the Sellers' sole cost and expense, upon reasonable advance written notice and under reasonable circumstances including the execution of appropriate confidentiality and non-use restrictions, afford to the Sellers' officers, independent public accountants, attorneys, consultants and other representatives, reasonable

access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets on a royalty-free basis solely for the purpose of enabling the Sellers to conduct an orderly wind-down of the Sellers' operations until such time as the wind-down is completed on or before the one-year anniversary of the Closing Date. The Sellers' shall, and use its commercially reasonably efforts to cause its Representatives to, to minimize any disruption to Purchaser and the Purchased Assets. The Sellers expressly acknowledge that nothing in this Section is intended to give rise to any contingency to the Sellers' obligations to proceed with the transactions contemplated herein or any subsequently appointed trustee (either in a chapter 7 or 11 bankruptcy case), liquidating trustee, plan administrator or similar successor to the Sellers. In addition, the Purchaser agrees that it shall use commercially reasonable efforts to maintain and safeguard all of the Sellers' books and records (both hard copies and those electronically stored) in a similar manner as the Purchaser has maintained its own books and records for a period of at least two (2) years from and after the Closing Date.

11.12   <u>Enforcement of Agreement</u>. Each Party acknowledges and agrees that the other Parties would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by any of the Parties could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which the Parties may be entitled, at law or in equity, each Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

11.13   <u>Interpretation; Drafting</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

11.14   <u>Waiver of Setoff</u>. All payments hereunder by the Sellers to the Purchaser or by the Purchaser to the Sellers shall be made without setoff, counterclaim or other defense and each of the Purchaser and the Sellers hereby waives any and all of its rights to assert any right of setoff, counterclaim or other defense to the making of a payment due hereunder to the Sellers or the Purchaser, as the case may be.

**[Remainder of page intentionally left blank]**
**[Signatures Follow Next Page]**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS:**

**ACC MANUFACTURING, INC.,**
as a Debtor and Debtor in Possession

By: _____

Name: ___Alan Klapmeier_____

Its: ___CEO_____

**AIRCRAFT DESIGN COMPANY,**
as a Debtor and Debtor in Possession

By: _____

Name: ___Alan Klapmeier_____

Its: ___CEO_____

**BRIGADOON AIRCRAFT MAINTENANCE, LLC,**
as a Debtor and Debtor in Possession

By: _____

Name: ___Alan Klapmeier_____

Its: ___CEO_____

**DR MANAGEMENT, LLC,**
as a Debtor and Debtor in Possession

By: _____

Name: ___Alan Klapmeier_____

Its: ___CEO_____

**ECLIPSE AEROSPACE, INC.,**
as a Debtor and Debtor in Possession

By: _____

Name: ___Alan Klapmeier_____

Its: ___CEO_____

*(Signature Page to Asset Purchase Agreement)*

**INNOVATUS HOLDING COMPANY,**
as a Debtor and Debtor in Possession

By: _____

Name:   Alan Klapmeier

Its:   CEO


**KESTREL AIRCRAFT COMPANY,**
as a Debtor and Debtor in Possession

By: _____

Name:   Alan Klapmeier

Its:   CEO


**KESTREL BRUNSWICK CORPORATION,**
as a Debtor and Debtor in Possession

By: _____

Name:   Alan Klapmeier

Its:   CEO


**KESTREL MANUFACTURING, LLC,**
as a Debtor and Debtor in Possession

By: _____

Name:   Alan Klapmeier

Its:   CEO


**KESTREL TOOLING COMPANY,**
as a Debtor and Debtor in Possession

By: _____

Name:   Alan Klapmeier

Its:   CEO


*(Signature Page to Asset Purchase Agreement)*

**OAC MANAGEMENT, INC.,**
as a Debtor and Debtor in Possession

By: _____

Name:    Alan Klapmeier

Its:    CEO


**ONE AVIATION CORPORATION,**
as a Debtor and Debtor in Possession

By: _____

Name:    Alan Klapmeier

Its:    CEO


[Signatures Continue Next Page]

*(Signature Page to Asset Purchase Agreement)*

**PURCHASER:**

**AML GLOBAL ECLIPSE LLC**

By:

    Name:   Christopher C. S. Harborne
    Its:     Manager

*(Signature Page to Asset Purchase Agreement)*

## Annex I

ACC Manufacturing, Inc., a Delaware corporation
Aircraft Design Company, a Delaware corporation
Brigadoon Aircraft Maintenance, LLC, a Delaware limited liability company
DR Management, LLC, a Wisconsin limited liability company
Eclipse Aerospace, Inc., a Delaware corporation
Innovatus Holding Company, a Delaware corporation
Kestrel Aircraft Company, Inc., a Delaware corporation
Kestrel Brunswick Corporation, a Maine corporation
Kestrel Manufacturing, LLC, a Wisconsin limited liability company
Kestrel Tooling Company, a Maine corporation
OAC Management, Inc., a Delaware corporation