**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------x

In re:

ONE AVIATION CORPORATION, *et al.*,[1]

        Debtors.

------------------------------------------------------------x

:   **Chapter 11**

:   **Case No. 18-12309 (CSS)**

:   **Jointly Administered**

:   Ref. Docket No. 1081

## NOTICE OF FILING OF RESPONSE

     **PLEASE TAKE NOTICE** that, in conjunction with the telephonic status conference currently scheduled on January 27, 2021 at 1:00 p.m. (ET), the above-captioned debtors and debtors in possession hereby file the attached response to AML Global Eclipse LLC's letter to the Court dated January 4, 2021 [D.I. 1081].

Dated: January 20, 2021
      Wilmington, Delaware

*/s/ Jaime Luton Chapman*
Robert S. Brady (No. 2847) [rbraby@ycst.com]
M. Blake Cleary (No. 3614) [mbcleary@ycst.com]
Sean M. Beach (No. 4070) [sbeach@ycst.com]
Jaime Luton Chapman (No. 4936) [jchapman@ycst.com]
Jared W. Kochenash (No. 6557) [jkochenash@ycst.com]
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

– and –

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: ONE Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986). The debtors' corporate headquarters is located at 3520 Spirit Drive SE, Albuquerque, NM 87106.

Chris L. Dickerson (admitted *pro hac vice*)
Brendan M. Gage (admitted *pro hac vice*)
Nathan S. Gimpel (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

- and -

Todd M. Schwartz (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
1117 S. California Avenue
Palo Alto, California 94304
Telephone: (650) 320-1800
Facsimile: (650) 320-1900

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit 1</u>**

27411840.2



1(312) 499-6045
chrisdickerson@paulhastings.com


January 19, 2021

Hon. Christopher S. Sontchi
United States Bankruptcy Court, District of Delaware
824 North Market St., 5th Floor
Wilmington, DE 19801

   Re:  ***In re ONE Aviation Corporation***, **Case No. 18-12309-CSS (Bankr. D. Del.)**
       **Response to Letter from Fried, Frank, Harris, Shriver & Jacobson LLP**

Dear Chief Judge Sontchi:

I write on behalf of ONE Aviation Corporation ("<u>OAC</u>") and its affiliated debtors (collectively, the "<u>Company</u>") in response to the letter from Fried, Frank, Harris, Shriver & Jacobson LLP ("<u>Fried Frank</u>") to Your Honor, dated January 4, 2021 and filed in the above-captioned bankruptcy case (the "<u>Fried Frank Letter</u>").[1]  The Fried Frank Letter contains a number of incorrect assertions and statements, omits important information, and provides an incomplete picture of the events surrounding the APA and TSA executed between AML, OAC, and certain of OAC's subsidiaries (together with OAC, "<u>ONE</u>").  The purpose of this letter is to clear up the record and provide additional information from ONE for Your Honor's consideration.

   **General Background and Status of Asset Separation Process:** Generally stated, it is my client's view that the Fried Frank Letter portrays AML as having purchased ONE's entire Eclipse business as a going-concern when that is not what happened.  In fact, ONE submits that AML bought discrete Eclipse assets from ONE in a liquidation sale and then hired certain EAI employees in an effort to restart ONE's Eclipse business.

Accordingly, the APA makes a lengthy and clear delineation between "Purchased Assets" in Section 2.1 and "Excluded Assets" in Section 2.2.  ONE "retain[s] all right, title and interest to, in and under [the Excluded Assets]."  APA § 2.2.  Excluded Assets include, among other things: (i) "copies of any and all information not relating to the Eclipse Project or the Purchased Assets that is stored on [ONE's] computer systems, data networks or servers," APA § 2.2(a); (ii) "all agreements and contracts of [ONE] other than the Assigned Contracts [which must be listed on Schedule 2.1(b) to the APA]," §§ 2.2(b), 2.6(b)-(c); (iii) "all Documents and personnel records of [ONE's] employees that [ONE is] required by Law to retain and [is] prohibited Law from providing a copy thereof to [AML]," § 2.2(c); (iv) "all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto)," § 2.2(j); (v) "all trade and non-trade accounts receivable, notes receivable and negotiable instruments of [ONE]," § 2.2(k); and (vi) "all rights and obligations under key employee retention plans and similar arrangements with (or for the benefit of) employees and agents of [ONE]."  § 2.2(m).

