**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| ONE AVIATION CORPORATION, *et al.*, | Case No. 18-12309 (CSS) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: 8/17/21 @ 10:00 a.m. (ET)** |
| | **Obj. Deadline: 7/27/21 @ 4:00 p.m. (ET)** |

**OBJECTION BY CITIKING INTERNATIONAL US LLC**
**TO CLAIM OF AML GLOBAL ECLIPSE LLC**

Citiking International US LLC ("Citiking"), by its undersigned counsel, hereby files this Objection to the allowance of any claim asserted by AML Global Eclipse LLC ("AML") against the above-captioned debtors (the "Debtors") or their estates, and respectfully states as follows:

**Preliminary Statement**

1.      The Debtors brought these cases to their conclusion in chapter 11 by overseeing the expedited sale of the Debtors assets for $5.25 million (the "Purchase Price") to AML (the "Sale"). At least two aspects of the Sale process were remarkable.  First, by strategic design and agreement achieved through coordination among key parties, the Purchase Price AML paid to the Debtors was entirely an illusion.  AML secretly planned to acquire the secured debt and lien position owned by DWC Pine Investments I, LTD ("DW"), a major secured creditor of the Debtors under the Pre-Petition Credit Agreement, and re-take the entirety of the Purchase Price as a new first lien lender.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: ONE Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986). The Debtors' corporate headquarters is located at 3250 Spirit Drive SE, Albuquerque, NM 87106.

After funding the Carve Out for estate professionals, the estate would be left with net $0 cash. Second, AML was introduced to the Court as a potential bidder interested only in acquiring the Debtors' assets with an upfront deposit of the total cash consideration for the Sale. Accordingly, there is no valid business reason for AML, after it was announced as the successful bidder at the Sale Hearing, to then *post-Sale* acquire the secured indebtedness of DW unless there was a greater arrangement among key parties never disclosed to the Court. Why would the successful buyer of assets devote additional cash consideration to buy into a litigation concerning lien priorities on Sale proceeds? How much did AML pay DW to acquire its debt and lien position? More or less than the amount of Sale proceeds less the Carve Out?

2. One possible explanation is that there was a deal among key parties to lock in AML as the successful bidder. The deal required very atypical Bidding Procedures that mandated any Qualifying Bids to be all cash upfront; *i.e.,* no credit bidding. That deeply prejudiced Citiking but also impacted DW, a potential credit bidder. The prejudice to DW was remedied, however, by AML agreeing to acquire DW's debt if it was the successful bidder. Excluding credit bidding and requiring an all cash bid also ensured that the Carve Out to pay professionals was funded.

3. The first step in this scheme was to deprive Citiking of its right to credit bid, a fundamental right of all secured creditors embodied in section 363(k) of the Bankruptcy Code. Credit bidding serves several purposes. It reduces the amount of secured debt against the debtor and its estate and may be used to spark competitive bidding. It also permits a secured creditor to protect against the sale of its collateral for too low a value. In derogation of Citiking's section 363(k) rights, the Bidding Procedures promulgated by the Debtors required that any Qualifying Bid must satisfy the requirement of delivering to the Debtors a Cash-Consideration Deposit "***by a certified or bank check or wire transfer in immediately available funds, in the amount of the***

***total cash consideration contemplated by the Qualified Bid***"; *i.e.,* be "all cash." Bidding Procedures at ¶ 3(c). This excluded Citiking—and DW—from credit bidding, and chilled competitive bidding from third parties.

4. But at the same time the Debtors and AML were discussing Bidding Procedures, AML, upon information and belief, was negotiating with DW to acquire post-Sale DW's secured debt position if AML was the successful bidder. To the extent there were discussions, these are two bidders working together to lock up the outcome of the Sale. AML was making an all cash bid; DW had the right to credit bid. Instead of bidding against each other, they worked together. It appears that AML bought DW's acquiescence to Bidding Procedures and the Sale. This injured the estate at least by the amount AML paid DW after the Sale.

5. Although the AML deal was touted as bringing cash into the estate,[2] the deal was never structured to bring any net cash into the estate. When all of the facts are surfaced, it appears the deal was structured so that Sale Proceeds would fund the Carve-Out with the remainder making a round trip back to AML. This arrangement—no credit bidding, an all cash upfront bid and AML owning DW's secured debt—reflects a deal struck by key parties to appease and silence DW, chill competitive bidding, lock in the sale to AML and pay professionals. The net effect was injury to the estate's creditors, especially Citiking.

6. The foregoing allegations raise a number of unanswered and troubling questions that should be brought to light through discovery. When did AML begin negotiations to acquire DW's position? If DW is considered a potential bidder for purposes of section 363(n) of the

---

[2] *See* November 20, 2020 Hearing Transcript ("Tr."), attached hereto as **Exhibit A**, at 24:3-11 ("[T]he proposed sale should be approved because they satisfy the requirements of the bankruptcy code and are in the best interest of the debtor's estates. . . . Just as a reminder that is $5.25 million in cash from AML subject to certain purchase price adjustments plus about a million dollars in cure costs.").