---

[1] Capitalized terms used herein but not otherwise defined have the meaning set forth in the Fried Frank Letter or in the APA, as applicable.



January 19, 2021
Page 2

As explained more fully below, ONE submits that AML has repeatedly attempted to access, retain, and possess Excluded Assets that fall within the categories listed above (as well as others). It is ONE's position that it has a responsibility to maintain and protect these Excluded Assets, including to defend against any future claims.

Logically, Excluded Assets must be separated and removed from the Purchased Assets, including from the ONE headquarters, which AML was to take possession of under the APA. Complicating matters further, as the Court is aware, the Debtors sold certain Kestrel-related assets to a separate buyer concurrently with the AML sale. Accordingly, prior to the closing of the sale on November 30, 2020 (the "Closing"), ONE began separating assets by removing (i) 19 file cabinets from the ONE headquarters and (ii) computer files primarily residing in the servers AML purchased, in each case to assess whether the files and data were Excluded Assets.

Subsequently, in an effort to minimize disputes regarding the separation process going forward and to address AML's desire to close quickly, ONE entered into the TSA with AML shortly before the Closing. Paragraph 2 of the TSA provides that:

> [AML] hereby acknowledges that certain data and information that do not constitute Purchased Assets (including data and information relating to the Debtor's corporate documents, personnel records, the "Kestrel project", and other records or data, in each case to the extent not constituting Purchased Assets, together, the "Debtor Data") are contained on the computer servers of the Debtors.

In addition, the TSA provided that AML "agrees it will cooperate with the Debtors from and after the Closing to separate the Debtor Data contained on such the computer servers, to not access the Debtor Data and to transfer the Debtor Data to the Debtors or as directed in writing by the Debtors." TSA ¶ 2. Another key aspect of the TSA is that the parties agreed to work with an independent party to serve as an independent representative of, and liaison between, the parties to oversee the separation of the electronic files. TSA ¶ 2. I understand that ONE has, and continues to, work cooperatively with this independent party to complete the separation process.

It is also my understanding that with the exception of the five Human Resource cabinets, which are locked, and the keys for which are held improperly by an AML employee, ONE has returned to AML all files in the cabinets (except for files that are Excluded Assets) as well as all "F: Drive" contents that were included in the APA as Purchased Assets. Upon receiving the keys to the five Human Resource cabinets from AML, ONE informs me that it will separate out any Purchased Assets and promptly provide those remaining files to AML. I further understand that the parties are also in the process of separating a few other minor assets, including web domain accounts and Eclipse-related assets in Grand Rapids, Minnesota, and Albuquerque, New Mexico, but ONE believes that none of these are major undertakings and expects to continue to work cooperatively with AML on completing these separations.

Apart from the separations noted above, ONE believes that the only significant Purchased Assets remaining to be transferred to AML are the electronic files currently in ONE's Google cloud data storage and email system (the "Google G-Suite"), which I understand have been available to transfer to AML since early December. I also understand that the Google transfer is still in process because AML did not have its own



January 19, 2021
Page 3

system established to receive the files and then hired a company to do the file transfer who has had difficulties and has led to additional delays.

In light of the above, ONE submits that the accusations in the Fried Frank Letter that ONE is intentionally withholding Purchased Assets are simply not true.  My client maintains that all of the Purchased Assets have either been transferred, are queued up for transfer upon AML's readiness to accept, are in the process of being separated from Excluded Assets, or are waiting to being separated from Excluded Assets (in the case of the Human Resource filing cabinets).  Furthermore, the Fried Frank Letter fails to mention ONE's clear position to AML that certain documents and data AML is requesting are Excluded Assets.  (See the email to Mr. Mike Press, dated December 11, 2020, attached as **__Exhibit A__**.)