3

Bankruptcy Code in connection with the Sale by reason of its secured claim and right to credit bid, does whatever agreement that was struck between DW and AML violate section 363(n)? [3] When did the Debtors know that DW would not object to Bidding Procedures that disallowed credit bidding because it was secretly selling its debt and lien position to AML? [4] Should the consideration that DW received directly from AML that, upon information and belief, was paid to silence DW, been included in the Purchase Price? Did the Debtors' board of directors have any discussions/agreements with AML concerning carving out funds from the Sale Proceeds to pay board of directors' fees? [5] If AML worked *sub silentio* with DW to lock up Bidding Procedures/the Sale, and chill competitive bidding, should the Sale be set aside pursuant to section 363(n)?

7.     Subject to discovery, AML should not be rewarded for its conduct in the Bidding Procedures/Sale process, and any claim acquired from DW that AML now seeks to assert against the Sale proceeds should be disallowed or at least equitably subordinated. Citiking objects to

---

[3] Section 363(n) provides:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n).

[4] Absent a deal, DW ordinarily would be expected to protect its rights in and to the collateral it shared with Citiking as co-Lenders under the Pre-Petition Credit Agreement.

[5] There is evidence the Board was trying to get their fees paid ahead of creditors with superior or equal rights in the Sale proceeds and therefore may have suffered from a conflict of self-interest in connection with Bidding Procedures/the Sale. *See, e.g.,* AML's January 4, 2021 Letter to the Court [D.I. 1081] ("the [Debtor], through its counsel, tried to make a trade for audit rights in exchange for AML agreeing to allocate a portion of sale proceeds to which it is entitled (by virtue of AML having acquired all of the first priority senior secured debt previous held by DW Partners, LP in November 2020) to pay a portion of the Company's administrative expense claims, **including unpaid board of directors' fees**") (**emphasis** added).

AML's secretly acquired secured claim for several reasons. <u>First</u>, AML's acquired claim should be equitably subordinated. The atypical all cash Bidding Procedures and the shadow nature of the true deal structure calls into question findings of fact requested by the Debtors and made in connection with the Sale. How can the Sale be in the "best interests of creditors" or in "good faith" when certain parties were orchestrating the result of *no* net financial benefit to the estate, except professionals? How can AML be deemed a "good faith purchaser for value" when the cash consideration it paid DW—to buy DW's silence—should have been part of the cash consideration paid *to the Debtors*, subject to the Lien Priority Dispute (defined below). AML bought DW's lien position at the expense of the estate.

8.      <u>Second</u>, Citiking and DW had a co-lending business relationship defined by certain contracts: (a) the Pre-Petition Credit Agreement and (b) the Intercreditor Agreement (later defined). The Intercreditor Agreement contains a right of first refusal with respect to the sale of debt under the Pre-Petition Credit Agreement that serves several purposes, one of which is to allow each lender to have some control over who becomes a new lender under the Pre-Petition Credit Agreement. DW's unilateral sale of its secured debt position to AML violated Citiking's right of first refusal under the Intercreditor Agreement. DW's unilateral sale of its secured debt position to AML also violated the Pre-Petition Credit Agreement. Upon information and belief, DW did not comply with provisions of the Pre-Petition Credit Agreement governing the assignment of its lending position or AML becoming a participant in the Pre-Petition Credit Agreement.

9.      <u>Third</u>, following the Sale, AML ignored applicable rules of bankruptcy procedure and public disclosure concerning its acquisition of DW's debt. For example, AML failed to file a Notice of Transferred Claim pursuant Bankruptcy Rule 3001(e)(4) confirming as a matter of public

record it purportedly had acquired the secured debt of DW.  After the conversion of the cases to chapter 7, AML also failed to file a Proof of Secured Claim pursuant to Rule 3002(a).

10.  AML participated with others to create a process that injured the bankruptcy estate. That process included AML agreeing to pay cash post-sale directly to DW, a potential credit bidder.  With that assurance in place, there was no need for DW to credit bid to protect its rights at the Sale Hearing and DW also avoided the Lien Priority Dispute.  That arrangement also provided the opportunity for the Debtors to require all cash Bidding Procedures; *i.e.,* eliminating Citiking's right to credit bid and chilling competitive third party bidding.  AML submitted a bid that was illusory and never was intended to provide a net benefit to the estate.  This conduct was employed to ensure AML was the successful bidder and the estate was injured.  The Court should not reward AML for its conduct and any secured claim AML now purports to assert either should be expunged or equitably subordinated.  Further, the money paid to DW should be remitted to the estate.

### Relevant Background

11.  The Debtors were engaged in the business of providing aircraft services and upgrades, aircraft remanufacturing, and new aircraft manufacturing and sales.