Overall, it is ONE's position that AML is inappropriately attempting to expand the definition of Purchased Assets while ignoring the carefully negotiated terms of the APA and TSA.  For example, the Fried Frank Letter asserts that "vendor contracts assumed by AML" have not been provided, but the letter identifies no contracts on Schedule 2.6(b) of the APA that ONE failed to provide.  I understand that it would be an easy task for AML to audit the files ONE provided against the APA and determine if any contracts were missing.  But, in any event, my client submits that it provided all Assumed Contracts within one week of Closing.  Instead, AML seems to be trying to add contracts after Closing contrary to the APA, impeding the transition of the sale, and causing ONE employees to volunteer needless hours responding to inappropriate requests for additional information.

The following items from ONE listed as one through four below (which I relay to Your Honor on behalf of my client), provide additional background from ONE on the reason certain file cabinets were moved off-site, ONE's cooperation in assisting with the asset sale transition, the Excluded Assets AML has demanded, and responses to certain incorrect assertions and statements in the Fried Frank Letter:

1.      **File Cabinet Protection:**  Nineteen file cabinets containing Human Resource, Banking information, Accounts Payable, Contract, Patent and Trademark files were moved to an off-site location due to a credible threat that Excluded Assets and confidential Company information would become inappropriately available to AML.  The threat was credible based on the prior actions of AML.

   a)  **Background:**  Before entry of the Sale Order and Closing, a process by which AML could request due diligence information was established whereby AML agreed to make such data requests in writing to ONE management and the data requests would be validated against the APA to ensure the requested data was authorized to send.  AML repeatedly violated this process by contacting junior personnel including the human resources department and ONE management repeatedly reminded AML to follow the process when ONE learned that data requests were going outside of management.  Each time ONE reminded AML, AML equivocated about the process, but subsequently acted otherwise on many occasions, and in response once said "so sue me".  Some examples include:

   b)  On or about October 28, 2020, AML induced an EAI employee from the human resources department to send AML restricted and confidential personnel files that were Excluded Assets under Section 2.2



January 19, 2021
Page 4

of the APA, which necessitated terminating the employee (who had been previously instructed and subsequently warned not to send AML such files).

c) On November 23, 2020, ONE employee, Jon Hansen, received a call from the City of Albuquerque's Sunport Aviation Department Manager advising that an attorney from AML contacted the City's Assistant Attorney the day before (Sunday November 22, 2020) asking if they could have access Monday, November 23rd to the City's SP1 building, which housed ONE's computer servers so that AML could remove the servers. Hansen advised the Aviation Department Manager that the sale of the Purchased Assets had not closed yet and AML did not have the right to remove the servers, upon which the Aviation Department Manager replied that they would not grant access to AML.

Given AML's track record of inappropriate behavior prior to Closing, ONE had no confidence that AML would not remove or attempt to retain ownership of Excluded Assets and reasonably decided to move 19 of the Company's hundreds of file cabinets to protect ONE's assets and confidential information containing Excluded Assets under the APA.

2.      **Cooperation:** ONE has cooperated with AML in all material aspects including, but not limited to, the following below. A significant portion of this work ONE employees proactively initiated and was done voluntarily without compensation:

a) ONE expedited the sorting of the cabinets stored off-site and F: Drive files to segregate Purchased Assets from Excluded Assets. ONE provided the bulk of the separated Purchased Assets within one week of the Closing, with the balance provided early the following week. It should be noted that all F: Drive data owned by AML was duplicated in SAP, and access/possession of SAP data was transferred to AML within the first week after Closing. Furthermore, ONE stated to AML on multiple occasions that it would expedite any specific files AML needed, with the expectation that such files could probably be provided within one day. **To date there have been no specific requests for files located in the file cabinets or data that was located in the F: Drive, even though AML has hired former EAI employees who know (or should know) if there is any missing data or information constituting Purchased Assets.**

b) ONE paid its 50% share of the TSA costs to assist AML in transferring IT programs and electronic data. It is ONE's understanding that AML still has not paid its 50% share.