12.  ***The Credit and Security Agreement.***  Pursuant to that certain *Credit and Security Agreement* dated as of July 20, 2012 (as amended, the "Pre-Petition Credit Agreement"),[6] by and among Eclipse Aerospace, Inc. and Brigadoon Aircraft Maintenance, LLC, as Borrowers, ONE Aviation Corporation as Guarantor, the lenders party thereto from time to time, and Cantor Fitzgerald Securities, as Administrative Agent and Collateral Agent, the Debtors obtained a (i)

---

[6] All referenced documents herein are voluminous and available on the docket.  A copy of the documents will be provided upon written request therefor by a party in interest.

term loan (the "Prepetition Term Loan") and (ii) a revolving line of credit (the "Prepetition Revolver," together with the Prepetition Term Loan, the "Prepetition Senior Debt"). To secure repayment of the debt, the Debtors entered into security documents granting first-priority liens on substantially all of their assets (the "Credit Agreement First Liens").

13. DW owned all of the secured debt under the Pre-Petition Credit Agreement at one point in time. Citiking purchased two separate tranches of the Prepetition Senior Debt at different points in time.

14. **The First Tranche.** Pursuant to that certain *LSTA Purchase and Sale Agreement for Distressed Trades* dated November 10, 2017 ("First Tranche PSA"), Citiking acquired from DW half of the Prepetition Term Loan in the amount of approximately $21 million. Citiking paid DW in full for the purchase and sale of this first tranche of secured debt. The sale of the first tranche did not include any portion of the Prepetition Revolver. Thereafter, Citiking and DW, on a 50-50 basis, began funding the Prepetition Revolver on a senior secured basis. Eventually, DW ceased funding the Prepetition Revolver. Citiking continued to fund.

15. **The Second Tranche.** Citiking also agreed to purchase from DW a second tranche of senior secured debt pursuant to that certain *LSTA Purchase and Sale Agreement for Distressed Trades* dated July 10, 2018, consisting of the remaining fifty percent (50%) of the Prepetition Term Loan in the amount of approximately $23.2 million, plus all of the Prepetition Revolver owed to DW in the amount of approximately $2.8 million. In total, Citiking, acquired an additional face amount of $26,105,837.15 in senior secured debt. Citiking's acquisition of the second tranche is disputed by DW.

16.     ***The Intercreditor Agreement.***   Citiking and DW also entered into that certain *Intercreditor Agreement* dated November 10, 2017.[7]   The Intercreditor Agreement defines each of Citiking and DW as a Lender under the Pre-Petition Credit Agreement, and describes their business relationship as co-Lenders to the Debtor.   The preamble to the Intercreditor Agreement provides that DW and Citiking will "cooperate in making decisions from time to time with respect to the Borrowers and the Credit Agreement and wish to agree on how certain issues will [be] handled . . . ."   The Intercreditor Agreement identifies those issues and then details the agreement how they are to be handled.

17.     ***Right of First Refusal***.   One key issue in the *Intercreditor Agreement* relevant to this Objection is the agreement by and between DW and Citiking limiting the right to exit the Pre-Petition Credit Agreement by selling their respective debt to a third-party.   Toward that end, section 5 of the Intercreditor Agreement provides:

> Notwithstanding anything to the contrary contained in the Credit Agreement, except in connection with a sale pursuant to Section 4 of this Agreement, **each Lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title and interest in an to the Obligations or the Loan Documents from an unaffiliated third party (the "Third Party Purchase Offer") to become a lender under the Credit Agreement pursuant to Section 14 of the Credit Agreement prior to accepting the Third Party Purchase Offer, the receiving Lender shall make an offer in writing to the other Loan Party (the "ROFR") to enter into the same purchase and sale transaction on the same terms as the Third Party Purchase Offer.** The ROFR Party shall have three (3) business days to accept or reject the offer.   Anything in this Agreement or in the Loan Documents to the contrary notwithstanding, (i) each Lender Party hereby agrees that either Lender may, subject to the terms of this Agreement, assign and delegate to any of its managed funds and accounts or its respective affiliates (to the extent such Persons would be permitted assignees pursuant to the terms of the Credit Agreement) any of its rights and obligations acquired by either

[7] A true and correct copy of the executed Intercreditor Agreement is attached hereto as **Exhibit B.**

Lender as a result of its exercise of its rights pursuant to this Section 5."

Intercreditor Agreement at § 5 (**emphasis** added).  DW did not provide Citiking a ROFR before selling its debt to AML.

18.    *Citiking Provides DIP Financing.*  On October 9, 2018, Citiking, as DIP Lender, entered into certain *Senior Secured Superpriority Debtor in Possession Credit and Security Agreement* [Docket No. 208, Ex. 1] (the "<u>DIP Facility Agreement</u>") with Eclipse Aerospace, Inc. and Brigadoon Aircraft Maintenance, LLC, as Borrowers and the Debtor as Guarantor.   On November 27, 2018, the Court entered the *Final Order (I) Authorizing Debtor Borrowers to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(3), 364(d)(1) and (364)(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (III) Granting Related Relief* (the "<u>Final DIP Order</u>").  Pursuant to the Final DIP Order, the Court authorized the Debtors to obtain a senior secured super priority revolving loan facility (the "<u>DIP Facility</u>"), consisting of a superpriority revolving loan facility with commitments to lend up to approximately $19.1 million, and such other financial accommodations, allocated as follows: (i) a superpriority priming new money revolving facility with commitments to lend up to approximately $8.0 million (the "<u>DIP New Money</u>"); and (ii) roll up loans in the amount of approximately $11.13 million (the "<u>DIP Roll-Up</u>").  Final DIP Order ¶ Preamble (ii).  Citiking funded all required DIP lending

obligations under its DIP Facility to the Debtors and any obligation to fund terminated on or before July 12, 2019.[8]