c) ONE proactively advised AML on December 1, 2020 of a fire suppressant patent allowance and fees due on December 4, 2020 so that AML would not miss a critical deadline. (See email to Mike Press dated December 1, 2020, attached as **Exhibit B**.)

d) ONE prompted AML to begin the process of assuming the aircraft maintenance software (Corridor) rights. Corridor was needed to support AML's resumption of aircraft maintenance work.

e) ONE provided letters to the FAA and EASA to initiate the transfer of aircraft Type Certificates to AML.



January 19, 2021
Page 5

f)  ONE performed a required engine run on December 3, 2020, after Closing, on N506EA (X107) in Grand Rapids, MN.  A ONE employee traveled over 150 miles round trip at his own expense to perform this task gratis for AML, since AML had not taken the steps to perform the necessary 30-day procedure themselves. The ONE employee has submitted a proposal to AML to continue performing the required engine runs until the time that AML takes ownership of the airplane.  AML has not responded to any proposals.

g)  ONE provided early access to the SAP ERP system, which contains all Eclipse-specific financial data needed. (Note: ONE offered multiple times to meet with AML's CFO to advise where data resided and answer questions, but to date, that offer has not been accepted.)

h)  ONE returned customer bank transfer wires that were sent to ONE's bank account after Closing. AML had not yet set up its own accounts and/or failed to notify customers of the new AML bank account information.  This occurred multiple times with the most recent wire occurring on December 31, 2020.

i)  ONE accepted FedEx charges through December 2, 2020, without compensation from AML in order to avoid disruption to AML and advised AML of their need to set up AML FedEx accounts.  (See email to Mike Press dated December 2, 2020, attached as **Exhibit C**.)

j)  ONE set up, on 12/1/2020, and has maintained 63 temporary User accounts in ONE's Google G-Suite account so that email would continue to flow to AML's newly hired employees.  Additionally, ONE transferred the old e-mails (prior to 12/1/2020) of the newly hired employees to these temporary mailboxes to support AML's start-up.  AML has compensated ONE for maintenance of these 63 User accounts for the month of December and AML has requested these accounts remain supported for the first two weeks of January.

k)  ONE assisted AML to set up off-site server operations based on a ONE agreement, which AML did not assume (despite ONE's suggestion that AML assume server operations contracts).  This was done cooperatively to assist AML with its obligations to the City of Albuquerque to remove the servers out of its facility by December 31, 2020.

l)  ONE coordinated the transfer of utilities to AML to avoid disruption of service.

m)  ONE transferred Aircraft N506EA (X107), located in ONE's Grand Rapids, MN hangar.  Despite being available to transfer since Closing, AML only just took possession of the Aircraft on January 12, 2021. AML has refused to pay customary and usual hangarage fees incurred with AML's delay in taking possession of the Aircraft.

3.  **Excluded Assets:**  As noted above, Section 2.2 of the APA establishes the list of Excluded Assets, some of which AML has requested on multiple occasions.  ONE remains the custodian of any Excluded Asset,



January 19, 2021
Page 6

many of which contain highly sensitive and confidential information that AML has no right to, nor obligation to protect and for which it would be a violation of such contracts or non-disclosure agreements to provide access. ONE has the responsibility to maintain the confidentiality of those documents and may need to keep them to address any future claims. These Excluded Assets include the following:

a) Financial records and data of ONE that do not pertain to Purchased Assets as set forth in Section 2.2(a): "copies of any and all information not relating to the Eclipse Project or the Purchased Assets that is stored on the Sellers' computer systems, data networks, or servers."