19. ***The Waterfall Analysis***. In the wake of Citiking buying the First Tranche, the dispute over the Second Tranche, the DIP Financing and Roll Up, there was the potential for a lien priority dispute by and between Citiking and DW (now AML) (the "<u>Lien Priority Dispute</u>"). At Citiking's request, the Debtor's law firm provided to Citiking a waterfall analysis of the distribution of cash proceeds resulting from the liquidation of the Debtors' assets based on the relative lien priorities.[9]

20. ***The Proposed Sale and Bidding Procedures***. On October 20, 2020, the Debtors filed their *Motion for Entry of Order (I) Approving Purchase Agreement, (II) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (III) Granting Related Relief* [D.I. 969] (the "<u>Sale Motion</u>") seeking to sell substantially all of the Debtors' assets

---

[8] As explained at the November 17, 2020 hearing, Citiking's obligation to fund under the DIP Facility Agreement was limited by time and amount. Pursuant to the DIP Facility Agreement, Citiking agreed to loan "from time to time during the **Availability Period** in an aggregate amount not to exceed at any time outstanding the amount of the Revolving Commitment." DIP Facility Agreement at § 2.1(a). Here, the Revolving Commitment was $8 million. *Id.*, Schedule 1.1(b). While Citiking funded more than that amount, Citiking had no obligation to do so. Citiking also only agreed to fund during the Availability Period, defined as "the time period from and including the Closing Date [of the DIP] to the Termination Date. *Id.*, Schedule 1.1(a), at p. 3. The Termination Date is the *earliest* of the following four events:

> (i) January 31, 2019 (the date described in this clause (i) being the "Maturity Date"); provided that the Maturity Date may be extended upon written consent by the Lender,
>
> (ii) the date Borrowers terminate the Revolving Commitment pursuant to Section 2.11,
>
> (iii) the date the Revolving Commitment is terminated pursuant to Sections 10.1 and 10.2 following an Event of Default, or
>
> (iv) the Consummation Date (the earliest of these dates, the "Termination Date").

*Id.* at § 2.9. The Maturity Date, as extended, occurred no later than July 12, 2019.

[9] A copy of the waterfall analysis is attached hereto as **<u>Exhibit C</u>**. A motion to file under seal the waterfall analysis was previously filed at D.I. 989.

to AML.  On November 10, 2020, the Debtors filed the *Notice of Revised Bidding Procedures* [D.I. 1040] (the "Bidding Procedures").

21.  ***The Debtors' Bidding Procedures for the sale of the Debtors' assets to AML did not permit Credit Bidding.***  To be considered a Qualified Bid, the Bidding Procedures required, among other things, the bidder must make (i) a $500,000 Good Faith Deposit … and (ii) a Cash-Consideration Deposit "***by a certified or bank check or wire transfer in immediately available funds, in the amount of the total cash consideration contemplated by the Qualified Bid***," on or prior to November 11, 2020, at 5:00 p.m. (Eastern Time) (the "Bid Deadline").  Bidding Procedures ¶¶ 3(b)-(c).  In other words, Citiking, which was owed in excess of $77 million in secured debt, and had sought to acquire the Debtors' business from before the petition date, was prohibited from credit bidding for the assets and thereby prohibited from protecting against the sale of its collateral for too low a purchase price.  The Bidding Procedures were not approved by the Court in advance of the Sale hearing so Citiking did not have a meaningful opportunity to object.  In an attempt to justify the "all-cash" bid requirement, the Debtors stated at the Sale Hearing that the revised Bidding Procedures was "in reaction to AML's bid and offer to put their entire cash purchase price into escrow" and therefore "it was appropriate to require all of the potential bidders to do the same in order to evaluate them on an equal footing."  *See* Tr. (Ex. A) at 44:22-45:2.  The consequence of an all-cash bid requirement, however, was far from putting bidders on equal footing and now appears to entirely serve AML, DW and estate professionals' self-interest.  James Carroll, the Debtors' director, testified at the Sale hearing that "[t]he debtors ultimately did not receive any other qualified bids for their assets including **because no other prospective purchaser was willing to put its purchase price in escrow**."  *Id.* at 22:8-11 (**emphasis** added).

22.    ***DW's Limited Disclosure of its Deal with AML at the Sale Hearing.***  The hearing

to consider approval of the Sale to AML was held on November 20, 2020 (the "<u>Sale Hearing</u>").