b) Excluded Contracts as set forth in 2.2(b): "all agreements and contracts of the Sellers other than the Assigned Contracts." Assigned Contracts must be listed on Schedule 2.1(b) to the APA and ONE has provided all such contracts to AML. APA § 2.6(b)-(c). All agreements and contracts of the Sellers other than the Assigned Contracts are "Excluded Contracts." APA § 2.6(c). In addition, contracts previously rejected or terminated by their terms or by ONE prior to the Designation Deadline cannot be Assigned Contracts. APA § 2.6(j).

c) Personnel records as set forth in Section 2.2(c): "all Documents and all personnel records of the Sellers' employees that the Sellers are required by Law to retain and are prohibited by Law from providing a copy thereof to Purchaser." AML has requested these records on numerous occasions, including requests for DOT drug testing records. ONE's drug testing records are also irrelevant to a new company (AML), which is responsible for implementing its own drug testing program to comply with FAA rules and regulations.

d) Company benefit plans as set forth in Section 2.2(j): "all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto)." AML has represented themselves as purchasing the Eclipse business in its entirety to a ONE vendor in an attempt to transfer ONE benefits plans, despite not assuming such contracts.

e) Accounts receivable as set forth in Section 2.2(k): "all trade and non-trade accounts receivable, notes receivable and negotiable instruments of the Sellers." AML has requested these account receivables records.

f) Company retention plans as set forth in Section 2.2(m): "all rights and obligations under key employee retention plans and similar arrangements with (or for the benefit of) employees and agents of the Sellers."

4.    **Inaccuracies:** The following are inaccuracies in the Fried Frank Letter that ONE feels compelled to address specifically:

a) Paragraph 2, Sentence 2: The statement that Mr. Klapmeier refused to allow ONE to close the sale is not true. AML insisted on closing the first day possible, and Mr. Klapmeier made clear to AML and AML's counsel of the need to have agreed closing instructions and a "game plan" in place before



January 19, 2021
Page 7

Closing to avoid misunderstandings during the asset separation process (which ultimately resulted from rushing the Closing). ONE had a fiduciary duty to its stakeholders not to convey Excluded Assets to AML and a duty not to disclose confidential employee information required to be protected by law.

b) Paragraph 3, Sentence 1: AML did not (and could not) have "*rehired* 45 of the Debtors' former employees" because AML only purchased discrete Eclipse assets, not the entire Eclipse business or these EAI employees' employment and benefit contracts. This is indicative of AML's apparent misconception that it purchased the entire Eclipse business as a going-concern, which might also explain why AML has repeatedly demanded Excluded Assets. It would be correct to state that AML "hired" 45 of the Debtors' former employees, but is incorrect to state that AML "rehired" them. EAI terminated all remaining EAI employees on November 30, 2020, and AML, as a new company, hired them as new employees on December 1, 2020. As such, all documents and all personnel records of ONE's employees are those that ONE is required by Law to retain and is prohibited by Law from providing a copy thereof to AML under Section 2.2(c) of the APA. In addition, since AML is a new company with new employees, personnel records from a previous company should be irrelevant to AML.

c) Paragraph 4, Sentence 2: The Accounts Payable file cabinets the Fried Frank Letter references contained files starting in 2017, not 2014 as the letter states. ONE delivered the Accounts Payable files for all assumed contracts to AML.

d) Paragraph 5, Sentence 1: Files removed from the "F: Drive" were reviewed, separated, and the contents included in the APA as Purchased Assets returned to AML. The remaining data and files that were removed and not returned belong to ONE and are not a part of the Purchased Assets as the Fried Frank Letter claims.

e) Paragraph 6: The assertion that AML is entitled to the "Eclipse Information" and the information and documents on the "F: Drive" entirely ignores the definition of "Excluded Assets" as set forth in Section 2.2 of the APA.

f) Paragraph 7, Sentence 2: To the best of ONE's knowledge, none of the remaining files contained in the file cabinets constitute Purchased Assets, and none of the data removed from the "F: Drive" that has not been returned to AML constitutes Purchased Assets.