Just minutes into the Sale Hearing, counsel to DW made the following statement:

> Your Honor, while I don't think I have an obligation, I do want to
> disclose to you and the court just by way of disclosure just within
> the last hour or so we were able to document our sale of our debt to
> AML subject to closing of - - subject to entry of a sale order. Again,
> I think that is a private transaction, but I didn't want it later to be
> said that the court was unaware of that. I am not sure it's particularly
> relevant to today.
>
> We do hold the debt. I think we can take the position we're taking,
> but I wanted the court to be aware of that.

*See* Tr. (Ex. A) at 14:14-24.  Counsel for AML appeared at the Sale Hearing but said nothing about

AML's purchase of DW's debt.

23.    Counsel's statement raises questions concerning the integrity and transparency of

the Sale process.  Again, what valid business reason exists for a successful bidder to acquire

secured debt *after the Sale* unless it was part of a larger agreement?  Why would a successful

bidder seek to acquire a lien on its own Sale Proceeds or buy into a litigation; *i.e.*, the Lien Priority

Dispute?  When did discussions about this "private transaction" first occur and who was involved?

Why was a transaction between AML, the successful bidder, and DW, a potential bidder by reason

of its credit bid, not disclosed earlier in connection with Bidding Procedures?  Does DW's

agreement to sell its debt to AML constitute collusion under section 363(n)?  How could DW sell

its debt to AML without violating the ROFR?  Why should the structure of this transaction be

blessed by the Court when the intended result is net $0 to the estate?  Why should the consideration

paid to DW by AML not be viewed as consideration that should have been paid to the estate?

24.    The Debtors' assets were sold for $5.25 million to AML by Order dated November

20, 2020 and the Sale proceeds remain subject to the Lien Priority Dispute.

25.     ***The Cash AML Paid to DW Should Have Been Paid to the Debtors and Their Estates Subject to the Lien Priority Dispute.***  The Debtors touted AML as a bidder willing to put up an all cash bid for $5.25 million.[10]  The Debtors then adopted Bidding Procedures requiring any bid to deliver a Cash-Consideration Deposit "***by a certified or bank check or wire transfer in immediately available funds, in the amount of the total cash consideration contemplated by the Qualified Bid***,"[11]  *See* Bidding Procedures ¶ 3(c).  But the reality is that AML was willing to and did pay more, except that such consideration went directly to DW after the Sale.  Without explanation, and none was offered at the Sale Hearing except it was a "private transaction[,]" one reason is that AML was buying DW's cooperation in the Sales process.

26.     There was not a wisp of disclosure in connection with Bidding Procedures that AML surreptitiously would acquire DW's secured debt position to take back the entirety of its cash bid and leave the estate with net $0.  Nor was there any disclosure that AML agreed to pay DW an undisclosed amount if it was the successful bidder.  AML's purchase of DW's debt appears to be entirely strategic to lock up the Sale.  It appears AML's Qualified Bid did not remit all cash consideration to the Debtors and their estates, an unknown amount was paid directly to DW.  That amount should have been remitted to the Debtors and their estates subject to the Lien Priority Dispute.

27.     ***AML wants its cake and to it eat it too.***  AML's acquisition of DW's debt did not reduce on a dollar for dollar basis the secured indebtedness of the Debtors and provided no benefit

---

[10] *See* Tr. (Ex. A) at 44:22-45:2 ("And the reason that the bidding procedures were amended was in reaction to AML's bid and offer to put their entire cash purchase price into escrow.  And so, we felt that it was appropriate to require all of the potential bidders to do the same in order to evaluate them on an equal footing.").

[11] The requirement of an all cash bid had the effect of chilled bidding.  *See* Tr. (Ex. A) 22:8-11 (Mr. Carroll testified that "[t]he debtors ultimately did not receive any other qualified bids for their assets including because no other prospective purchaser was willing to put its purchase price in escrow.")

to the estate.  The purchase benefitted only DW, AML and estate professionals.  DW got cash

directly and avoided the Lien Priority Dispute.  AML locked in the Sale by appeasing DW, chilled

competitive third party bidding and eliminated Citiking's right to credit bid and block the Sale.

Estate professionals received cash to fund the Carve Out.[12]  The final insult is that AML wants the

remainder of the Sale proceeds back.  AML basically paid DW and estate professionals to acquire

the Debtor's assets.

28.     DW's disclosure at the Sale Hearing became more relevant to Citiking when an

exchange of letters between the Debtors and AML appeared post-Sale on the docket.  *See* D.I.

1081 and 1091.  In a letter dated January 25, 2021 [D.I. 1091], AML stated:

> Moreover, despite not permitting an audit of the files prior to their
> removal, in connection with broader discussions between AML and
> the Company over the past couple of weeks regarding distribution
> of proceeds from the sale to AML, **the Company, through its
> counsel, tried to make a trade for audit rights in exchange for
> AML agreeing to allocate a portion of sale proceeds to which it
> is entitled (by virtue of AML having acquired all of the first
> priority senior secured debt previous held by DW Partners, LP
> in November 2020) to pay a portion of the Company's
> administrative expense claims, including unpaid board of
> directors fees.**  In response to this "offer", AML made clear to
> Company counsel that AML is already contractually entitled to the
> audit pursuant to the TSA and would not discuss or consider
> allocation of sale proceeds until after AML completed an audit of
> the removed files.  In light of AML's response to the Company's
> horse-trading gambit, Company counsel informed AML that despite
> having agreed to the audit, the Company would no longer allow
> AML to conduct an audit of the missing files.