g) Paragraph 8, Sentences 1-2: As noted above, the Eclipse information and data constituting Purchase Assets has been transferred to AML (with the exception of the data in the Human Resource cabinets to be reviewed) and neither the APA nor the TSA mandates an audit. ONE believes it has been abiding by the process outlined in the TSA and has endeavored to work with the independent party and the other liaisons identified therein to efficiently and effectively resolve the outstanding issues without the added expense of an auditor. As noted above, AML hired former EAI employees who know (or should know) if there was any missing data or information constituting Purchased Assets,



January 19, 2021
Page 8

and ONE believes that the audit AML requires will be tantamount to a fishing expedition that will lead to further disputes over perceived responsive documents and further litigation.

h) Paragraph 9, Sentence 2:  ONE has complied with the terms of the TSA.   Notably, AML has not complied with TSA on several points including, but not limited to:

  i)  Failure to pay its 50% share of the independent representative's cost.
  ii)  Failure to acknowledge that Debtor Data (including Debtor Data on ONE's computer servers) does not constitute Purchased Assets in accordance with Paragraph 2 of the TSA.
  iii)  Failure to "not access the Debtor Data and to transfer the Debtor Data to the Debtors or as directed in writing by the Debtors." TSA ¶ 2.

i) Paragraph 9, Sentence 3:  The conclusion made in the third sentence that ONE management is activing trying to undermine the sale is simply not true and unsupported given the extent of assistance ONE has provided, as cited in Section 2, Cooperation, above.  As noted above, ONE's management has worked to ensure that the asset transfer process is completed properly, and, consistent with its fiduciary duty to stakeholders and other legal obligations, that only Purchased Assets are conveyed to AML.  Conveying Excluded Assets (which AML did not purchase) would be inconsistent with ONE's legal obligation to obtain the best possible price for its assets and to protect confidential information.

\*        \*        \*

As noted earlier, ONE proposed (and AML agreed to) the asset separation process outlined in the TSA in an effort to prevent further disputes with AML regarding the TSA.  Unfortunately, ONE believes this effort has not been successful, due to, among other things, AML's continued failure to appreciate the meaningful distinction between Excluded Assets and Purchased Assets under the APA.  Indeed, I understand that there have been several instances in which AML personnel has stated to ONE that they do not understand the APA or have not read it at all.

In light of the clear language of the APA and ONE's demonstrated cooperation as set forth herein, ONE respectfully requests that Your Honor: (i) enforce the APA and TSA and determine that AML is not entitled to the additional information and data AML seeks (subject to AML providing ONE key access to the Human Resource cabinets and a review of the files therein); (ii) require AML to reimburse ONE for 50% of the costs associated with the TSA that it has failed to cover to date; and (iii) require AML to pay customary and reasonable hangarage fees for the storage of Aircraft N506EA (X107) from December 1, 2020 through January 11, 2021.

Sincerely,

*/s/ Chris L. Dickerson*
Chris L. Dickerson, Esq.



January 19, 2021
Page 9


cc:    Gary L. Kaplan, Esq. Gary.Kaplan@friedfrank.com
       Matthew C. Rowe, Esq. Matthew.Rowe@friedfrank.com
       Laura Davis Jones, Esq. ljones@pszjlaw.com
       Mary Caloway, Esq. mcaloway@pszjlaw.com
       Wojciech F. Jung, Esq. wjung@lowenstein.com
       Bruce Buechler, Esq. bbuechler@lowenstein.com

**EXHIBIT A**

**Jon Hansen**

| | |
|---|---|
| **From:** | Jon Hansen <jon.hansen@oneaviation.aero> on behalf of Jon Hansen |
| **Sent:** | Friday, December 11, 2020 1:46 PM |
| **To:** | Mike Press |
| **Cc:** | Carol LaRotonda; Mike Hinton; Alan Klapmeier; Jackie LaGesse |
| **Subject:** | RE: Finance data question |

Mike,

We take our responsibility to transfer the assets due to AML Global as set forth in the asset purchase agreement seriously and we are working diligently to that end. It is important to note that AML Global did not purchase the company, but rather those specified assets. Section 2.2 court approved Asset Purchase Agreement specifically states that ONE Aviation, in no event, shall be deemed to sell, transfer, assign, or convey, and ONE Aviation shall retain all right, title and interest to Excluded Assets. For assets not purchased, ONE Aviation has the responsibility to maintain proper custodial care, protect confidential information and to defend against any future claims.