D.I. 1091 (**emphasis** added) (the "AML Letter").

---

[12] The Debtors' initial proposed conversion order provided no money to Citiking but funds going to: Professional Fees.  *See Proposed Order Converting the Debtors' Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy* [D.I. 1086-2] (the "Initial Conversion Order") at ¶ 3(a).

29.     The key takeaways from the AML Letter are:  (a) AML and the Debtors apparently engaged in discussions (without Citiking) how to direct the distribution of Sale proceeds [13] knowing full well the proceeds were subject to a Lien Priority Dispute and (b) the fiduciary duties of the Board of Directors continued to elude them as they tried to carve-out Board fees from Sale proceeds ahead of the Debtors' secured and other administrative creditors. [14]

30.     The purported transfer of DW's secured claim to AML was not recorded on the docket by AML as required by Bankruptcy Rule 3001(e)(4).

31.     DW never informed or obtained written consent from Citiking before selling its secured debt to AML and, therefore, violated Citiking's ROFR under the Intercreditor Agreement.

32.     On February 18, 2021, these cases converted to chapter 7 [D.I. 1152].

33.     On March 5, 2021, the Court entered a bar date notice, setting April 20, 2021 ("Bar Date") as the deadline to file a proof of claim.  AML did not file a proof of claim.

## OBJECTION

**A.      Any Secured Claim Acquired by AML from DW to Re-Take the Sale Proceeds should be Equitably Subordinated**

34.     Equitable subordination is a remedy developed under common law now codified in section 510(c) of the Bankruptcy Code.  It has as its purpose to remedy misconduct that results in injury to creditors.  Section 510(c) provides:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may … under principles of equitable subordination,

---

[13] *See* Second Revised Proposed Conversion Order [D.I. 1148-1] at ¶ 5 (dictate payments from to the Sale Proceeds to certain administrative claims such as Epiq Corporate Restructuring, LLC and JD Lockaway LLC.

[14] At the Sale Hearing, the Debtors' proffer on behalf of its director, Mr. James Carroll, stated that AML's offer is better because it included a significant cash portion *that can be used to pay expenses of administration*. *See* Tr. (Ex. A) at 22:12-25.  This makes no sense because the amount of cash the estate was receiving was not nearly sufficient to pay off all secured claims.

> subordinate for purposes of distribution all or part of an allowed claim to all
> or part of another allowed claim ….

11 U.S.C. § 510(c).

35.     The leading case on equitable subordination instructs that three elements must be satisfied: (a) the claimant must have engaged in some type of inequitable conduct, (b) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant, and (c) equitable subordination of the claim must not be inconsistent with other provisions of the Bankruptcy Code.  *See Citicorp Venture Capital Ltd v. Committee of Creditors holding Unsecured Claims (In re Papercraft Corp.)*, 160 F.3d 982, 986-987 (3d Cir. 1998) (citing *U.S. v. Noland*, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996)); *see also Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

36.     Here, AML worked with other key parties, including DW as a potential credit bidder, to lock up the bidding and Sale process.  AML's agreement to post the total amount of its cash consideration upfront was not intended to put all potential bidders on an equal footing.  It was intended to exclude other potential bidders from the Sale process.  AML's agreement to purchase DW's debt in a secret side deal was intended to sideline DW, so that DW would not need to protect its right to credit bid.  The Debtors' Bidding Procedures requiring Qualifying Bids to be the total cash consideration was intended to exclude Citiking from the Sale process.  Citiking was prohibited from credit bidding all or a portion of its $77 million secured position to either acquire its collateral or protect the sale value of its collateral as allowed by section 363(k).  AML's agreement with DW also was calculated for AML to re-take the entirety of its purchase price less payment of the fees of professionals through the Carve Out.  Taken together, AML's conduct was inequitable, and pursued to ensure the Sale was not a value maximizing transaction.  In fact, it resulted in no value, a net $0 to the estate.

37.     AML worked with other parties to chill bidding and lock up the Sale.  There was no valid business reason for AML, after it became the successful bidder, to purchase DW's debt *directly* and *after the sale occurred*.  DW wanted out of the credit and AML wanted to make sure DW did not object to the Sale.  AML did not acquire DW's claim for the purpose of credit bidding.  That would have opened the door for Citiking.  AML's conduct injured creditors and the estate by taking steps to ensure the Sale was not a value maximizing transaction.

38.     AML should not be rewarded for appearing to pay $5.25 million to the estate while all the while having a secret plan to take back all sale proceeds less payments to professionals.  The Court made critical factual findings to support the Sale that the Court might not have made if *all* relevant facts about the structure of the Sale were disclosed in connection with Bidding Procedures.  For example, with no net Sale proceeds, the Court might not have found the Sale to be in the best interests of creditors.