As such, we will deliver the documents that are due to AML Global as is our responsibility. In addition to the files transferred previously this week, we will transfer the remaining files due early next week. Those will include the Accounts Payable documents for the assumed contracts. After those are transferred, there will be no other documents due to AML Global. It should also be noted that AML Global is already in possession of the electronic Accounts Payable data in SAP.

After you receive the remaining files due to AML Global and if there are documents you believe are still due to AML Global, please list those specifically and we will respond to those specific requests. We ask that you review the appropriate sections of the asset purchase agreement before making such requests, in order to avoid unnecessary and frivolous discussion on items excluded such as the accounts receivable files that you have previously requested.

The above is also applicable to the electronic files on the "F" drive and the hard copy files in Sheila's, Uruj's and Jennifer's desks, where the files that are ONE Aviation's, including bank records, ONE Aviation corporate financial records, bank accounts, credit card information, tax documents, bankruptcy related items, and AP not assumed etc. were removed are not the property of AML Global.

As noted above in the excluded assets, 2.2(c) specifically excludes all Documents and personnel records from being shared with the Purchaser (AML Global). In keeping with the executed Aircraft Purchase Agreement, employee documents and records will not be shared.

Sincerely,

**Jon Hansen**
Vice President, Operations | **ONE Aviation**
Office: 505.724.1773| Mobile: 505.350.1224
e-mail: jon.hansen@oneaviation.aero

**From:** Mike Press [mailto:mike.press@eclipse.aero]
**Sent:** Thursday, December 10, 2020 3:22 PM
**To:** Jon Hansen
**Cc:** Carol LaRotonda; Mike Hinton; Alan Klapmeier
**Subject:** Re: Finance data question

**EXHIBIT B**

**Jon Hansen**

| | |
|---|---|
| **From:** | Jon Hansen <jon.hansen@oneaviation.aero> on behalf of Jon Hansen |
| **Sent:** | Tuesday, December 1, 2020 8:01 AM |
| **To:** | Mike Press |
| **Subject:** | Fwd: FW: Fire Suppression Systems |
| **Attachments:** | 2020-09-02 Fire Suppression Systems - Notice of Allowance and Fees Due.pdf |

Mike,

This is something you need to consider today or no later than tomorrow.  There is one more e-mail in this string that I will forward to you.

**Jon Hansen**

Vice President, Operations | **ONE Aviation**

Office: 505.724.1773| Mobile: 505.350.1224

e-mail: jon.hansen@oneaviation.aero

---------- Forwarded message ---------
From: **Patrick M. Bergin** <pbergin@vonbriesen.com>
Date: Wed, Nov 25, 2020 at 2:09 PM
Subject: FW: Fire Suppression Systems
To: Jon Hansen <jon.hansen@oneaviation.aero>

Jon,

At this point, I assume that we are simply paying the issue fee and not filing a new continuation, but please confirm your intentions.  The issue fee is due December 2, 2020, which is also the last day to file a new continuation application.

Happy Thanksgiving!

Pat

**Patrick M. Bergin | Attorney**
**von Briesen & Roper, s.c.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202

Direct: 414-287-1505
Fax: 414-238-6594
pbergin@vonbriesen.com | vcard | bio
vonbriesen.com

**From:** Patrick M. Bergin
**Sent:** Monday, October 26, 2020 5:10 PM
**To:** 'Jon Hansen' <jon.hansen@oneaviation.aero>
**Subject:** FW: Fire Suppression Systems
**Importance:** High

Hello Jon,

Just a reminder on this.