39.     Principles of equitable subordination require that any claims of AML against the Debtors or their estates acquired secretly from DW be equitably subordinated consistent with the provisions and purposes of the Bankruptcy Code.  Accordingly, the Court should equitably subordinate any and all claims of AML against the Debtors pursuant to 11 U.S.C. § 510(c) or, alternatively, they should be disallowed.

**B.      Because AML's Acquisition of DW's Secured Debt and Lien Position was Unlawful, any Claim Now Asserted by AML should not be Allowed.**

40.     The co-lending relationship between Citiking and DW in part was governed by the Intercreditor Agreement.  Section 5 of the Intercreditor Agreement governs the respective rights and obligations of the Lenders [Citiking and DW] if a Third Party—here, AML—sought to acquire all or a portion of either Citiking or DW's debt.  It provides the other Lender—here, Citiking—a Right of First Refusal, as follows:

> Notwithstanding anything to the contrary contained in the Credit Agreement, except in connection with a sale pursuant to Section 4 of this Agreement, each Lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title and interest in an to the Obligations or the Loan Documents from an unaffiliated third party (the "<u>Third Party Purchase Offer</u>") to become a lender under the Credit Agreement pursuant to Section 14 of the Credit Agreement prior to accepting the Third Party Purchase Offer, the receiving Lender shall make an offer in writing to the other Loan Party (the "<u>ROFR</u>") to enter into the same purchase and sale transaction on the same terms as the Third Party Purchase Offer. The ROFR Party shall have three (3) business days to accept or reject the offer. Anything in this Agreement or in the Loan Documents to the contrary notwithstanding, (i) each Lender Party hereby agrees that either Lender may, subject to the terms of this Agreement, assign and delegate to any of its managed funds and accounts or its respective affiliates (to the extent such Persons would be permitted assignees pursuant to the terms of the Credit Agreement) any of its rights and obligations acquired by either Lender as a result of its exercise of its rights pursuant to this Section 5."

Intercreditor Agreement at § 5.

41. Citiking alleges that DW breached the Intercreditor Agreement by agreeing to sell its debt to AML. In unilaterally and secretly selling its secured debt to AML, DW expressly violated the ROFR. The ROFR contractually obligated DW to provide notice to Citiking and allow Citiking to exercise its ROFR before offering it debt for sale to AML. DW never did this, and never informed Citiking of its intent to sell its debt to AML. AML wanted to sideline DW from Bidding Procedures and the Sale process and lock up the sale, and DW wanted to get out of the credit and avoid the Lien Priority Dispute. AML now seeks to benefit from its conduct and DW's breach. That conduct—which prejudiced Citiking and injured the estate—should not be rewarded equitably or contractually and AML's purported acquired claim should not be allowed. Citiking disputes that AML holds a first (or any) lien position with respect to the Sale proceeds and objects to AML asserting such a claim.

**C. DW Cannot Unilaterally Sell its Debt Position in the Pre-Petition Credit Agreement to AML**

42.     DW apparently believed it owned its debt on a standalone basis, and not through the Pre-Petition Credit Agreement, and could sell it as and when it saw fit.  This is not the case. The debt DW owned resulted from its participation in the Pre-Petition Credit Agreement as a lender and that agreement expressly restricted who could be a participant in the credit and the contractual steps that had to be cleared to become a lender.  Section 14 of the Pre-Petition Credit Agreement provides in relevant part:

> **14. ASSIGNMENTS; SUCCESSORS.**
>
> (b)     Lenders . . . may assign this Agreement and the other Loan Documents in whole or in part and its rights and duties hereunder to any one or more financial institutions or funds or companies or an agent or trustee for such financial institutions, entities, persons or funds or companies (an "<u>Assignee</u>") or grant participations to any one or more financial institutions or funds or companies or an agent or trustee for such financial institutions, entities, persons or funds or companies (a "<u>Participant</u>") in the Obligations hereunder and thereunder; **provided, however, any such assignment of interest in the Term Loans and Revolving Loans (and/or Revolving Allocations) by any Lender shall be accomplished by Lender providing to Borrowers and Agent a duly executed Assignment and Assumption Agreement identifying the Assignee and the amount of the Term Loan and Revolving Loan (and/or Revolving Allocation) being assigned, together with any existing Note (or a lost note affidavit in customary form) subject to such assignment, and payment of an assignment fee in the amount of $3,500 to the Agent (unless such fee is otherwise waived or reduced by Agent in its reasonable discretion).  Upon such execution, delivery, acceptance and recording by the Agent, from and after the effective date specified in each Assignment and Assumption Agreement, the Assignee thereunder shall be a party hereto and to the other Loan Documents and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder and thereunder and the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption Agreement, relinquish its**

**rights and be released from its obligations under this Agreement.**

Pre-Petition Credit Agreement at § 14(b) **(emphasis** added**)**. DW and AML did not comply with the Intercreditor Agreement and, upon information and belief, DW and AML also did not comply with the terms of the Pre-Petition Credit Agreement. AML should not be considered a participant or lender under the Pre-Petition Credit Agreement or a creditor of the Debtor or the estate. *See In re Woodbridge Grp. of Cos., LLC*, 590 B.R. 99 (Bankr. D. Del. 2018) (purported transfer of claim in violation of underlying debt instrument was void).