Thanks,

Pat

**Patrick M. Bergin | Attorney**
**von Briesen & Roper, s.c.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202

Direct: 414-287-1505
Fax: 414-238-6594
pbergin@vonbriesen.com | vcard | bio
vonbriesen.com

**From:** Patrick M. Bergin
**Sent:** Friday, September 18, 2020 3:16 PM
**To:** 'Jon Hansen' <jon.hansen@oneaviation.aero>
**Subject:** FW: Fire Suppression Systems
**Importance:** High

Hello Jon,


I'm attaching the Notice of Allowance and Fees Due in connection with the Fire Suppression System patent application.  Per our earlier discussions, the Issue Fee is due December 2, 2020.  This will also be the deadline to file a continuation application based on this application.  In order to have time to prepare a continuation application, we will need your instructions on or before November 15, 2020.


We look forward to hearing from you.


Best,

Pat




**Patrick M. Bergin | Attorney**
**von Briesen & Roper, s.c.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202

_____

Direct: 414-287-1505
Fax: 414-238-6594
pbergin@vonbriesen.com | vcard | bio
vonbriesen.com

**From:** Chad Azzaline
**Sent:** Thursday, September 3, 2020 11:27 AM
**To:** Patrick M. Bergin <pbergin@vonbriesen.com>
**Subject:** Fire Suppression Systems
**Importance:** High


Pat,


Please find attached the Notice of Allowance and Fees due for the patent Fire Suppression Systems.


The $500 fee is due by December 2, 2020.

Thanks

**Chad Azzaline | Paralegal**
**von Briesen & Roper, s.c.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202

---

Direct: 414-287-1244

Cell: 414-708-6451
Fax: 414-238-6631
cazzalin@vonbriesen.com | vcard | bio
vonbriesen.com

---

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

**EXHIBIT C**

**Jon Hansen**

| | |
|---|---|
| **From:** | Mike Press <mpress@spjets.com> on behalf of Mike Press |
| **Sent:** | Wednesday, December 2, 2020 9:56 AM |
| **To:** | Jon Hansen |
| **Cc:** | Carol LaRotonda |
| **Subject:** | Re: FedEx ACH |

Thanks Jon

*Regards,*

*Mike*

Mike Press
**SPJ Consulting**
314-277-6890
mpress@spjets.com

---

**From:** Jon Hansen <jon.hansen@oneaviation.aero>
**Sent:** Wednesday, December 2, 2020 10:30 AM
**To:** Mike Press <mpress@spjets.com>
**Cc:** Carol LaRotonda <carol.larotonda@oneaviation.aero>
**Subject:** FedEx ACH

Mike,

Please see below to confirm our phone conversation this morning.

One of the actions AML Global should take right away is to set up a new FedEx account.  We are approving an ACH payment today, but that will be the last ACH payment we approve.

Sincerely,

**Jon Hansen**
Vice President, Operations | **ONE Aviation**
Office: 505.724.1773| Mobile: 505.350.1224
e-mail: jon.hansen@oneaviation.aero

PROPRIETARY INFORMATION. All information and data contained herein are the property of ONE Aviation Corp. and/or its subsidiaries, Eclipse Aerospace Inc. and Kestrel Aircraft Corp., and are not to be duplicated or disclosed to others for any purpose without the consent of ONE Aviation Corp., Albuquerque, NM. If you are not the intended recipient, please delete this email immediately.

This email may contain commodities, technology or software exported from the United States in accordance with the Export Administration Regulations. These commodities, technology or software are intended for use only in the End User's country. An export license from the U.S. Department of Commerce may be required before these products can be

re-exported, transferred, transshipped on a non-continuous voyage, or otherwise disposed of in any other country, either in their original form or after being incorporated into an end item. Diversion of this end-item or its use contrary to any applicable U.S. government license or to U.S. law is prohibited.