### D.  AML Failed to File a Notice of Transfer of Claim Pursuant to Rule 3001(e)

43.     Rule 3001(e) contains certain notification procedures designed to ensure that the Court and parties in interest have an accurate public record of the identity of claim owners. Proof of a transferred claim must be filed in accordance with Rule 3001. The Advisory Committee Note accompanying the 1991 amendments to Rule 3001 state that in the event there is an objection to the transfer, as Citiking does now, the "court's role is to determine whether a transfer has been made that is enforceable under nonbankruptcy law."

44.     AML ignored procedural rules that expressly require AML to file a Notice that it acquired a claim for security. Fed. R. Bankr. P. 3001(e)(4) provides:

> (4) Transfer of Claim for Security after Proof Filed. If a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security after the proof of claim has been filed, evidence of the terms of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 21 days of the mailing of the notice or within any additional time allowed by the court. If a timely objection is filed by the alleged transferor, the court, after notice and a hearing, shall determine whether the claim has been transferred for security. If the transferor or transferee does not file an agreement regarding its relative rights respecting voting of the claim, payment of dividends thereon, or participation in the administration of the estate, on motion by a party in interest and after notice and a hearing,

the court shall enter such orders respecting these matters as may be
appropriate.

Fed. R. Bankr. P. 3001(e)(4) (**emphasis** added).

45.     It should be noted that "failure to file notice of a transfer under Rule 3001(e) only affects the standing of the transferee as a creditor." *In re B.C. Enter., Ltd.*, 160 B.R. 827, 833 (Bankr. D. Ariz. 1993) (*citing Official Unsecured Creditors' Comm. v. Stein (In re SPM Manufacturing Corp.*), 984 F.2d 1305, 1314, n. 10 (1st Cir. 1993)). Here, AML failed to file a Notice and should not be viewed as a creditor the Debtor or its estate. DW and AML also acted in violation of the Intercreditor Agreement and Pre-Petition Credit Agreement and AML should not be entitled to assert an ill-acquired claim against the estate.

### E.     AML Failed to File a Proof of Claim

46.     The Rules of Bankruptcy Procedure were amended in December 1, 2017. As a result of the amendment, certain affirmative obligations were imposed on secured creditors to protect their right to distribution in a bankruptcy case. Specifically, Rule 3002(a) now requires a secured creditor to file a proof of claim. The Rule reads "[a] secured creditor . . . *must file a proof of claim* . . . for the claim . . . to be allowed . . . ." Fed. R. Bank. P. 3002(a) (*emphasis* added). Prior to the amendment, only general unsecured creditors and equity holders were required to file proof of claims or interests to be allowed. A "claim" is a right to payment, *see* 11 U.S.C. § 101(5), such as the right to payment AML seeks against its own Sale proceeds.

47.     AML purports to have acquired DW's secured claim. But, in so doing, AML ignored the Intercreditor Agreement, Rule 3001(e) and Rule 3002(a). Reviewing the public record, the Trustee and creditors would have no idea that AML is an alleged creditor. To assert its right to payment, AML was required, but failed to, file a proof of claim. *See* 11 U.S.C. § 501; Fed. R.

Bankr. P. 3002(a).  Perhaps AML elected not to because if it did it would have to attach the documentation by which it purportedly acquired DW's claim.

48.      The Court should not reward AML's misconduct, its failure to adhere to the terms of the Intercreditor Agreement or Pre-Petition Credit Agreement and ignoring important Bankruptcy rules concerning disclosure and notification.  At all relevant times, subject to discovery, AML schemed and/or colluded with DW to lock up the Sale process and thwart a competitive Sale process.  AML and DW diverted cash consideration away from the estate to potential bidder DW to buy its silence in the Sale process.  The funds AML paid DW should have been paid to the Debtors and their estates and made subject to the Lien Priority Dispute.  This inequitable and secret conduct resulted in injury to the Debtors and their creditors, especially Citiking.

## **RESERVATION OF RIGHTS**

Citiking reserves the right to amend this Objection, take discovery in connection with prosecuting this Objection and any response thereto.  Citing reserves the right to exercise all other rights and remedies including adding other causes of action if surfaced during discovery including bringing an action to set aside the Sale under section 363(n) and against DW for breach of contract and inequitable conduct.

*[Signature follows on next page]*

Dated: July 13, 2021
Wilmington, Delaware

Respectfully Submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE Bar No. 3995)
Zhao (Ruby) Liu (DE Bar No. 6436)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Tel: 302-777-1111
Email: rosner@teamrosner.com
Email: liu@teamrosner.com

*Attorneys for Citiking International US LLC*